# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

JONATHAN LEE;

ERIN LEE;

C.L., a minor, BY AND THROUGH
PARENTS JONATHAN and ERIN LEE
as next friends;

M.L., a minor, BY AND THROUGH
PARENTS JONATHAN and ERIN LEE
as next friends;

NICOLAS JURICH;

LINNAEA JURICH; and

H.J., a Minor, BY AND THROUGH
PARENTS NICOLAS and LINNAEA
JURICH as next friends,

Plaintiffs,

v.

POUDRE SCHOOL DISTRICT R-1,
Ft. Collins, Colorado; and,

POUDRE SCHOOL DISTRICT R-1
BOARD OF EDUCATION,

Defendants.

Civil Action No.: _____

---

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

---

## INTRODUCTION

1.     This civil rights action brought under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution seeks to reassert that parents, not the state, govern the direction of a child's education.

2.     The Plaintiffs are comprised of members of the Lee and Jurich families who each had children enrolled at a school located in the Defendant Poudre School District R-1, which is under the supervision of Defendant Poudre School District R-1 Board of Education (Defendants District and District Board of Education, together "PSD," "Defendant District," or "Defendants").

3.     Firmly established in its history and tradition, a parent's right to direct a child's education is one of the oldest liberties recognized by this Nation.

4.     The United States long ago rejected the notion that a child's education is in service to the state.

5.     When a child is educated, the moral and cultural values of one generation are passed down to the next, and so the concerns of the parents—not the state—are paramount in this process.

6.     The state defers to parents because the law presumes that parents, acting under the natural bonds of affection, act in the best interests of their children; the state may interfere with this relationship only upon a showing of unfitness on the part of the parents.

7.     The law recognizes that parents have a choice in pursuing public education or pursuing a separate path, and if this choice is to be meaningful, public schools must be transparent as to the curricula and activities that will form the child's education.

8.      This case is being brought because the Defendants knowingly and willfully implemented procedures designed to defeat this all-important goal of transparency, with horrific consequences for the Plaintiffs.

## JURISDICTION AND VENUE

9.      This action arises under the Civil Rights Act of 1871 (42 U.S.C. §§ 1983, 1988) and the First and Fourteenth Amendments to the United States Constitution.

10.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

11.     The Court has the authority to provide preliminary and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 65.

12.     Venue lies in the United States District Court for the District of Colorado because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Larimer County, Colorado. 28 U.S.C. § 1391(b).

## PARTIES

*Plaintiffs*

**The Lee Family**

13.     Jonathan Lee is the father of C.L. and M.L., and his parental rights were violated by the customs, policies, and practices of Defendants.

14.     Erin Lee is the mother of C.L. and M.L., and her parental rights were violated by the customs, policies, and practices of the Defendants.

15.     C.L. is the minor child of Jonathan Lee and Erin Lee. C.L. is a former student at Wellington Middle School ("WMS," now consolidated into Wellington Middle-High School, a school within the Defendant District) who was directly impacted by the unlawful customs, policies, and practices of the Defendants. At the time of the events that gave rise to this complaint, C.L. was in 6th grade.

16.     M.L. is the minor child of Jonathan Lee and Erin Lee. M.L. is a former student at Rice Elementary School ("RES," a school within the Defendant District) who was directly impacted by the unlawful customs, policies, and practices of the Defendants. At the time of the events that gave rise to this complaint, M.L. was in 1st grade.

17.     At all relevant times, every member of the Lee family lived within the geographic area served by the PSD system.

**The Jurich Family**

18.     Nicolas Jurich ("Nick") is the father of H.J., and his parental rights were violated by the customs, policies, and practices of Defendants.

19.     Linnaea Jurich is the mother of H.J., and her parental rights were violated by the customs, policies, and practices of Defendants.

20.     H.J. is the minor child of Nick Jurich and Linnaea Jurich. H.J. is a former student at WMS who was directly impacted by the unlawful customs, policies, and practices of the Defendants. At the time of the events that gave rise to this complaint, H.J. was in 6th Grade. (H.J., together with Jonathan Lee, and Erin Lee, C.L., M.L., Nick Jurich, Linnaea Jurich, collectively, the "Plaintiffs").

21.     At all relevant times, every member of the Jurich family lived within the geographic area served by the PSD system.

*Defendants*

22.     Poudre School District (R-1) is a K-12 public school district in Larimer County, Colorado. Poudre School District (R-1) manages the public schools in the city of Fort Collins, Wellington, Timnath, Loveland, Windsor, Laporte, and Livermore. Both RES and WMS (now consolidated as Wellington Middle-High School) are schools within Poudre School District (R-1).

4

23.     The Poudre School District, R-1, Board of Education is the elected governing body that sets policy and governance for the Poudre School District R-1. The Poudre School District, R-1, Board of Education presently has seven directors: Rob Petterson, President; Kristen Draper, Vice President; DJ Anderson; Jim Brokish; Nate Donovan; Carolyn Reed; and Jessica Zamora.

24.     At the time of the events that gave rise to this Complaint, WMS was in the Town of Wellington, Colorado, and was within and under the authority of Defendant PSD.

