# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01117-NYW-STV

JONATHAN LEE;
ERIN LEE;
C.L., a minor, BY AND THROUGH PARENTS JONATHAN and ERIN LEE
as next friends;
M.L., a minor, BY AND THROUGH PARENTS JONATHAN and ERIN LEE
as next friends;
NICOLAS JURICH;
LINNAEA JURICH; and
H.J., a Minor, BY AND THROUGH PARENTS NICOLAS and LINNAEA JURICH
as next friends,

       Plaintiffs,

v.

POUDRE SCHOOL DISTRICT R-1,
Ft. Collins, Colorado; and,
POUDRE SCHOOL DISTRICT R-1 BOARD OF EDUCATION,

       Defendants.

---

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

---

Defendants, Poudre School District R-1 ("PSD" or the "District") and the PSD Board of Education (the "Board") (collectively, "Defendants"), by and through their undersigned counsel, hereby move pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss Plaintiffs' Complaint with prejudice, as follows:

## INTRODUCTION

This case concerns whether parents have a fundamental constitutional right pursuant to the Fourteenth Amendment to control extracurricular activities sponsored by a public school. It also concerns whether school practices designed to support students in expressing their gender

identities, consistent with Colorado law, are constitutionally guaranteed under the Equal Protection Clause for families wishing to prevent their children from expressing a gender different from what they were assigned at birth. As discussed below, PSD violated no rights in sponsoring a Genders and Sexualities Alliance[1] ("GSA") extracurricular club and allowing any interested students to attend. Nor did PSD violate any rights in affording gender support plans only for students who desire to change their biological gender expression or identity. Additionally, Plaintiffs fail to establish municipal liability against Defendants and otherwise fail to plausibly allege any harm or injury caused by PSD sufficient to satisfy Article III standing. For these reasons, Plaintiffs' Complaint should be dismissed in its entirety.

## PLAINTIFFS' CLAIMS AND ALLEGATIONS

Plaintiffs assert two violations of their constitutional rights under the Fourteenth Amendment. In Count I, Plaintiffs allege a substantive due process violation of their parental interests in directing the education and upbringing of their children. Compl. at 27–29. During the 2020–2021 school year, their minor children, C.L. and H.J., voluntarily attended at least three GSA meetings at Wellington Middle School ("WMS"), which discussed transgender issues and "sexually themed matters" without the District providing advance notice or opt-out choices to Plaintiff Parents. *Id.* ¶¶ 37, 90, 32, 42, 46, 54–55, 60, 91–93, 95, 97, 100. According to the Complaint, C.L. and H.J. began to question their genders and/or sexuality after attending the GSA meetings. *Id.* ¶¶ 66, 114–15. The day after C.L. communicated to her parents that she wanted to transition, the Lee Plaintiff Parents disenrolled C.L. from WMS for the remainder of the school

---

[1] In this motion, Defendants use Plaintiffs' terminology (Compl. ¶ 28) although the District uses different terminology on its website.

year and placed her at a private school the following school year. *Id.* ¶¶ 69, 70. The Jurich Plaintiff Parents removed H.J. from WMS in September 2022. ECF No. 27, Scheduling Order, Undisputed Facts, ¶¶ 7–8 (July 6, 2023).

In Count II, the Lee Plaintiff Parents allege an equal protection violation because the District refused to implement a gender support plan for their child M.L., who was attending Rice Elementary School ("RES"), to confirm that only his given name and pronouns matching his biological sex would be used at school. Compl. at 29–30. The Lee Plaintiff Parents allege that allowing gender support plans for transgender youth but disallowing them for non-transgender youth violates the Equal Protection Clause. The Lee Plaintiff Parents removed M.L. from RES for the 2022-2023 school year. ECF No. 21, ¶ 10.

Plaintiffs also generally complain about provisions in the District's 2023 Guidelines for Supporting Transgender and Non-Binary Students, attached as Ex. 1 to their Complaint, ECF No. 1-1. Plaintiffs allege that provisions within the Guidelines aim to supplant the role of parents with school employees, Compl. ¶ 150, and to do so, the Guidelines call for deception (*id.* ¶¶ 146, 148, 153-55), secrecy (*id.* ¶¶ 94, 98, 105, 146), and subterfuge (*id.* ¶¶ 94, 154).

