IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01117-NYW-STV

JONATHAN LEE;
ERIN LEE;
C.L., a minor, by and through parents JONATHAN and ERIN LEE as next friends;
M.L., a minor, by and through parents JONATHAN and ERIN LEE as next friends;
NICOLAS JURICH;
LINNAEA JURICH; and,
H.J., a minor, by and through parents NICOLAS and LINNAEA JURICH as next friends,

      Plaintiffs,

v.

POUDRE SCHOOL DISTRICT R-1, Ft. Collins, Colorado; and,
POUDRE SCHOOL DISTRICT R-1 BOARD OF EDUCATION,

      Defendants.

---

**RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS (ECF NO. 29)**

---

## INTRODUCTION

This action seeks to uphold one of the oldest fundamental rights recognized by our system of law: the right to raise one's children. Plaintiffs' concerns are simple and straightforward. First, the Defendants' customs, practices, and policies denied Plaintiffs essential information needed to meaningfully direct the upbringing of their children. Second, the Defendants violated the Equal Protection Clause by denying Plaintiff M.L. access to a Gender Support Plan on the basis that his sex aligns with his gender identity. Both actions violate the Plaintiffs' Fourteenth Amendment

1

rights, and this Court should deny the Defendants' motion to dismiss (ECF No. 29, henceforth "Motion" or "Mot.").

Plaintiffs' prayer for injunctive relief seeks to ensure that parents are fully informed about school programs that address sexually themed topics and seeks no change to the Defendants' curriculum. Information is the lifeblood of a meaningful exercise of a parent's right to direct a child's education, and the Plaintiffs' rights were frustrated by the Defendants' secrecy policies. Regardless of whether the Defendants were engaged in secret discussions of transgenderism or secret Christian baptisms, the issue would be the same: the imperative for schools to keep parents adequately informed.

## FACTUAL BACKGROUND

The Plaintiffs are members of the Jurich and Lee families. Their children attended schools under the control of the Defendants Poudre School District R-1 and the PSD Board of Education (together, "Defendants"). Compl. ¶¶ 13-16 (Lee family); 18-20 (Jurich family); 22-27 (Defendants). Plaintiffs C.L. and H.J. are girls who attended Wellington Middle School and were encouraged by representatives of the Defendants to attend an after-hours meeting of the school-sponsored Genders and Sexualities Alliance ("GSA") club. Compl. ¶¶ 28, 42, 49, 50, 95, 97, 98, 107, 108. School-sponsored club meetings are subject to the Defendants' approval[1] and the GSA meetings attended by C.L. and H.J. were sponsored by their art teacher Jenna Reip. Compl. ¶¶ 52, 53, 184-88. Plaintiff C.L. attended a meeting in early May 2021, and H.J. attended two separate GSA meetings within the following two weeks. Compl. ¶¶ 42, 97. At these GSA meetings the

---

[1] Defendants' arguments on pages 5 and 6 of the Motion indicate that they do not contest the claim that the GSA meetings were part of the curricular experience.

Defendants' representatives, including the art teacher Jenna Reip, discussed sexually themed topics such as puberty blockers, polyamory, transgenderism, gender identity, and suicide. Compl. ¶ 60. Neither family had been informed by the Defendants of these school-sponsored GSA clubs. Compl. ¶¶ 76, 109-11. Prior to attending these meetings, neither daughter had expressed any confusion as to her gender; after the meetings, both started to question their identity. Compl. ¶¶ 67, 114-15. As a result of the doubts raised in the girls by their attending these GSA meetings, both went down a path of severe depression, with C.L. contemplating suicide, and H.J. going so far as to actually attempt it. Compl. ¶¶ 75, 113, 116-20.

Based on the experience of their daughter C.L., Plaintiffs Jonathan and Erin Lee sought a Gender Support Plan ("GSP") for their son, M.L. Compl. ¶¶ 78-87. GSPs prohibit harassment based on gender identities and expressions, by Defendants' representatives, who are obliged to use the pronouns and names identified in the submitted plan. Compl. ¶¶ 79, 81. The Defendants denied the Lee family's request for a GSP; although the benefits of GSP are of value to any family who seeks to ensure the Defendants honor a child's gender identity, the Defendants stated that GSPs are only available for transgender students. Compl. ¶ 86. The Defendants' Guidelines for Supporting Transgender and Non-Binary Students ("Guidelines") unequivocally establish the Defendants' discriminatory intent regarding access to GSPs, stating that they are "intended to support a transgender or non-binary student" since "[c]isgender and gender normative students inherently have access to a gender-affirming school environment." Compl. ¶ 176; Ex. 1 to Mot.