25.     At the time of the events that gave rise to this complaint, Kelby Benedict ("Benedict") served as the principal of WMS.

26.     At the time of the events that gave rise to this complaint, Jenna Riep ("Riep") served as an art teacher at WMS.

27.     At the time of the events that gave rise to this complaint, Kimberly Chambers was a substitute teacher in PSD who also worked with an organization, SPLASH, which was invited by agents of the Defendant District to address an after-school club at WMS.

## FACTUAL ALLEGATIONS

### Defendants Unlawfully Deprived Plaintiffs of their Constitutional Rights

*Overview*

28.     Through a school-sponsored after-school organization, the Genders and Sexualities Alliance ("GSA"), the Defendants introduced concepts of gender fluidity and various types of sexual attraction.

29.     PSD runs ten GSA clubs at its schools.

30.     No Defendant disclosed the GSA as part of Defendant's curriculum.

31.     Importantly, the Defendants engaged in a pattern and practice of keeping the GSA activities secret from parents.

32.     Not only were the GSA activities not disclosed to parents, the agents of the Defendant District who led the GSA meetings actively encouraged the children to treat the discussions as secret.

33.     In fact, the Defendants' agents suggested directly and individually to Plaintiff C.L and Plaintiff H.J. that discussing GSA materials at home with their families might not be safe.

34.     This warning about parental trustworthiness came without any determination by the Defendants, much less any tribunal, that the parents of the children attending these GSA meetings were unfit.

**Lee Family**

Plaintiff C.L.

35.     During the relevant period C.L. attended WMS, which a that time included grades six through eight.

36.     At the time, C.L. was a 12-year-old sixth grader at WMS.

37.     C.L. started at WMS in the fall of 2020, following her family's recent move to Wellington, Colorado.

38.     However, because of government shutdowns, classes were being held remotely, later increasing to two days a week in-person with masks.

39.     As a consequence, C.L. had not made friends at her new school.

40.     Jenna Riep was C.L.'s homeroom teacher and art teacher at WMS; she remains a PSD employee.

41.     Ms. Riep was the WMS staff sponsor of the school-sponsored GSA club.

42.     On May 4, 2021, Ms. Riep personally invited C.L. to attend that afternoon's GSA club meeting, describing it as an after-school club called the "GSA Art Club."

43.    According to the PSD website, there are no GSA Art Clubs in PSD. Upon information and belief, there never have been.

44.    Ms. Riep did not explain the acronym "G.S.A." for C.L., who was unaware that it stood for Genders and Sexualities Alliance; C.L. had to look it up upon her return home later that evening.

45.    Because C.L. is interested in art and is artistic, she hoped to attend.

46.    C.L. texted her parents and asked to be picked up later than usual to accommodate her attendance at what she thought would be an art club.

47.    Her parents, Plaintiffs Jonathan and Erin Lee, were happy to receive C.L.'s text message asking if she could attend the art club since they know of and encourage her artistic talent.

48.    C.L.'s parents were also excited that their shy daughter, who had not had much opportunity to make friends, was asked to become involved with school activities.

49.    Ms. Riep, along with Ms. Caitlin Delahunt a school counselor at WMS, invited Ms. Kimberly Chambers to be a guest speaker at the "GSA Art Club" on May 4, 2021, the date C.L. attended.

50.    Ms. Chambers, a part-time teacher with PSD, also runs an organization called "SPLASH," (Supporting Pride Learning and Social Happenings) which seeks to educate school aged children on topics of sexuality and gender identity..

51.    School-sponsored clubs at WMS are permitted to have guest speakers only if the guest speaker is approved by PSD's Teaching and Learning Department and/or the Language, Culture, and Equity Department.

52.   As WMS's GSA sponsor, Ms. Riep was accountable for the actions of any guest speaker at the GSA.

53.   PSD is also accountable for the actions of guest speakers, given that its Teaching and Learning Department and/or the Language, Culture, and Equity Department must approve guest speakers.

54.   In her talk on May 4, 2021, Ms. Chambers told the children that if they are not completely comfortable in their bodies, that means that they are transgender.

55.   Chambers also had the children discuss what sex or gender they were attracted to.

56.   Additionally, for children who "came out" as transgender, Ms. Chambers awarded prizes in the LGBTQ paraphernalia such as toys, flags, and other swag.

57.   Several students declared their transgender status in that meeting, and, feeling pressure to do the same and wanting to receive Ms. Chambers' prizes, C.L. did likewise.

58.   Ms. Chambers repeatedly emphasized to the children that it might not be safe to tell their parents what happened at the GSA meeting or to talk about transgender issues.

59.   Ms. Chambers suggested, however, that it would be safe to discuss these issues with Ms. Riep and herself.

60.   At the GSA meeting, Ms. Riep and Ms. Chambers discussed and educated the student attendees on the following topics:

a.   Polyamory;

b.   Suicide;

c.   Puberty blockers;

d.   Transgenderism and gender identities;

e.   Sexualities;

       f.   Changing names & pronouns; and

       g.   Keeping the discussions at GSA secret from parents.