## STANDARD OF REVIEW

"In ruling on a motion to dismiss for failure to state a claim, all well-pleaded facts, as distinguished from conclusory allegations, must be taken as true, and the court must liberally construe the pleadings and make all reasonable inferences in favor of the non-moving party." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017) (citation omitted). Conclusory allegations need not be taken as true. *See, e.g.*, *Khalik v. United Air Lines*, 671 F.3d 1188, 1193–94 (10th Cir. 2012). A plaintiff must "nudge [his] claims across the line from

conceivable to plausible" to survive a motion to dismiss. *Id.* at 1190. "[T]he tenet that a court must accept as true all the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action…do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I.   Plaintiffs Fail To Plausibly Allege Any Constitutional Violation.

#### A.   Plaintiffs Do Not Have a Fundamental Right To Control or To Direct the Extracurricular Activities That Their Children Choose To Participate in While Attending a Public School, and the District's Guidelines Do Not Otherwise Infringe Upon Any Constitutional Right.

In Count I, Plaintiffs allege that Defendants have violated the Fourteenth Amendment and their fundamental interest in "govern[ing] the direction of" their children's education, Compl. ¶¶ 1, 3–6, and "upbringing," *id.* ¶¶ 204–06, 209, in the following ways: (1) in extracurricular activities, such as GSA meetings, teaching or discussing "sexually themed matters that have not been disclosed to the parents," (2) "undermining parental authority by encouraging students to confide in intimate personal secrets with teachers and not their parents," and (3) "by not providing parents notice and opt-out choices regarding sexually themed educational topics" discussed at extracurricular meetings (*id.* ¶ 209).

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. 14 § 1. The Clause also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). If the individual's asserted right is fundamental, then any governmental actions that infringe upon fundamental constitutional rights are subject to strict scrutiny and must be

narrowly tailored in furtherance of a compelling government interest to pass. *John & Jane Parents 1 v. Montgomery Cty. Bd. of Educ.*, 622. F. Supp. 118, 128 (D. Md. 2022). And if government actions do not implicate a fundamental right, then they need only clear the significantly lower hurdle of bearing a rational relationship to a legitimate government interest. *Id*.

Plaintiffs do not plausibly allege any fundamental right. While parents retain a fundamental right to make decisions concerning the care, custody, and control of their children generally, *Troxel*, 530 U.S. at 66, no court has expanded the scope of that right to mean that parents may foreclose any exposure to their child about gender fluidity while at school, in the school's curriculum, or during an extracurricular activity that the student chooses to attend. The Supreme Court "has repeatedly stressed that while parents have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction, they have no constitutional right to provide their children with private school education unfettered by reasonable government regulation" and the same holds true for public school education. *Runyon v. McCrary*, 427 U.S. 160, 163 (1976) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972), *Pierce v. Society of Sisters*, 268 U.S. 510, 534 (1925), *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923)). "Indeed, the Court in *Pierce* expressly acknowledged "the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils . . . ." *Runyon*, 427 U.S. at 170–71 (citing *Pierce*, 268 U.S. at 534).

Though "education is perhaps the most important function of state and local governments," *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954), a right to education is neither explicitly nor implicitly guaranteed by the Constitution, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 30, 34 (1973) (applying rational basis to state education and taxation issue

and finding no equal protection violation). According to the 10th Circuit, "[t]he case law in this area establishes that parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998). "Decisions as to what curriculum a public school decides to offer or require are uniquely committed to the discretion of local school authorities." *Id*. at 700.[2]

Plaintiff Parents allege that their minor children's attendance at GSA meetings and the District 2023 Guidelines impermissibly infringed upon their interest in directing the education and upbringing of their children. Even taken as true, these allegations do not create any viable constitutional violation against the District. As evident in the above cited authority, constitutionally protected parental control does not extend into curriculum or extra-curricular activities to exclude discussion of transgender issues, so no fundamental right is at issue within Plaintiffs' allegations. Accordingly, the GSA meetings and the 2023 Guidelines need only "bear some rational relationship to a legitimate state interest" to pass constitutional muster, and they do. *San Antonio Indep. Sch. Dist.*, 411 U.S. at 32.