## STANDARD OF REVIEW

A complaint survives a motion to dismiss when the alleged facts, which are accepted as true, state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

3

*Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is plausible when a court can draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* At the pleading stage, plausibility is not probability; the inquiry is whether there are enough facts to believe that discovery will reveal evidence supporting the claim." *Twombly*, 550 U.S. at 556. And to survive a "Rule 12(b)(6) motion to dismiss a § 1983 claim, a plaintiff must allege '(1) a violation of rights protected by the federal Constitution . . . (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage of any State[.]'" *Beedle v. Wilson*, 422 F.3d 1059, 1064 (10th Cir. 2005) (quoting *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002)). Where the § 1983 claim is asserted against a municipality, the "claim must include factual allegations that a particular municipal custom or policy was the moving force behind the constitutional injury in order to withstand a Rule 12(b)(6) dismissal." *Soto for estate of Jimenez v. Bd. of Cty. Comm'rs of Caddo Cty., Okla.*, 748 Fed. Appx. 790, 794 (10th Cir. 2018) (citing *Plye v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017)).

## ARGUMENT

### I. Defendants Violated Plaintiffs' Parental Rights

Under the text of the Fourteenth Amendment "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Certain fundamental rights, deeply rooted in this Nation's history and tradition, deserve heightened protection from government intrusion. *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228, 2242 (2022). The right of parents to direct the upbringing of their children is precisely such a fundamental right; the Supreme Court has held that it "is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000).

The Defendants ran afoul of these rights by surreptitiously inserting themselves into the private realm of the family. Without providing notice to parents, the Defendants kept parents uninformed about sexually explicit topics taught at school-sponsored clubs and discouraged children from discussing issues related to gender and sexuality with their parents.

When examined through the lens of *Troxel* the unlawful nature of Defendants' policy is clear. The *Troxel* Court invalidated a Washington statute that allowed any person to petition for visitation rights with a child if a court deemed the visit would "serve the best interest of the child." 530 U.S. at 60. In *Troxel,* the grandparents of two girls successfully petitioned for visitation rights over the objection of the girls' mother (the grandparents were the parents of the recently deceased father). *Id*. at 61. Declaring the Washington statutes to be "breathtakingly broad," Justice O'Connor held that the statute improperly "accorded no deference" to a parent's decision as to the best interests of a child, and unconstitutionally "places the best-interest determination solely in the hands of the judge." *Id.* at 67. Pivotal to O'Connor's analysis was the fact that there was no allegation that the mother was an unfit parent: "[t]hat aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children." *Id.* at 68. In support of the presumption that fit parents are presumed to act in the best interests of the child, the *Troxel* Court relied on this earlier statement in *Parham v. J.R.,* 442 U.S. 584, 602 (1979) (cleaned up):

> Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations." *Pierce v. Society of Sisters,* 268 U.S. 510, 535 (1925). See also *Wisconsin v. Yoder,* 406 U.S. 205, 213 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944); *Meyer v. Nebraska,* 262 U.S. 390, 400 (1923). Surely, this includes a "high duty" to recognize symptoms of illness and to seek and follow medical advice. The law's

5

> concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children. 1 W. Blackstone, Commentaries * 447; 2 J. Kent, Commentaries on American Law * 190.

*Parham'*s citation to *Pierce*, *Yoder*, *Prince*, and *Meyer* in the passage above demonstrates the Court's century long deference to the concerns of parents in raising children. Relying on this passage, the *Troxel* Court held that "so long as a parent adequately cares for his or her children (*i.e.* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."  530 U.S. at 68-69 (citation omitted).

Similarly, there has been no suggestion that any Lee or Jurich parent are unfit.  Accordingly, the Defendants were compelled to presume that the Lees and Juriches possess the maturity and experience their children lack and that their "natural bonds of affection [will] lead [the] parents to act in the best interests of their children."  *Parham,* 442 U.S. at 602.  The Defendants, however, kept parents in the dark as to gender and sexuality matters involving their children.