61.    In an act that further inserted herself in the minds of the students as being more trustworthy than their parents, Ms. Chambers handed out her phone number and invited them to connect with her on Discord so that they could contact her at any time.

62.    Ms. Chambers also planted the notion of a higher likelihood of suicide by transgender youth.

63.    At the time of the statement, C.L. did not even fully understand what suicide is.

64.    Notably, no art-related activities were undertaken at GSA "Art" Club on May 4, 2021.

65.    The May 4th meeting of GSA ran for at least 90 minutes, which was longer than the most afterschool activities at WMS.

66.    Upon her return home from GSA Art Club, C.L. announced to her mother that she would be transitioning—despite never having had any thoughts about transgenderism before the meeting.

67.    Before the May 4, 2021, GSA meeting, Plaintiff C.L. had not expressed sentiments regarding gender dysphoria or sexual attraction to her parents.

68.    Before May 4, 2021, Plaintiffs Jonathan and Erin Lee were never informed about the GSA club, and they did not understand the range of topics it covered. Like their daughter, they thought C.L. was going to an art club—not a place where the most elemental and demonstrable aspects of who their daughter is would be challenged.

69.    The next day, astonished that their daughter was advised to keep secret from them the important discussions held at the GSA club, Plaintiffs Jonathan and Erin Lee

disenrolled C.L. from WMS and ultimately moved her to a private school the following academic year.

70.     Plaintiff C.L.'s announcement that she would be transitioning (which she has since abandoned) heavily impacted her relationship with her father, Plaintiff Jonathan Lee, and for several weeks they found it very difficult to communicate with each other.

71.     After the disenrollment, the Lees made a concerted effort to speak with the WMS principal Kelby Benedict to learn about GSA Art Club.

72.     Finally, on May 14, 2021, Mr. Benedict agreed to meet with the Lees, but he insisted on meeting the Lees at their house.

73.     The Lees later learned that WMS staffers had discussed seeking a child protective services well-child check in light of their having pulled C.L. from WMS; Mr. Benedict's visit to their home was, in reality, a *de facto* well-child check.

74.     Benedict confirmed to Plaintiff Jonathan Lee that in order to create a "safe space," the GSA clubs created an expectation of confidentiality.

75.     C.L.'s experience at the GSA club led to a months-long emotional decline of gender and sexuality confusion that required counseling and included suicidal thoughts.

76.     No Defendant ever provided Jonathan or Erin Lee notice of the GSA's activities, agenda, or materials, that an employee of PSD would solicit C.L.'s attendance without notice and consent from her parents, or that PSD had a policy, as confirmed by Benedict, of usurping parents' rights by keeping all these things secret from parents and encouraging children to do the same.

77.     On May 11, 2021, Erin Lee attended a PSD Board of Education public meeting and spoke during the public comment period to express her concern that she was neither

notified, nor was her consent sought, for her daughter's attendance at the May 4th GSA meeting where genders and sexualities would be discussed.

Plaintiff M.L.

78.     M.L. is Plaintiffs Jonathan and Erin Lee's son, who was seven years old and in first grade at the time of the events involving C.L.

79.     Plaintiffs Jonathan and Erin Lee learned that Defendant PSD offers gender support plans, which prohibit harassment based on gender identities or gender expressions, such as by misusing a transgender child's name or pronouns.

80.     Defendant PSD provides gender support plans ostensibly under the auspices of Colorado's prohibitions against unlawful harassment.

81.     These gender support plans oblige PSD personnel to use the elected pronouns and names identified in the submitted plan when communicating to or about the identified child.

82.     PSD permits both students and parents, on behalf of their student children, to complete gender support plans.

83.     Weary of C.L.'s experience with PSD, Jonathan and Erin Lee requested a gender support plan for M.L. on three separate occasions.

84.     Plaintiffs Jonathan and Erin Lee wanted to protect their son in the same way that other parents protect their children so that PSD officials and staffers would not harass M.L. based on his gender identity.

85.     Specifically, Plaintiffs Jonathan and Erin Lee completed three separate gender support plans that requested PSD personnel to refer to M.L. by his biological gender and birth name.

86.     PSD officials, however, informed the Lees that gender support plans exist only to benefit and protect the gender identities of transgender children, whereas the Lees sought a gender support plan binding the school to benefit and protect the gender identity of their son, including his name and masculine pronouns.

87.     Had M.L been a biological girl requesting the use of male pronouns and name PSD would have granted the gender support plan.

88.     Only because M.L. is a biological boy did PSD deny the gender support plans submitted by Jonathan and Erin Lee.

89.     Accordingly, PSD denied M.L. protections that are available to other, similarly situated children.

**Jurich Family**

90.     Like Plaintiff C.L., Plaintiff H.J. was also a 12-year-old sixth grader at WMS during the 2020–2021 academic year (Plaintiffs C.L. and H.J. did not know each other at WMS).

91.     In May 2021, Plaintiff H.J. advised her parents that she wanted to attend an after-school "Anime Club" at WMS.

92.     Plaintiff H.J. knew that there was no such "Anime Club" at WMS and was, in fact, planning to attend the school-sponsored GSA club.