To begin, the plain language of the 2023 Guidelines contradicts Plaintiffs' allegations of

---

[2] *See also Parents for Privacy v. Barr*, 949 F.3d 1210, 1232 (9th Cir. 2020) ("While parents may have a fundamental right to decide whether to send their child to a public school, they do not have a fundamental right generally to direct how a public school teaches their child.") (quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005)), *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008) (no federal case found to permit exemption for their children from exposure to certain books used in public schools); *Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2002) (no free exercise or parental due process right violated by school's refusal to exempt student from mandatory health class); *Morrison ex rel. Morrison v. Bd. of Educ.*, 419 F. Supp. 2d 937 (E.D. Ky. 2006) (no federal right to exempt child from mandatory school diversity training on homosexuality), *rev'd on other grounds*, 507 F.3d 494 (6th Cir. 2007).

any attempt to supplant the role of parents with deception, secrecy, and subterfuge.[3] The Guidelines expressly foster communication with, and the involvement of, parents: "these Guidelines support healthy communication between educators and parents/guardians to further the successful educational outcomes and well-being of every student." Ex. 1 at 2. The Guidelines also recognize the rights of all involved individuals, including parents, and strive to balance the rights of all interested parties depending on the circumstances:

> Transgender and non-binary students have the right to discuss and express their gender identity and expression openly and to decide when, with whom, and how to share private information. . . .The school counselor will work with the student in coming out to their family and others, as appropriate, and collaborate with families to promote consistent gender support. . . . Parents/guardians have the right under FERPA to view all education records of their student upon request, which would include a student's Individual Gender Support Form.

Ex. 1 at 3.

The District has a legitimate interest in providing a safe and supportive environment for all its students, including those who are transgender or gender nonconforming.[4] *Vesely v. Ill. Sch. Dist.*, No. 22-CV-2035, 2023 WL 2988833, at *5 (N.D. Ill. Apr. 18, 2023). And the objectives of

---

[3] The District's 2023 Guidelines (ECF 1-1), the Parties undisputed facts (ECF No. 21), and information from PSD's website may be considered because they either are central to Plaintiffs' claims, referenced in the Complaint, or subject to judicial notice as public facts. *GFF v. Assoc. Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997); *Van Woudenbert ex rel Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2006) ("[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."). Relevant documents referenced in a complaint and central to plaintiffs' claims are properly considered without converting a motion to dismiss without converting to a motion for summary judgment. *Id.*; *Tal v. Hogan*, 453 F.3d 1244, n.24 (10th Cir. 2006). And given that a conflict exists between Plaintiffs' allegations and the 2023 Guidelines, the plain text of the actual document guides the Court's evaluation. *Brokers' Choice*, 861 F.3d at 1105 (citation omitted); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

[4] *See generally* Br. for Pflag et al. as Amici Curiae Supporting Defendants-Appellees, *John & Jane Parents I v. Montgomery Cty. Bd. of Educ.*, 2023 WL 144152 (4th Cir. Jan. 4, 2023) (No. 22-2034) [hereinafter "Amici Br."], attached as Ex. 2.

both the Guidelines and the GSA are rationally related to achieving that result. *Id*. (plaintiff "must demonstrate that the policy lacks a rational relationship; it is not the school district's obligation to prove rationality with evidence."). The Guidelines aim to protect students' legal rights and safety by clarifying how anti-discrimination laws and District policies apply to transgender and non-binary students based on their gender identity and/or gender expression. Ex. 1 at 1. The Guidelines also seek to reduce the stigmatization of, and improve the educational experiences and outcomes of, transgender and non-binary students while maintaining the privacy of all students and fostering cultural competence and professional development for school staff. *Id*. at 2. The Guidelines set forth protocols for school and district staff to address the needs of transgender and non-binary students in various situations while emphasizing that "the needs of individual students should be assessed on an individual basis." *Id*. at 1–2.

The GSA is one of many extracurricular options for students to choose based upon their individual interests. According to the District's website, the "purpose of the GSA is to create an atmosphere where students of all gender identities and sexualities feel safe, respected, and valued. It is a place for LGBTQIA+ students and allies to socialize, have fun, and come up with ideas for promoting a school culture of mutual respect, inclusion, and acceptance."[5]

Even if the GSA and the Guidelines were subject to strict scrutiny, they are narrowly tailored in furtherance of a compelling government interest. *New York v. Ferber*, 458 U.S. 747, 756, (1982) ("[T]he State's interest in safeguarding the physical and psychological well-being of a minor is compelling . . . . Accordingly, we have sustained legislation aimed at protecting the