Importantly, the Defendants' efforts at concealment were a feature, not a bug, of the Defendants' policies and practices.

Starting with the GSA meetings, the Defendants' representatives encouraged children to treat the discussions as secret, and (despite no determination as to parental fitness) warned that it might not be safe to discuss the meetings with their families.  Compl. ¶¶ 32-34, 58, 76, 103-05, 110-11.  The Defendants' representatives did, however, suggest to C.L. and H.J. that it would be safe to discuss issues regarding sexuality and gender with school officials.  Compl. ¶ 59.  Defendants' Guidelines continue the pattern of secrecy towards parents by mandating that the

6

Defendants' representatives should not, "disclose information that may reveal a student's transgender or non-binary status to . . . parents," without student permission. Compl**.** ¶ 149. The Guidelines state that employees are to use, "the name and pronouns that the student's parent or guardian use, unless the student requests otherwise." Compl. ¶ 153. Furthermore, when directly confronted by a parent as to whether a student uses a different name and set of pronouns at school than at home, the staff is directed to not answer and to "refer [parents] to the school counselor . . .;" the counselor should then use "professional judgment to determine" whether to inform the parents of the child's transgender status. Compl. ¶¶ 153, 156, 159-61. In so saying, Defendants refute their own contention that "these Guidelines support healthy communication between educators and parents/guardians to further the successful educational outcomes and well-being of every student." Mot. p. 7; Guidelines, Ex. 1 to Mot., p. 2. Regarding the GSPs the Defendants are again perfectly willing to exclude parents from the decision process and keep them ignorant of student decisions. Compl. ¶ 169-70. It must be remembered that this is all completely independent of any judicial finding as to the fitness of the parents. The Defendants are simply inserting themselves "into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel,* 530 U.S. at 68-69 (citation omitted).

These secrecy policies undermine the parents' fundamental right to direct their child's upbringing. *See Ricard v. USD 475 Geary Cty., Kan. Sch. Bd.,* No. 5:22-cv-5:22-cv-04015-HLT-GEB, 2022 WL 1471372, at *8, n.12 (D. Kan. May 9, 2022) (addressing a school policy preventing disclosure to parents of a child's transgender status, the court held that ". . . it is illegitimate to conceal information from parents for the purpose of frustrating their ability to exercise a fundamental right . . ."); *Willey v. Sweetwater Cty. Sch. Dist.*, No. 23-CV-069-SWS, 2023 WL

7

4297186, at *14 (D. Wyo. June 30, 2023) (addressing a school policy preventing disclosure to parents of a child's transgender status, the court held that parents have a "right to direct their minor child's education which cannot be accomplished unless they are accurately informed in response to their inquiries.  Similarly, parents could not make a reasonable choice regarding the type of education [they want for their child] . . . if they are unaware of circumstances that have a significant bearing on that decision because of a school's withholding of information or active deception, despite their inquiry.").  Additionally, the Defendants' concealment efforts also run afoul of Colorado law.  Colorado parents have statutory rights to be notified of educational materials that contemplate sexually explicit content and require parents to be afforded a meaningful opt-out provision.[2]  Compl. ¶ 134-35.

Just as the Defendants' policies affect a parent's fundamental rights, they are properly subject to strict scrutiny.  *See, e.g., San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973) ("We must decide, first, whether the [state action] impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny"). Although Justice O'Connor's opinion in *Troxel* did not address scrutiny, Justice Thomas' concurrence noted that as "parents have a fundamental constitutional right to rear their children including the right to determine who shall educate and socialize them . . . I would apply strict scrutiny to infringements of fundamental rights." *Troxel,* 530 U.S. at 80 (Thomas, J., concurring).