93.     Plaintiff H.J. misled her parents due to the influence of a transgender friend, who counseled that her parents might not be willing to let her attend if they knew the true nature of the GSA club.

94.     This sort of misdirection reflected the secrecy and subterfuge in which the Club encouraged children to engage, as well as the mistrust of parents and destruction of the parent-child relationship that the Club engendered.

95. Plaintiff H.J. was also separately solicited by Ms. Riep to attend a GSA meeting.

96. Plaintiffs Nick and Linnaea Jurich were ignorant of the fact that WMS did not have an "Anime Club" and were also unaware of the presence of the GSA club, but willingly let their daughter stay after school to attend what they thought was "Anime Club."

97. Plaintiff H.J. attended two meetings of the GSA club on May 11 and May 18, 2021.

98. Riep was present at these GSA club meetings, despite Plaintiff Erin Lee expressing her concerns about the scope of the club meetings and their related secrecy policies.

99. The experiences of H.J. closely resembled those of C.L.

100. H.J. was told about gender fluidity and that gender "assignment" at birth can be a mistake made by parents or doctors.

101. The GSA club discussed the heightened connections between transgenderism and suicide.

102. During the meetings Plaintiff H.J. attended, Ms. Riep suggested to the students that if they did not like their bodies, they were most likely not the gender they were "assigned" at birth.

103. Like C.L., H.J. was advised that the meetings should be confidential and that if anyone asks a participant about the meetings, they do not have to say anything.

104. Furthermore, H.J. was advised that her parents may not be people with whom she should discuss the events of the GSA meetings.

105. Accordingly, the advice Plaintiff H.J. received from her friend, who encouraged her to mislead her parents, was only compounded by Riep who similarly encouraged secrecy, confidentiality, and suspicion about whether her parents could be trusted with these discussions.

106.   Based on the substance of the discussions at the GSA meetings, Plaintiff H.J. believed that the message of the clubs was that anyone who was neither transgender nor a supporter of the transgender community was a bad person.

107.   After attending the two GSA meetings, Riep invited Plaintiff H.J. to attend a meeting with SPLASH, the organization to which Chambers was, and remains, the executive director.

108.   Plaintiff H.J. attended no other GSA meetings, and when courses resumed in the fall of 2021, Riep approached H.J. multiple times and invited her to resume attending the GSA meetings.

109.   No Defendant, or agent thereof, ever provided Nick or Linnaea Jurich notice of the GSA club's activities, agenda, or materials.

110.   No Defendant, or agent thereof, ever notified Nick or Linnaea Jurich that an employee of WMS would solicit H.J.'s attendance to the GSA meetings without notice to or permission from her parents.

111.   No Defendant, or agent thereof, ever notified Nick or Linnaea Jurich that an employee of WMS would advise his daughter H.J. that H.J. need not tell her parents about attendance at, or the material covered, at the GSA meetings.

112.   The effect of the GSA meetings on Plaintiff H.J. was nothing less than horrific.

113.   After the GSA meetings, Plaintiff H.J. began to have her first suicidal thoughts.

114.   In the summer of 2021, H.J. began leaving notes to her parents that she is "aromantic" and "asexual" and started to leave notes about transgenderism for her parents.

115.   Later in the fall of 2021, H.J. began to openly question her gender identity.

116.  After her experiences at the GSA club her relations with her friends deteriorated, and she was not comfortable with the idea of potentially taking classes with Riep.

117.  Plaintiff H.J. underwent a significant emotional decline, including a request in December 2021 to be homeschooled.

118.  Shortly after the request to be homeschooled, Plaintiff H.J.'s emotional decline culminated in an attempted suicide by drinking an ounce of bleach.

119.  Plaintiff H.J. soon recognized and verbalized that her disturbed emotional state began when she attended GSA at WMS.

120.  Plaintiff H.J. was able to receive immediate medical treatment and, after a week in the hospital, was able to make a physical recovery.

**Defendants' Unlawful Acts Were a Direct Result of the District's Policies**

*Overview*

121.  The steps the Defendants took to keep Jonathan and Erin Lee and Nick and Linnaea Jurich (together, "Plaintiff Parents") in the dark about the GSA club's activities demonstrate an unequivocal attempt to repudiate parental authority.

122.  Like all parents, Plaintiff parents believe that schools should not undermine the parent-child relationship or adopt customs, policies, or practices that have the effect of driving a wedge between parents and their children or of depriving parents of their fundamental rights to direct the upbringing of their children.

123.  The GSA meetings regularly address sex, sexualities, mental health, suicide, sexual orientation, gender identities, and other topics in discussions, lectures, and distributed materials.

124.  Gender identities and sexual orientations are aspects of a child's core sense of identity.

125.   The Jurich and Lee families both have strong and sincere religious convictions regarding the education of their children on these sensitive topics.

126.   Had the parents been provided notice of the topics planned for discussion and germane to GSA, they would have elected to opt their child out based on these deeply held religious beliefs.