---

[5] Https://wel.psdschools.org/electivesenrichment/school-clubs-and-organizations.

physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights.") (internal quotations and citations omitted); *Bostock v. Clayton Ct*y., 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020) (transgender individuals are protected from discrimination under Title VII); Colorado Anti-Discrimination Act, C.R.S. § 24-34-601, 2(a) (2021) (prohibiting discrimination on the basis of, *inter alia*, "sexual orientation, gender identity, gender expression"). As evident above, Plaintiffs have failed to plausibly allege a violation of their due process rights under the Fourteenth Amendment, which requires dismissal with prejudice of Count I. *Cf. Jones v. Boulder Valley Sch. Dist.*, No. 20-cv-03399-RM-NRN, 2021 WL 5264188, at **15-17, 21-22 (D. Colo. Oct. 4, 2021) (recommending dismissal with prejudice of plaintiff's claims regarding similar transgender issues and district guidelines); *John & Jane Parents 1,* 622. F. Supp. at 118 (finding parents did not have fundamental right under due process clause to be promptly informed of their child's claimed gender identity at school, rational basis review applied to parents' due process claim that public school's guidelines for student gender identity violated their right to direct their children's education, public school's guidelines for student gender identity satisfied rational basis review, and parents did not state § 1983 claim against public school).

### B.  The Lee Plaintiffs Were Not Treated Differently Than Other Cisgender Individuals Who Requested a Gender Support Plan and Were Denied.

As evident in Count II, Plaintiff Parents Erin and Jonathan Lee further allege that District "policy" regarding gender support plans violates the Equal Protection Clause of the Fourteenth Amendment by permitting transgender children to have a gender support plan yet denying the same to parents who desire to use a plan to reaffirm that their child's given name, biological sex, and biologically conforming pronouns be used in the school environment. Compl. at 29–30.

The Equal Protection Clause prevents states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "Different types of equal protection claims call for different forms of review. A claim that a state actor discriminated on the basis of a suspect (*e.g.*, race), quasi-suspect (*e.g.*, gender), or a non-suspect classification calls for strict, intermediate, or rational basis scrutiny, respectively. But in each instance, to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011) (internal quotations and citation omitted). "The 'similarly situated' requirement is an "exacting burden," which requires the comparative individuals to be '*prima facie* identical in all relevant respects or directly comparable in all material respects.'" *Gallegos v. Adams Cnty. Sch. Dist. 14*, No. 17-cv-00306-CMA-NYW, 2017 WL 4236320, at *6 (D. Colo. Sept. 25, 2017) (citing *A.B. ex rel. B.S. v. Adams-Arapahoe28J Sch. Dist.*, 831 F. Supp 2d 1226, 1253 (D. Colo. 2011)). "Before a court may get to the business of assessing the rationality of a challenged state action, some evidence of intentional discrimination against a particular class of persons must be present . . . ." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 688 (10th Cir. 2012). "Unless a statute provokes 'strict judicial scrutiny' because it interferes with a 'fundamental right' or discriminates against a 'suspect class,' it will ordinarily survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose." *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457-58 (1988) (citations omitted).

Intermediate scrutiny is inappropriate here because the gender support plans do not create a gender classification per se, *i.e.*, a distinction between male and female students. The gender support plans are only for transgender or gender non-conforming students, so they are denied to

both male *and* female cisgender students. Even if the Court were to apply intermediate scrutiny, the gender support plans are substantially related to sufficiently important interests, *i.e.*, protecting students' legal rights, safety, and privacy and promoting inclusion and acceptance to enhance individual well-being and reduce substantiated high rates of depression, anxiety, and suicide ideation among transgender and non-binary students.

As a threshold matter, this equal protection claim fails because M.L., a cisgender[6] male whose parents wanted to enforce those characteristics in a gender support plan, cannot show that he was "identical in all relevant respects" to transgender or gender non-conforming students who requested and received a gender support plan. As a cisgender student, M.L. is identical in all relevant respects to other cisgender students who may request and would be denied gender support plans.[7] Accordingly, he cannot show any discriminatory intent or improper motive for the classification. These two deficiencies should end the Court's analysis. *A.B. ex rel. B.S.*, 831 F. Supp 2d at 1253; *SECSYS*, 666 F.3d at 688.