While the Defendants concede that parental rights are a "fundamental right" under Supreme Court jurisprudence (Mot. p. 4), the Defendants suggest that the Plaintiffs are seeking to

---

[2] Colo. Rev. Stat. § 22-25-110(4)(a) (Health Education Act); Colo. Rev. Stat. § 22-1-128(3)(b) (Sex Education Act).

modify the Defendants' curriculum and therefore strict scrutiny would not apply. (Mot. p. 5, 6.) Plaintiffs, however, seek no such relief; Plaintiffs' injunctive prayer for relief is focused on ensuring the Defendants do not hide anything from parents, a point also supported by Colorado law.³ Information is an essential component to the exercise of rights protected by the Fourteenth Amendment. *See, e.g., Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 269 (1990) ("Th[e] notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment."); *White v. Napolean*, 897 F.2d 103, 113 (3d Cir. 1990) (holding that the "right to refuse treatment is useless without knowledge of the proposed treatment"); *Licerio v. Lamb*, No. 20-cv-00681-WJM-STV, 2021 WL 4556092 at *15 (D. Colo. July 15, 2021) ("the Fourteenth Amendment right to refuse medical treatment includes the derivative right to such information as is reasonably necessary . . . to make an informed decision to accept or reject the treatment."). As information is the mother's milk of a meaningful exercise of fundamental rights, strict scrutiny is the proper standard for evaluating Defendants' custom of secrecy.

Moreover, even under a rational basis analysis, Defendants' secrecy policy similarly fails. Their rationales of safety and inclusion, while noble, are entirely irrelevant as "there is a presumption that fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68. In *Stanley v. Illinois*, 405 U.S. 645, 652 (1972), the Court invalidated a presumption in dependency hearings that unwed fathers are unfit, noting that the State sees "no gain towards its declared goals when it separates children from the custody of fit parents." *See also Parents Defending Education v. Linn-Mar Community School District*, 629 F.Supp.3d 891, 909 (N.D. Iowa 2022) ("Plaintiff is certainly correct no one can decide without proper process that a parent is unfit or should not be

---

³ Colo. Rev. Stat. § 22-1-128(3)(b).

allowed to make decisions directed toward the care, custody, and control of their children."); *Jacinto-Castanon de Nolasco v. U.S. Immigration and Customs Enforcement*, 319 F.Supp.3d 491, 501 (D.D.C. 2018). ("While the need to protect children from unfit parents is a well-recognized compelling reason for burdening family integrity, defendants must make at least some showing of parental unfitness in order to establish such a compelling state interest."). As with Illinois' unconstitutional presumption in *Stanley* that unwed fathers were presumptively unfit, the Defendants' policies simply presume the unfitness of parents without any judicial determination. Defendants present no particularized rationale as to why the Lees and Juriches ought to be deprived of relevant information regarding their children, and as such the secrecy applied to those families was entirely arbitrary.

## II.  Denial of M.L.'s GSP Violated the Equal Protection Clause

The Fourteenth Amendment's Equal Protection Clause provides that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. To "assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011) (citation omitted). "Individuals are 'similarly situated' only if they are alike 'in all relevant respects.'" *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (quoting *Coal. For Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008)).

After their experience with their Daughter C.L., the Lee Plaintiffs sought a GSP for their son, M.L. but were denied because his sex aligned with his gender identity.  Compl. ¶ 86.  The crux of Count II rests on identifying the class of "similarly situated" persons entitled to a GSP.  As

the name implies, "gender support plans" are designed to support children who are "gendered." Contrary to the Defendants' suggestion, the similarly situated pertinent groups are not "transgender" and "cisgendered" but rather any child that experiences gender who seeks "access to a school environment that is affirming and is free from discrimination and harassment on the basis of gender identity and gender expression." Compl. ¶ 176; Mot. Ex. 1, p.10. By design, the accommodation creates an affirming and harassment free environment for students.

As the Defendants' denial of M.L.'s GSP was based on his sex, this Court's review falls under the "heightened standard of review" of intermediate scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Class-based equal protection claims that allege discrimination based on race, national origin, or sex require a showing that "the challenged state action intentionally discriminates between groups of persons." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012) (citations omitted). But "[w]hen a distinction between groups of persons appears on the face of a state law or action, an intent to discriminate is presumed and no further examination of legislative purpose is required." *Id* (citations omitted). As noted above, the Guidelines, on their face, deny gender support plans to cisgender children while granting them to transgender children; the Defendants' denial of M.L.'s request shows these Guidelines are honored in practice as well.