127.   Parental concern about sexually themed topics is no stranger to public schools, and the fact that transgenderism is no less charged an issue should have been obvious to the Defendants.

128.    For example, recent national polling[1] demonstrates that the topic of transgenderism among school-age children shows reveals strong public reactions:

   a.   66% of parents would encourage the child to retain his or her biological gender if a school-aged child said he or she wanted to transition;

   b.   69% of voters say children should not be allowed to receive puberty blockers or surgery to change their gender;

   c.   71% of voters believe boys should not be allowed in bathrooms or locker rooms designated for girls;

   d.   Nearly 60% of voters believe that gender transition surgery is a form of child abuse;

   e.   Importantly, 62% of voters say that a teacher or school encouraging a student to change his or her gender is a form of child abuse; and,

   f.   71% of voters say that if a boy tells his teacher he wants to identify as a girl, the teacher or school should notify the parents.

---

[1] RMG Research, Inc., survey of 1,000 registered voters conducted April 18-19, 2023.

16

129.  Given the nature of the discussions at GSA meetings, ordinary prudence should have compelled the Defendants to provide notice to the Plaintiff Parents.

130.  Compounding the error of a lack of notification is the fact that the District discouraged students from having frank discussions with their parents about the GSA meetings.

131.  The Defendants knew or should have known that the failure to provide notice coupled with affirmative steps to discuss the topics secretly, would necessarily undermine parental authority.

*District Policy Regarding Parental Involvement*

132.  In its official, public-facing policies, PSD recognizes and embraces a parent's right to direct the education of their child.

133.  PSD likewise publicly recognizes the sensitive nature of sexually themed topics in the education context and notes that parents must have the opportunity to review sexually themed curricula to determine whether such curricula are appropriate for their children.

134.  For example, PSD Policy IHAM ("Policy IHAM") holds that "Parents/guardians shall be provided written notice before the commencement of any unit or lesson that is part of the District's comprehensive health education program at their child's school which **shall include** (1) an overview of the substantive content of the unit or lesson to be presented; (2) notice of when and where the associated curriculum and materials are available for inspection; and (3) **notice that parents/guardians may excuse their child, upon written request, from some or all of the comprehensive health education program** . . . ." (Emphasis added)

135.  Policy IHAM reflects Colo. Rev. Stat. § 22-25-110, which requires that there be a means by which parents can exempt their children from such materials.

136.  Policy IHAM was enacted by PSD.

137. PSD holds sole authority to enforce Policy IHAM within the schools comprising the school district.

138. PSD is, at a minimum, aware of its obligations under Policy IHAM.

139. For example, every other year, PSD distributes a Colorado Healthy Kids Survey to its secondary school students. This survey asks students, *inter alia*, to identify their sexual orientation and gender identity.

140. Before this survey's distribution, PSD notifies parents of the survey's contents prior to the survey's distribution and provides parents the opportunity to excuse or opt out their child from completing the survey.

141. No Defendant has ever notified the parents of students within the school district that PSD would not comply with the obligations of Policy IHAM.

142. No Defendant has ever notified the parents of students within the school district that the parent would not be informed of sexually themed topics taught within PSD schools.

143. No Defendant has ever notified parents that parents would not be given the opportunity to exempt their child from a notified or unnotified sexually themed topic discussed or taught at any PSD school as is required by Colorado law.

144. The Defendants' representations through Policy IHAM would lead the reasonable parent to conclude that all planned in-school educational discussions of sexual themes topics are noticed to the parent with an opportunity for the parent to opt their child out.

145. Policy IHAM is not the only PSD policy regarding information transparency between schools and parents. PSD Policy KD Public Information and Communications ("Policy KD") obliges PSD and the schools therein to "[k]eep the public informed about the

18

**policies**, administrative operations, objectives, and **educational programs** of the schools." (Emphasis added).

146.   This policy recognizes the significance of transparency and the cruciality of avoiding secrecy and deception. Policy KD directs that there shall be placed "great importance on the role of the **teacher as communicator and interpreter** of the school program **to parents**[.]" (Emphasis added).

147.   Policy KD is further notable in that it is framed as being responsive to the interests of the district's residents "in their schools as an extension of their homes – an extension which exists to perform a special function in the development of their children."

*District's Transgender Policies*

148.   PSD maintains a set of Guidelines for Supporting Transgender and Non-Binary Students ("Guidelines"), which require that, within their communications, school staff deliberately deceive parents of potentially transgender students who refer to their child by that child's birth name. The Guidelines represent PSD policies, customs, and practices. Ex. 1.

149.   The Guidelines direct that "[s]chool personnel should not disclose information that may reveal a student's transgender or non-binary status to others, **including** students, **parents**, or community members" without student permission. (Emphasis added).

150.   The Guidelines supplant the role of the parent with school employees.

151.    The Guidelines place within the discretion of a school when and if a parent ought to learn that their child has identified as transgender.

152.   The Guidelines specifically say that a "school counselor will work with the student in coming out to their family and others, as appropriate," with the determination of appropriateness left to the discretion of the counselor.