Even if the Court's analysis continued, rational basis review is appropriate and satisfied here. As white cisgender individuals, M.L. and his parents are not members of a suspect class and have not articulated a significantly burdened fundamental right. As previously discussed in Section I.A, there is no fundamental right to education, *Kadrmas*, 487 U.S. at 458, and parents have no right to provide their children with education "unfettered by reasonable government regulation,"

---

[6] "A term used to describe a person whose gender identity aligns with those typically associated with the sex assigned to them at birth." Ex. 1 at 12.

[7] The PSD website explains that parents cannot complete an Individual Gender Support Form to ensure that the school only affirms their student's sex assigned at birth and states that agreeing to only affirm a student's sex assigned at birth would amount to discrimination if the student later communicates a transgender or non-binary identity at school. Https://www.psdschools.org/programs-services/PSD-Gender-Support-FAQs.

*Runyon*, 427 U.S. at 178. Under rational basis review, "a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Heller v. Doe*, 509 U.S. 312, 320 (1993). The complaining party has the burden to "negat[e] every conceivable basis which might support it." *Id.*; *see also Jones*, 2021 WL 5264188, at **17–18 (rejecting equal protection challenge).

Plaintiffs cannot negate the legitimate interest that the District has in adhering to prohibitions against discrimination for sexual orientation, gender expression, or gender identity in state law and District policy while providing educational services to students. Ex. 1 (citing compliance with relevant state law and District policies, *i.e.*, C.R.S. § 24-34-601, 3 C.C.R. § 708-1, 3 C.C.R. § 708-1-81.9, District policies AC, GBAA, and JBB). Gender support plans are intended to support transgender or gender non-conforming students' expression of their preferred gender identity at school, which is a right protected by state law. C.R.S. § 24-34-601, 2(a). The Lee Plaintiff Parents want to misuse a plan to lock M.L. into the gender he was assigned at birth and prevent him from ever expressing another gender preference at school. They have no such constitutional right, and the District would violate its own policies and state and federal law if it allowed them to do so. Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (prohibits discrimination on basis of sex, including sexual orientation and gender identity, in any education program or activity offered by a recipient of Federal financial assistance.) More specifically, both District policy and state law prohibit harassment based on gender identity or gender expression, which includes deliberately misusing a transgender student's name or gender-related pronoun. For the same reason, the District cannot agree with parents to only affirm a student's sex assigned at birth through a gender support plan for a cisgender student.  Doing so

would qualify as discrimination if the student later communicates a transgender or non-binary identity at school. Given these legitimate interests in complying with state and federal law and District policies prohibiting discrimination, Plaintiff Lee's equal protection challenge fails as a matter of law.[8]

## II. Plaintiffs Fail To Establish Municipal Liability, Punitive Damages are Unavailable, and Naming the District and its Governing Board is Redundant.

Plaintiffs' Complaint shows a failure to establish municipal liability as a matter of law, which requires that their request for punitive damages and one defendant to be stricken, and all their remaining claims to be dismissed with prejudice pursuant to Rule 12(b)(6).

*First*, Plaintiffs request punitive damages, which are disallowed against municipalities. *Compare City of Newport v. Fact Concerts, Inc*., 453 U.S. 247 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. § 1983.") *with Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701, 738 (1989) (stating public school districts are considered municipal entities). Accordingly, Plaintiffs' request for punitive damages must be stricken. Compl. at 31, ¶¶ C, D.

*Second*, in their Complaint, Plaintiffs name both the District and the Board as Defendants. Compl. at 1. However, in Colorado, a school district is the entity subject to suit, and the district

---

[8] To the extent that Plaintiffs also attempt to assert a free exercise claim, it has not been plausibly pled. Plaintiffs refer to the First Amendment in only two paragraphs in their 31-page complaint. Compl. ¶¶ 1, 9. Similarly, Plaintiffs refer to their religious beliefs and convictions in only two paragraphs. *Id*. ¶¶ 125–26. Their two counts, in contrast, only reference the Fourteenth Amendment, *id*. at 27–30, and do not otherwise claim nor could they claim to have endured a violation of their religious freedoms. Even if Plaintiffs were to attempt to amend, any Free Exercise claim would fail as a matter of law. *Jones,* 2021 WL 5264188, at **11-14, 22 (determining that under First Amendment plaintiffs have no constitutional right for advance notice or to be free from references or discussion about transgender issues with lengthy discussion citing, *inter alia*, *Bauchman v. West High Sch*., 132 F.3d 542, 557 (10th Cir. 1997) (no right to dictate school's curricula to conform to religion), *Parker*, 514 F.3d at 107 (no right to provide notice and opt-out of gay marriage-tolerance programming in school)).