To survive intermediate scrutiny, the Defendants must establish an "exceedingly persuasive justification" for unconstitutional gender-based classifications. *Mississippi University for Women v. Hogan*, 458 U.S. 718, 731 (1982). The Defendants must show that the gender-based classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." *Wengler v. Druggists*

11

*Mutual Ins. Co.*, 446 U.S. 142, 150 (1980) (citations omitted). The Defendants argue that their admitted discrimination has nothing to do with sex, as both cisgendered males and females are equally refused gender support plans, but their denial was based on the fact that M.L.'s *sex* aligned with his preferred pronouns. Contrariwise, had female sought a GSP to use male pronounces, the Defendants would have readily accommodated the request. Defendants also suggest that the GSP would unfairly lock the child into an irreversible gender identity, but there is nothing in the GSP program which prevents subsequent changes.

Even if this Court determines the rational basis standard of review to be appropriate, the Defendants do not satisfy this standard. In denying GSPs to students like M.L., the Defendants run afoul of the very laws they claim they are following. The Defendants are participating in "a discriminatory practice" by "refus[ing], withhold[ing] from or deny[ing]" a GSP to M.L. because of his "sexual orientation, gender identity, [or] gender expression." Colo Rev. Stat. § 24-34-601(2)(a). It is impossible for there to be a reasonable fit between an interest of "adhering to prohibitions against discrimination" and a policy that is itself discriminatory. (Mot. p. 12.).

Defendants' own position disproves their claim that "[c]isgender and gender normative students inherently have access to a gender-affirming school environment," (Compl. ¶ 176). Defendants suggest that H.J. and C.L. suffered an emotional decline not as a result of Defendants' actions but due to the parents, "own traditional gender beliefs." (Mot. p. 19.) While issues of "non-acceptance" and "traditional gender beliefs" raise a factual concern not properly before the court on a motion to dismiss, the Defendants' position indicates that they consider Plaintiffs H.J. and C.L. to be trans-boys rather than girls. It is precisely to avoid this sort of confusion that GSPs should be made available to cisgender children. GSPs require the Defendants' representatives to

use the names and pronouns referenced in the GSP, and it is the parent's interest that controls as "there is a presumption that fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68.

Under *Parham*, there is a "presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." 442 U.S. at 602.  And if, as under *Troxel*, the interest of *grandparents* in visiting their *grandchild*, even when provided by *statute* and approved by a *court*, is a constitutional nullity when opposed by an otherwise fit parent, then a *school's* policy to conspire with a *child* to keep name, pronoun, and gender changes secret from a fit parent is equally invalid.  A child's name is no trivial matter; the paramount role of a parent in selecting a child's name has long been recognized by Colorado and is reinforced through statutes requiring judicial review for name changes.[4]  Secrecy policies for name changes are unrelated to either curriculum issues or the day-today challenges confronting educators.  The Defendants' policy is nothing other than a surreptitious and unconstitutional attempt by the "State to inject itself into the private realm of the family." *Troxel*, 530 U.S. at 68-69.

### III. Plaintiffs Established Municipal Liability Under *Monell*

Under *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978), a plaintiff may establish § 1983 liability against a municipality by showing that its customs or policies are responsible for the alleged violation.  When there is "an allegation that official policy is responsible for a deprivation of rights protected by the Constitution," liability can attach "even though such a

---

[4] See, for example, Colorado statutes regarding birth certificates (C.R.S. 25-2-112) and name changes, (C.R.S. 13-15-101 and 102).

custom has not received formal approval through the body's official decision-making channels." *Monell,* 436 U.S. at 690-91. Plaintiffs have sufficiently alleged that Defendants' custom and practice deprived Plaintiffs of their fundamental right to make decisions regarding the upbringing of their children, thereby establishing § 1983 liability. As was recently set out in a case from this District, municipal liability is established when a plaintiff alleges:

> (1) the existence of a continuing, persistent, and widespread practice of unconstitutional misconduct by the municipality's employees; (2) deliberate indifference to or tacit approval of such misconduct by the municipality's policymaking officials after notice to the officials of that particular misconduct; and (3) that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the custom and that custom was the moving force behind the unconstitutional acts.