153. The Guidelines require that when a school employee is "contacting or communicating with a parent/guardian of a transgender or non-binary student, school staff should use the name and pronouns that the student's parent or guardian use, unless the student requests otherwise." This requires the school to learn from children what names and pronouns they use so that they can, together with children, deceive parents and keep parents unaware of important information about their children.

154. This policy of deception and subterfuge extends to official written documents. The Guidelines also guide staff to use the name and pronouns used by a child's parent on documents with or in front of the parent while concurrently using the name and pronouns elected by the child when at school and outside the presence of their parents.

155. Notably, this policy of deception is specifically framed within a context where the school employee knows or has reason to know that the parent does not consent to the proliferated use of the child's elected pronouns or name.

156. Where a parent specifically asks a school employee whether their child uses a name other than their birth name, or a pronoun other than that associated with the child's sex, the Guidelines direct the staff to refuse to answer and "refer [parents] to the school counselor . . .."

157. A school counselor addressing a referred parent specifically inquiring on their child's gender expression in school is directed to "use their professional judgement to determine" whether the parent may be permitted to know how their child identifies and is addressed while in the custody of a PSD school.

158. To better inform parents and community members of the rules and policies of PSD, the district maintains official responses to frequently asked questions ("FAQ").

159. In a PSD Gender Support FAQ,[2] the school district announces that school staff will not inform a parent or guardian of conversations that school staff privately have with their child regarding sex, sexual orientation, or gender identity.

160. The FAQ, in fact, announces that the school district will aid a student in obstructing a parent from discovering that school employees are discussing sex, sexual orientation, and gender identity with their children. The FAQ declares that to "the extent possible, [a] school counselor will not out the student to their parent(s)/guardian(s) before the student is ready to come out themselves."

161. Whether a parent is permitted to be informed that their child is discussing sexuality and gender identity privately with a school staff member is left to the full discretion of a school employee. The FAQ explains that school counselors must "**balance** the inherent right of parents and guardians to their student's information **and the potential impact this sharing** [of a child's transgender or non-binary status at school] **could have on the student and the student's trust in sharing future concerns with the school counselor.**" (Emphasis added).

162. This FAQ recognizes a parent's right to their child's information, but school employees are given the authority and discretion to prioritize their relationships with children over the rights of parents.

163. PSD maintains a toolkit for Supporting Transgender and Gender Expansive Nonconforming Students, which directs school staff on how to address day-to-day challenges regarding transgender students.

---

[2] https://www.psdschools.org/programs-services/PSD-Gender-Support-FAQs, accessed on May 2, 2023.

164.   This toolkit directs school staff to use their discretion as to whether a parent may even be involved in consideration of their child's gender identity.

165.   The toolkit states that "[p]rior to notification of any parent/guardian or guardian [sic] regarding the transition process, school staff should work closely with the student to assess the degree, **if any**, the parent/guardian will be involved in the process" of the child's gender transition (emphasis added).

*District Gender Support Plans*

166.   PSD also maintains an official policy of shielding from parents requests by a child to change his or her pronouns and/or name within the school.

167.   An Individual Gender Support Form is an official document included in a child's education records, which directs school engagement with the child. The Individual Gender Support Form dictates how PSD school employees are expected to address a particular child.

168.   Individual Gender Support Forms may be completed by either parent or child.

169.   Individual Gender Support Forms may be completed wholly by a child without parental notice or consent.

170.   The Guidelines do not oblige any school employee to notify parents that their child has completed an Individual Gender Support Form.

171.   Under the Guidelines, a parent who is unaware that their child has completed an Individual Gender Support Form will not be informed by any employee of PSD of the completion of the form unless that parent directly inquires of the school.

172.   The Guidelines specifically contemplate the non-involvement of parents in the submission of an Individual Gender Support Form, noting that "it is helpful as the

school counselor meets with the student and parents/guardians, **if involved**, to discuss if others are aware of the student's gender identity[.]" (Emphasis added).

173.   Under PSD's Gender Support FAQ, parents are prohibited from completing an Individual Gender Support Form for their child in a way that ensures that the school only affirms their child's birth sex.

174.   Likewise, under the Gender Support FAQ, any parental instruction to school staff to refrain from the use of a name or pronouns in reference to that parent's child other than that used by the parent will be ignored.

175.   Under the Guidelines, the availability of an Individual Gender Support Form as an accommodation may be denied to certain students based on their gender identity.

176.   The Guidelines state that "[a]n Individual Gender Support Form **is intended to support a transgender or non-binary student** in gaining access to a school environment that is affirming and is free from discrimination and harassment on the basis of gender identity and gender expression. **Cisgender and gender normative students** inherently have access to a gender-affirming school environment based on this held identity, and an Individual Gender Support Form's **purpose is to work to ensure this access for students who have historically faced discrimination and harassment on the basis of gender identity and gender expression**." (Emphasis added).

177.   By the letter of this policy, an Individual Gender Support Form is not available to a biological male student who identifies as male nor a biological female student who identifies as a female.