encompasses its governing board, the Board of Education. Colo. Const. Art. IX, § 15 ("The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education . . . ."); C.R.S. § 22-32-101 (declaring each school district to be body corporate that may "sue and be sued"). Accordingly, this Court should dismiss the Board as a redundant Defendant. *Cf. K.D. v. Harrison Sch. Dist. 2*, No. 17-cv-2391-WJM-NRN, 2018 WL 4467300, at *6 (D. Colo. Sept. 18, 2018) (dismissing school board where both it and district had been named); *Roe v. Karval Sch. Dist. RE23*, No. 12-cv-00239-WYD-KLM, 2013 WL 1858464, at *7 (D. Colo. May 2, 2013) (holding proposed amendment naming both board and district as defendants was "inappropriate" because they "are not separate entities").

*Third*, Plaintiffs allege both due process and equal protection violations pursuant to the Fourteenth Amendment against the District. Compl. at 1, ¶¶ 205–31. Yet, a school district cannot be held liable for the actions of its employees under a theory of *respondeat superior*. *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978); *Milligan-Hitt v. Bd. of Trs., Sheridan Cty. Sch. Dist. No. 2*, 523 F.3d 1219, 1223 (10th Cir. 2008). To establish liability pursuant to Section 1983 against a municipality, Plaintiffs must plausibly allege that (1) a municipal employee committed a constitutional violation, and (2) that violation was caused by an official policy or custom. *Murphy v. City of Tulsa*, 950 F.3d 641, 644 (10th Cir. 2019); *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1249 (10th Cir. 1999) (affirming dismissal of Section 1983 claims against school district pursuant to Rule 12(b)(6) for failure to state a claim).

Among the five potential sources that may qualify as a municipal policy or custom, the following three are implicated by Plaintiffs' allegations: (1) a formal regulation or policy statement, (2) an informal custom amounting to a widespread practice that, although not authorized

by a written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law, or (3) the decision of a municipal employee with final policymaking authority. *Murphy*, 950 F.3d at 644 (citation omitted). A single unconstitutional incident is insufficient for municipal liability. *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985); *Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan*., 582 F.3d 1155, 1170 (10th Cir. 2009).

Plaintiffs' allegations fail to establish municipal liability against the District. To begin, they have failed to plausibly allege that the former faculty sponsor of the GSA committed any constitutional violation, which ends the inquiry.[9] Even if they could plausibly allege that she committed a constitutional violation, they cannot show that any of her alleged actions were in accordance with any official policy or custom of the District because none of the three above-referenced criterion applies here.

*First*, the 2023 Guidelines are not District policy voted upon and approved by the Board, and thus, they do not constitute "a formal regulation or policy statement." The District further notes that the 2023 Guidelines were not in existence while C.L., H.J., and M.L. were enrolled at WMS or RES, which further supports Defendants' argument that there is no injury in fact caused by the Guidelines to any of the Plaintiffs. Ex. 1 (showing date of Jan. 13, 2023), *see* Section III.

*Second*, there was no widespread practice constituting a custom or usage with the force of law within the District to violate any parental interests or constitutional rights. The Plaintiff Parents point to a singular concern about the former GSA faculty sponsor allegedly inviting C.L. to a "GSA

---

[9] Kimberly Chambers appeared at the May 2021 GSA meeting as Executive Director of SPLASH and to discuss related content. Compl. ¶ 50.

Art Club," Compl. ¶ 42, while admitting that H.J. was encouraged by a student, who is not a District employee, to mislead her parents that she was attending an "Anime Club" not a GSA meeting, *id*. ¶¶ 91–93. A singular instance of a former GSA faculty sponsor allegedly referring to a "GSA Art Club" does not show a widespread practice of improper conduct or deception by the District or a series of decisions that would constitute the same. *City of Okla. City*, 471 U.S. at 823-24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose [municipal] liability…."). Though Plaintiffs allege that the Guidelines represent "a policy, practice, or custom" of deception, secrecy, and subterfuge in violation of their parental interests to direct the education and upbringing of their children, the Guidelines express language contradicts these conclusory allegations. Ex. 1 at 2 ("[T]hese Guidelines support healthy communication between educators and parents/guardians to further the successful educational outcomes and well-being of every student."); *see also* n. 4 (citing authority for Court to reject allegations not supported by plain text of documents attached to Compl.).