*Dayton v. City & Cty. of Denver, Colorado,* No. 22-CV-0084, 2023 WL 112491, at *9 (D. Colo. Jan. 5, 2023) (citation omitted). The Defendants in this case introduced concepts of gender fluidity and various types of sexual attraction to students, including Plaintiffs H.J. and C.L., through school sponsored after-school activities, and failed to provide any notice to parents. Compl. ¶ 28. Jenna Riep, an art teacher employed by the Defendants, extended a personal invitation to C.L. without parental notification or consent and C.L. attended her first meeting on May 4, 2021. Compl. ¶ 42. Riep also extended a personal invite to H.J., without parental notification or consent. Compl. ¶ 95. At each meeting they attended, the students were told to keep the topics of discussion secret and that it "may not be safe" to discuss the meetings with their parents. Compl. ¶ 58, 59, 104. On a number of other occasions, Riep invited H.J. to attend GSA meetings related to sexuality and gender identity. Compl. ¶ 107. Taken as true, these allegations are sufficient to demonstrate a persistent, widespread custom or practice within the Defendants' schools of keeping GSA activities secret from parents, thereby preventing parents from exercising their fundamental right to direct the upbringing of their children. Plaintiffs have also satisfied the

second requirement of governmental custom because the Defendants had "actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation, and it consciously or deliberately cho[se] to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citations omitted).  For instance, Defendants were aware of GSA meetings and activities by at least May 11, 2021.  On that day, Erin Lee attended a PSD Board of Education meeting and expressed her objection and concern that she was neither notified of nor consented to her daughter's attendance at the May 4 GSA meeting.  Compl. ¶ 77.  In the days shortly after Lee's public appearance before the School Board, Riep continued to lead GSA meetings, including at least two that H.J. attended.  Compl. ¶ 98, 109, 110.  Also, on or about May 14, 2021, PSD Principal Kelby Benedict ("Benedict") met with Plaintiffs Erin and Jonathan Lee. Compl. ¶ 72. In that meeting, Benedict confirmed the custom of secrecy when he explained to the Lees that in order to create a "safe space" there was an expectation of confidentiality adopted by the school.  Compl. ¶ 74.  A reasonable jury could find that the continuation of the GSA clubs after this date constituted the official policy of the Defendants. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 977 (9th Cir.2010) (suggesting that ejections from a city council meeting could constitute official government policy for purposes of *Monell*).

Lastly, as to causation, the complaint alleges that the emotional depression of Plaintiffs H.J. and C.L. was a direct result of the discussions at the GSA meetings.  However, as significant as the physical and emotional injuries suffered by these families have been, the essential harm present in this case – the intentional deprivation of information essential for the adequate exercise of the Plaintiffs' parental rights – is exclusively a result of the Defendants' policies of secrecy.  There is a clear and unambiguous line between the Defendants' policies and an underlying belief

15

by the Defendants that parents may not act in the best interests of their children. These policies directly led to the collusion of the Defendants and their representatives to keep vital information about children away from their parents.

Plaintiffs' claims against the District and the Board are based on the roles they play in the management of the schools located within Poudre School District R-1. Their collective failure to stop their representatives from engaging in unconstitutional conduct contributed to the deprivation of the Plaintiffs' fundamental rights under the Fourteenth Amendment and Plaintiffs assert that it is too early to determine whether one of the entities should be dismissed. *See* Fed. R. Civ. P. 21 (stating in part that misjoinder is not a ground for dismissal).

Plaintiffs agree that punitive damages are not available against municipalities or governmental subdivisions. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding that municipalities are immune from punitive damages under 42 U.S.C. § 1983); *see also Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1307 (9th Cir. 2003). Plaintiffs therefore request that this Court allow the Complaint to be amended accordingly.

## IV.   Plaintiffs have Alleged Standing

To invoke federal jurisdiction a plaintiff must establish an injury in fact, a causal connection between the injury and the conduct at issue, and an injury that is likely to be redressed by a favorable decision by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Defendants contend that Plaintiffs do not allege any concrete harm or direct injury. However, Plaintiffs allege substantive due process injuries of "private school tuition, medical expenses, counseling fees, compensation for damages to the Plaintiffs' reputation, transportation, and emotional anguish" as a result of the violation of their substantive due process rights. Compl.

¶ B. These injuries are downstream of the Defendants' secrecy policies and clearly meet concrete and particularized injury-in-fact requirements.

Defendants practically admit their unequal treatment of the Lee family. The Equal Protection Clause requires that all persons similarly situated be treated alike. *Plyler v. Doe,* 457 U.S. 202, 216 (1982) (citations omitted). A traditional class-based equal protection claim also requires a showing of intentional discrimination. *See SECSYS, LLC,* 666 F.3d at 685.