178.   Under the Guidelines, PSD will reject an Individual Gender Support Form completed by a parent that affirms their child's biological sex and birth name.   Under the

Guidelines, PSD will reject an Individual Gender Support Form completed by a parent that affirms their child's biological sex and birth name. This is true even if the child desires the protection and support of the child's gender identity.

179. Policy JBB, Harassment of Students, defines harassment based on gender identity or gender expression to include unwelcome, hostile, or offensive verbal, written, or physical conduct based on or directed at the characteristics of a student's actual or perceived gender identity or gender expression, such as name-calling and imitating mannerism, and deliberately misusing a transgender student's preferred name, form of address, or gender-related pronoun.

180. Defendant PSD's stated reason for rejecting the requests for a gender support plan for M.L. is the conjunction of the biological sex and gender identity of the student.

181. Under the Guidelines, PSD will reject an Individual Gender Support Form completed by a student that affirms their child's biological sex and birth name.

182. This rejection is based on the conjunction of the biological sex and gender identity of the student.

*District's De Facto Policies*

183. PSD deliberately shirks its parental disclosure obligations regarding GSA clubs.

184. In PSD, a school-sponsored club is considered part of the school program and/or relates to a school's curriculum.

185. PSD requires that school-sponsored clubs designate a school employee as a "sponsor" who supervises, advises, facilitates, coaches, and or/instructs the activity or organization.

186. Guest speakers to school-sponsored clubs must be approved by PSD's Teaching and Learning Department and/or the Language, Culture, and Equity Department.

187.   A school-sponsored club may be established by the school principal, subject to approval by the Assistant Superintendent of Secondary Schools.

188.   The WMS GSA is a school-sponsored club.

189.   The WMS GSA regularly discusses, lectures, and teaches students about sexual health in health education.

190.   Despite being a school-sponsored club that advances the health education curriculum at WMS, the school and the club sponsors have a *de facto* policy of refusing to notify parents of the child's participation.

191.   WMS administration does not inform parents of their child's attendance at the school-sponsored GSA.

192.   WMS administration does not inform parents of the content of the GSA school meetings.

193.   The WMS GSA regularly discusses sex, sexual health, mental health, suicide, sexual orientations, gender identities, and other health-related topics.

194.   WMS administration does not provide parents with an opportunity to review and opt their child out of the sexual and gender-based discussions and topics that regularly occur at GSA meetings.

195.   WMS administration, in violation of PSD Policy KD and Colorado law, does not provide parents with an opportunity to review and opt their children out of GSA meetings and the material presented there.

196.   WMS administration does not notify parents of when third-party personnel will appear as guest lecturers on topics including sex, sexual health, mental health, suicide, sexual orientation, gender identity, and similar topics.

197.   WMS administration considers membership and student attendance in the GSA to be strictly confidential.

198.   Student attendees to the WMS GSA are directed not to discuss with others who attended the GSA meetings.

199.   Ignoring parental disclosure and consent obligations at PSD schools is not limited to merely afterschool activities. For example, Plaintiff H.J.'s 6th grade English class at WMS assigned reading that included the book George by Alex Gino. This book describes the fictional life of a child changing their gender, including the use of gender hormone supplements, the surgical removal of male genitalia, and the explicit direction of caution in whom to tell when considering gender transition.

200.   Neither Nick Jurich, nor Linnaea Jurich were notified that George would be part of their daughter's English curriculum.

201.   Neither Nick Jurich, nor Linnaea Jurich were given any opportunity to opt their daughter H.J. out of the reading George in her 6th grade English class.

202.   PSD personnel are regularly encouraged to attend professional training sessions such as the "ABCs of LGBTQ" and "How to be a Trusted Adult." These training sessions, and others like them, train PSD personnel to not reveal a student's in-school transgender or gender non-conforming identity to that student's parents.

203.   Furthering the points taught in these professional training sessions, PSD personnel are directed that they need not disclose to parents the names and pronouns used to address students in roll calls. Personnel are further directed to use a child's preferred name and pronouns when addressing the child, but to use the child's birth name and pronouns when communicating with the child's parents that use the same.

204.   These instances are numerous and further evidence a *de facto* policy followed by PSD personnel to obstruct and frustrate the fundamental rights of parents to direct the education and upbringing of their children.

## COUNTS

### COUNT I – Violation of Parental Rights Under the Fourteenth Amendment

**(Denial of right of the Plaintiff Parents to direct the education and upbringing of the Plaintiff Children – All Plaintiffs against Defendants)**

205.   Plaintiffs incorporate the preceding allegations contained in paragraphs 1-197 as if set forth in full.

206.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects the fundamental right of parents to direct the education, upbringing, care, custody, and control of their children.

207.   This right, based on United States Supreme Court precedent, was well established at the time of the Defendants' offending conduct.

208.   This right would have been understood by any reasonable person, and all involved with public education have a duty to be aware of and honor this right.

209.   Defendants have violated, are violating, and will continue to violate Plaintiffs' fundamental right to make decisions regarding the upbringing, education, custody, care, and control of their children by, *inter alia*, (i) teaching sexually themed matters that have not been disclosed to the parents, (ii) undermining parental authority by encouraging students to confide in intimate personal secrets with teachers and not their parents, and (iii) by not providing parents notice and opt-out choices regarding sexually themed educational topics.