*Finally*, any alleged actions by the former GSA faculty sponsor or the former principal of WMS in conjunction with the GSA meetings do not constitute "the decision of a municipal employee with final policymaking authority." Principals of the school sponsoring the GSA or faculty sponsors of extracurricular clubs are not final policymakers. Like in *Murrell*, Plaintiffs' "complaint gives no indication that either the principal or the teachers possessed the 'final policymaking authority' the Supreme Court requires for purposes of establishing municipal liability under section 1983. . . ." *Murrell*, 186 F.3d at 1249; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) (determining final policymaking authority is legal question for judge); *accord Randle*, 69 F.3d at 447. Consequently, Plaintiffs' failure to establish municipal liability requires

dismissal with prejudice. *Singer v. Denver Sch. Dist. No. 1*, 959 F. Supp. 1325, 1330 (D. Colo. 1997) (finding no customary discriminatory employment practices, principal did not have final policymaking authority, and ruling in favor of school district).

### III. Plaintiffs Have Failed To Plausibly Allege Injuries Caused by the District Sufficient for Article III Standing.

Plaintiffs lack Article III standing, and their complaint should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). "The party invoking federal jurisdiction bears the burden of establishing th[ree] elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "*First*, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest [that] is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotations and citations omitted). A particularized injury is one that affects the plaintiff in a personal and individual way. *Id.* at n.1. "*Second*, there must be a causal connection between the injury and the conduct complained of—the injury [must] be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* at 560 (internal quotations and citation omitted). "*Third*, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561(internal quotations and citation omitted); *accord Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020).

Regarding the first prong, Plaintiffs' conclusory allegations are insufficient to show any concrete harm or direct injury to the minor children or their parents. According to the Complaint, C.L. and H.J. were "directly impacted by the unlawful customs, policies, and practices of Defendants." Compl. ¶¶ 15, 20. M.L. also was "directly impacted by the unlawful customs, policies, and practices of Defendants," *id.* ¶ 16, but the Complaint is devoid of any alleged **harm**

arising from his parents' request for a gender support plan reiterating his biological gender and pronouns—*i.e.*, his status quo remained the same and there is no other alleged injury to M.L. evident in the Complaint. Claiming to have been "directly impacted" does not plausibly establish any type of concrete and particularized adverse consequence constituting a harm or injury. The Plaintiff Parents have experienced no injury in fact regarding the Guidelines because they have not alleged that they have been denied any information related to their child's gender identity at school, which would be improbable anyway given that the District generally agrees that "[p]arents/guardians have the right under FERPA to view all education records of their student upon request, which would include a student's Individual Gender Support Form." Ex. 1. at 4. And, the Plaintiff Parents have endured no "invasion of a legally protected interest" given that no plausible constitutional violation has been pled, as discussed in Section I.

Even if Plaintiffs could satisfy the first prong, which they cannot, their allegations do not plausibly establish causation. Concerning the Plaintiff Parents, their alleged consequences cannot be fairly traceable to any conduct by the Defendants, especially given their own admitted actions evident in their Complaint. The Lee Plaintiff Parents complain of private school tuition and transportation costs for C.L. Compl., Prayer for Relief, B. Yet, those consequences were self-inflicted due to their decision to disenroll C.L. from WMS and enroll her in a private school. Compl. ¶ 69.[10] Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves

---

[10] Plaintiffs are free to remove their children from the District and select a private institution, *Pierce*, 268 U.S. at 534–35, or educate their children at home, *Wisconsin*, 406 U.S. at 205, to completely oversee their children's expression of gender identity. *See also Parents Def. Educ. v. Linn-Mar Cmty. Sch. Dist.*, No. 22-CV-78 CJW-MAR, 2022 WL 4356109 at *10 (N.D. Iowa Sept. 20, 2022) ("Parent A . . . has freely withdrawn their child from the school district. The Policy no longer applies to their child, and the harm of being 'forced' out of the school district is self-inflicted.") (to be published in F. Supp. 3d, on appeal to 8th Circuit).