An equal protection claim can establish injury-in-fact through the imposition of a barrier, not the ultimate inability to obtain a benefit. *See, e.g., Ne. Florida Chapter of Associated Gen. Contractors of America v. City of Jacksonville, Florida*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' element of standing in such an equal protection case is the denial of equal treatment resulting from the imposition of the barrier[.]"). Plaintiffs Lee sought a GSP for M.L., but the Defendants' official policy denies children like M.L. the accommodation purely because of sex. Denial of GSPs to children who, like their similarly situated schoolmates, want the support and safety of a GSP is the definition of the denial of equal protection of the law. Plaintiffs have accordingly established that the Defendants' denial establishes and injury-in-fact and violation of the Equal Protection Clause. Compl. ¶¶ 224-230.

As to causality, the Plaintiffs allege that the Defendants' policies impaired their fundamental right to direct the education and upbringing of their children. Compl. ¶¶ 132, 204, 214. The sole parties responsible for failing to provide information as to the activities of the Defendants and their representatives were the Defendants and their representatives. As a result of this violation, they suffered injuries such as medical care, counseling, and severe emotional harm. Compl. ¶¶ 220-21. These injuries are also a result of the acts of the Defendants and their

17

representatives. Taking these allegations as true, the Plaintiffs have sufficiently alleged a causal nexus between the Defendants' acts and Plaintiffs' injuries. *See Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012).

In challenging Plaintiffs' claims of causality, the Defendants reference facts contained in an amicus brief, submitted in a different case, in a different District.[5] Plaintiffs respectfully request that, pursuant to Fed. R. Civ. P. 12(d), this Court exclude from its consideration any facts contained in non-party submissions that have not been submitted to this Court and limit its review to the four corners of the complaint.

The final element to establish standing is that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quotations omitted). Plaintiffs allege that compensatory damages of "private school tuition, medical expenses, counseling fees, compensation for damages to Plaintiffs reputation, transportation, and emotional anguish" were caused by Defendants' actions. Compl. ¶ 220-221. A favorable decision would provide monetary damages fully redressing Plaintiffs' injuries.

Importantly, Plaintiffs have also established a claim for injunctive relief. To seek injunctive relief, the Supreme Court has held that a "plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (internal quotations omitted). Here, Plaintiffs have sustained direct injury caused by Defendants' conduct and will continue to sustain injuries if they reenroll their students in the Defendants' public schools. Plaintiffs' current

---

[5] *See generally* Mot. p. 7, n.4; Mot. p. 19, n.11-13.

educational plans for their children are much less convenient and much more costly than simply accessing the public schools in their districts but which unfortunately are governed by Defendants' unconstitutional policies. This would be fully redressed by injunctive relief, disallowing the infringing practices in Poudre School District.

## Conclusion

For the foregoing reasons the Court should deny Defendants' Motion to Dismiss.

Dated and respectfully submitted this 4th day of August, 2023.

**AMERICA FIRST POLICY INSTITUTE**

/s/ *Jase Panebianco*

By: Jase Panebianco
Pamela J. Bondi
Richard P. Lawson
Jessica H. Steinmann
America First Policy Institute
1001 Pennsylvania Ave NW
Suite 510
Washington, D.C. 20004
Phone: (202) 684-8361
Email: jpanebianco@americafirstpolicy.com
Email: pbondi@americafirstpolicy.com
Email: rlawson@americafirstpolicy.com
Email: jsteinmann@americafirstpolicy.com

**ILLUMINE LEGAL LLC**

J. Brad Bergford, Esq.
Illumine Legal LLC
7887 East Belleview Avenue
Suite 1100
Denver, Colorado 80111
Phone: (303) 228-2241
Email: brad@lawillumine.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

        Undersigned hereby certifies that a true and correct copy of the foregoing Response in Opposition to Defendants' Motion to Dismiss was filed on the 4th day of August, 2023, with the U.S. District Court of Colorado CM/ECF System, which will notify the following attorneys for the Defendant:

Stephanie K. Wood  
Jonathan P. Fero  
SEMPLE, FARRINGTON, EVERALL & CASE, P.C.  
1120 Lincoln Street, Suite 1308  
Denver, CO 80203  
(303) 595-0941  
jfero@semplelaw.com  
swood@semplelaw.com  

                                                  */s/ Jase Panebianco*

                                                  By: Jase Panebianco