210.   Defendants' unconstitutional conduct involves affirmative, coercive, compelled conduct by the Defendants.

211.   This includes but is not limited to Chambers and Riep's academic discussion of sex, sexualities, mental health, suicide, sexual orientation, gender identities and other sex-related content with no parental disclosure or consent, as well as their encouragement to children to keep GSA activities secret from parents.

212.    This avoidance of parental disclosure and consent was undertaken as part of the custom and standard operating procedures of Defendant PSD.

213.   Kimberly Chambers was a willing participant in joint activity with Defendant PSD.

214.   Jenna Riep and Kimberly Chambers knowingly engaged in concerted action which impacted the Plaintiffs' parental rights to direct their children's education.

215.   Jenna Riep and Kimberly Chambers knowingly engaged in activity that actively undermined the Parents' relationship with their Children.

216.   Defendant PSD remained deliberately indifferent to the activities undertaken by its agents and principals.

217.   No Defendant has a legitimate interest in discussing topics related to transgenderism in a manner not fully disclosed to parents.

218.   No Defendant has a compelling interest in undermining parental authority by suggesting that children may not want to discuss certain topics with fit parents.

219.   Defendants have acted and are acting with reckless disregard for Plaintiffs' fundamental parental rights by purposefully and intentionally interfering with Plaintiffs' ability to make decisions - directly related to their children's care and education.

220. Defendants' reckless disregard for Plaintiffs' rights has resulted in, is resulting in, and will continue to result in deprivation of Plaintiffs' fundamental constitutional rights.

221. Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

222. Plaintiffs have no adequate remedy at law to correct the continuing and threatened deprivation of their fundamental rights, although they have suffered legal damages as well.

**COUNT II– Violation of Parental Rights Under the Fourteenth Amendment**

**(Denial of equal protection under the law by denial of a gender support plan to Plaintiff ML where other similarly situated students are granted gender support plans. Plaintiffs Jonathan and Erin Lee and M.L. against Defendants)**

223. Plaintiffs incorporate the preceding allegations contained in paragraphs 1-197 as if set forth in full.

224. PSD offers gender support plans to certain students who desire to have their gender identity protected and affirmed by PSD.

225. PSD refused to implement a gender support plan for M.L. after a parental request.

226. PSD's refusal was based on sex discrimination; had M.L. been a biological female, rather than a biological male, PSD would have granted M.L.'s gender support plan for the use of male gender pronouns.

227. PSD further denied this request on the basis that the parents could not use a plan to re-affirm M.L.'s given name and biological gender.

228. PSD policy also provides that school staff cannot accommodate parent requests that the school staff use pronouns that align with a student's biology.

229. Children who are considered transgender and who desire a gender support plan may have one. Children who are not considered transgender but who nevertheless desire a gender support plan may not have one.

230. By refusing to implement the plan desired by the parents, PSD denied M.L. the protection of the laws offered to other similarly situated children within the district and thereby violated his right to equal protection of the laws.

231. The Fourteenth Amendment to the United States Constitution provides that the right to direct and control the upbringing of children is the province of fit parents and that this right is fundamental.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully ask that this Court enter judgment in its favor and provide the following relief:

A. Permanent injunctive relief in the form of an injunction requiring, *inter alia*, the District to provide parental notice and opt-out rights if the subjects of gender dysphoria and transgender transitioning or topics related thereto are to be taught in the District, including in middle school; that, if taught, these topics be taught only by qualified and trained professionals based on qualifications made available to the public by the District; and that all materials to be used in any such instruction be provided and/or accessible in advance to parents through appropriate technological means (e.g., District website) fourteen days advance of any instruction so as to make the notice and opt-out rights meaningful.;

B. Compensatory damages to be proven at trial including, *inter alia*, private school tuition, medical expenses, counseling fees, compensation for damage to the Plaintiffs' reputation, transportation, and emotional anguish;

C.      Punitive damages for the unlawful impairment of the Plaintiffs' parental rights;

D.      Punitive damages for the unlawful denial of the equal protection of the laws;

E.      Reasonable attorneys' fees and costs incurred in prosecuting this litigation; and

F.      Any and all other relief that the Court deems appropriate.

Respectfully submitted,

ILLUMINE LEGAL LLC
/s/ J. Brad Bergford
J. Brad Bergford, CO Bar no. 42942
8055 E. Tufts Ave., Ste. 1350
Denver, CO 80237
Phone: 303.228.2241
Email: brad@lawillumine.com
Attorney for Plaintiffs

**CERTIFICATE OF COMPLIANCE**

This pleading complies with the applicable format requirement set forth in D.C.COLO.LCivR 10.1, FORMAT OF PLEADINGS AND DOCUMENTS PRESENTED FOR FILING.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 3, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System. Defendants have not yet been (but will soon be) served pursuant to Rule 4.

*/s/ J. Brad Bergford*
J. Brad Bergford