based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Both C.L. and H.J. chose to attend the extracurricular GSA meetings. *Id.* ¶¶ 45, 46, 91, 92, 97. The Plaintiff Parents cannot fairly trace the GSA meetings to the impetus for C.L. and H.J.'s emotional decline, suicide ideation, and suicide attempt because the Complaint shows that it was parental non-acceptance and enforcement of their own traditional gender beliefs[11] that caused C.L. and H.J.'s emotional decline. Statistics show that transgender youth are much more prone to depression, anxiety, and suicide ideation,[12] especially when they lack familial acceptance and support,[13] and the Complaint shows that C.L. and H.J. were not immune to these serious issues. The allegations in the Complaint show that C.L.'s "emotional decline of gender and sexuality confusion that required counseling and included suicidal thoughts" were fairly traceable to her announcement that she would be transitioning and her parents' response of non-acceptance and consequences, *i.e.*, the announcement caused her immediate disenrollment from her public school, allegedly resulted in a well-child check from the school, "heavily impacted her relationship with

---

[11] Ex. 2, Amici Br., 2023 WL 144152, at **15-16 ("Parents and relatives are also the most likely source of pressure for young LGBTQ people to undergo so-called 'conversion therapy' aimed at altering their gender identity or sexual orientation, which the American Medical Association describes as 'clinically and ethically inappropriate' and has been rejected by '[a]ll leading professional medical and mental health associations . . . as a legitimate medical treatment . . . .'").

[12] *Id.* at *7 (reporting that "nearly 60% of TGD youth reported that they wanted to obtain help from a mental health professional", and that "transgender youth are 2.7 times more likely to attempt suicide than other young people") (citations omitted).

[13] *Id.* at **14-15 ("Parental support is 'significantly associated with higher life satisfaction . . . and fewer depressive symptoms' among TGD [transgender and gender-diverse] people…. '[P]arental support of youth's gender minority identity' is a protective factor against high risks of suicide. Family support also corresponds with improved mental health including lower levels of self-harm, distress, and anxiety, and higher levels of self-esteem and resilience…. Research accordingly confirms that rejection by family members corresponds directly to 'negative psychosocial outcomes' including depression, anxiety, and thoughts of suicide.") (internal citations omitted).

her father," who found it difficult to communicate with her for several weeks, and resulted in her being placed in a private school by her parents. *Id.* ¶¶ 66, 70, 73, 75, 69. Similarly, H.J.'s "emotional decline" and suicide attempt were fairly traceable to her grappling with her gender identity, resulting confusion, leaving notes related to transgenderism for her parents, and reactions from those around her. *Id.* ¶¶ 114-15, 117, 119.

Finally, Plaintiff Parents fail to show that their perceived injury (violation of their interests in directing the education and upbringing of their children) will be redressed by a favorable verdict because the Guidelines follow both state law and District policies, all of which would still be in effect regardless of any court decision pertaining to the GSA meetings or Guidelines. Ex. 1 (citing compliance with relevant state law and District policies, *i.e.*, C.R.S. § 24-34-601, 3 Colo. Code Regs. § 708-1, 3 Colo. Code Regs. § 708-1-81.9, District policies AC, GBAA, and JBB). Plaintiffs have failed to establish Article III standing for case or controversy and for injunctive relief,[14] and their Complaint should be dismissed for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing three independent legal bases (*i.e.*, failure to state a claim, failure to establish municipal liability against Defendants, and failure to establish Article III standing), Defendants request that Plaintiffs' Complaint be dismissed with prejudice.

RESPECTFULLY SUBMITTED this 7th day of July, 2023.

SEMPLE, FARRINGTON, EVERALL & CASE, P.C.

---

[14] Relatedly, Plaintiffs request injunctive relief to which they are not entitled. Compl. at 30, ¶A. Regarding standing to seek injunctive relief, Plaintiffs "must show that [they have] sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983); *Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011). Here, they do not plausibly allege any injury in fact or any immediate danger of sustaining a direct injury much less any continuing injury to establish any entitlement to injunctive relief as a matter of law.

By: /s/ Stephanie K. Wood
Jonathan P. Fero
Stephanie K. Wood
1120 Lincoln Street, Suite 1308
Denver, CO  80203
(303) 595-0941
jfero@semplelaw.com
swood@semplelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July, 2023, Defendants' Motion to Dismiss along with two cited exhibits were filed via CM/ECF and electronically served on all counsel of record.

By: /s/ Stephanie K. Wood