**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 23-cv-01117-NYW-STV

JONATHAN LEE,
ERIN LEE,
C.L., a minor, by and through parents Jonthan and Erin Lee as next friends,
M.L., a minor, by and through parents Jonathan and Erin Lee as next friends,
NICOLAS JURICH,
LINNAEA JURICH, and
H.J., a minor, by and through parents Nicolas and Linnaea Jurich as next friends,

      Plaintiffs,

v.

POUDRE SCHOOL DISTRICT R-1, and
POUDRE SCHOOL DISTRICT R-1 BOARD OF EDUCATION,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' Complaint (the "Motion" or "Motion to Dismiss") [Doc. 29]. The Court has reviewed the Motion, the Parties' briefing, and the applicable case law, and concludes that oral argument would not materially assist in the resolution of the Motion. For the reasons set forth in this Order, the Motion to Dismiss is respectfully **GRANTED**.

## BACKGROUND

The Court draws the following facts from Plaintiffs' Complaint for Damages and Injunctive Relief (the "Complaint"), [Doc. 1], and presumes they are true for purposes of

this Order.[1]  Defendant Poudre School District R-1 (the "District") is a K-12 public school district in Larimer County, Colorado.  [*Id.* at ¶ 22].  Its schools include Rice Elementary School ("RES") and Wellington Middle School ("WMS"), which is now consolidated into Wellington Middle-High School.  [*Id.* at ¶¶ 15–16, 22].

The District runs an after-school organization called the Genders and Sexualities Alliance ("GSA") at a number its schools.  [*Id.* at ¶¶ 28–29].  The GSA is not "disclosed" as part of District curriculum.  [*Id.* at ¶ 30].  Plaintiffs allege that GSA meetings "regularly address sex, sexualities, mental health, suicide, sexual orientation, gender identities, and other topics in discussions, lectures, and distributed materials."  [*Id.* at ¶ 123].

A GSA meeting was held at WMS on May 4, 2021.  [*Id.* at ¶¶ 41–42].  Plaintiff C.L., then a 12-year-old sixth grader at WMS, attended the meeting after being personally invited by her homeroom and art teacher.  [*Id.* at ¶¶ 36, 40, 42].  According to Plaintiffs, topics discussed at the May 4 meeting included polyamory, suicide, puberty blockers, gender identity, sexualities, changing names or pronouns, and "[k]eeping the discussions at GSA secret from parents."  [*Id.* at ¶ 60].  Plaintiffs allege that a part-time District teacher,

---

[1] Attached to Plaintiffs' Complaint is a document titled "Guidelines for Supporting Transgender and Non-Binary Students" (the "Guidelines").  [Doc. 1-1].  In ruling on a motion to dismiss under Rule 12(b)(6), a court "may . . . consider documents attached to or referenced in the complaint if they 'are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).  Defendants do not dispute the Guidelines' authenticity, and rely upon their language to support arguments that dismissal is proper.  [Doc. 29 at 6–7].  But Defendants also note that the Guidelines state that they were "Revised 1-13-2023," *see, e.g.*, [Doc. 1-1 at 2], and "were not in existence" when the circumstances giving rise to this case occurred, [Doc. 29 at 15].  Plaintiffs do not respond to this assertion.  *See* [Doc. 37].  To the extent that there is a conflict between the allegations by Plaintiff about the Guidelines and the contents of the Guidelines, the exhibit controls.  *See Brokers' Choice*, 861 F.3d at 1105.

who had been invited to be a "guest speaker" at the meeting, "told the children that if they are not completely comfortable in their bodies, that means that they are transgender." [*Id.* at ¶¶ 49–50, 54].  The part-time teacher also "awarded prizes in the [sic] LGBTQ paraphernalia such as toys, flags, and other swag" to students who came out as transgender. [*Id.* at ¶ 56].  Plaintiffs allege that several students in attendance announced that they are transgender, and, "feeling pressure to do the same and wanting to receive [the teacher's] prizes," C.L. also announced that she is transgender. [*Id.* at ¶ 57].  After the GSA meeting, C.L. announced to her mother, Plaintiff Erin Lee ("Ms. Lee"), that "she would be transitioning," although she had never expressed such sentiments to her parents before. [*Id.* at ¶¶ 66–67].[2]  The day after the meeting, Ms. Lee and C.L.'s father, Jonathan Lee ("Mr. Lee," and collectively with Ms. Lee, the "Lees"), disenrolled C.L. from WMS and enrolled her in a private school for the next academic year.  [*Id.* at ¶ 69].  Plaintiffs allege that "C.L.'s experience at the GSA club led to a months-long emotional decline of gender and sexuality confusion that required counseling and included suicidal thoughts." [*Id.* at ¶ 75].

Plaintiff H.J., then a 12-year-old sixth grader at WMS, attended GSA meetings on May 11 and May 18, 2021. [*Id.* at ¶¶ 90, 97].  At these meetings, Plaintiffs allege, it was suggested to the student attendees that "if they did not like their bodies, they were most likely not the gender they were 'assigned' at birth." [*Id.* at ¶ 102].  H.J. was also taught about gender fluidity and "the heightened connections between transgenderism and suicide." [*Id.* at ¶¶ 100–01].  After attending the GSA meetings, H.J. "began to have her first suicidal thoughts." [*Id.* at ¶ 113].  Throughout the summer of 2021, H.J. began leaving

---

[2] Plaintiffs allege that C.L. "has since abandoned" this announcement.  [Doc. 1 at ¶ 70].

notes for her parents, Plaintiffs Nicolas Jurich ("Mr. Jurich") and Linnaea Jurich ("Ms. Jurich," and collectively with Mr. Jurich, the "Juriches"), about "transgenderism" and being aromantic or asexual. [*Id.* at ¶ 114]. In the fall of 2021, H.J. began to question her gender identity. [*Id.* at ¶ 115]. H.J. then "underwent a significant emotional decline," and in December 2021, requested to be homeschooled. [*Id.* at ¶ 117]. Shortly thereafter, H.J. attempted suicide. [*Id.* at ¶ 118].

Plaintiffs allege that the District and the Poudre School District R-1 Board of Education (the "Board," and collectively with the District, "Defendants") engaged in a pattern and practice of keeping the GSA activities secret from District parents in that they failed to disclose GSA activities to parents and encouraged students to not discuss GSA activities with their parents. [*Id.* at ¶¶ 31–33]; *see also, e.g.*, [*id.* at ¶¶ 58, 104]. Plaintiffs allege that, in the District, school-sponsored clubs are "considered part of the school program and/or relate[] to a school's curriculum," [*id.* at ¶ 184], and that the District has a policy that requires written notice to parents or guardians of any curriculum that is "part of the District's comprehensive health education program," which includes notice that the parents or guardians may excuse their children from some or all of the comprehensive health education program, [*id.* at ¶ 134]. The Lees and the Juriches were not given notice of the GSA's activities, agenda, or materials. [*Id.* at ¶¶ 76, 109]. Plaintiffs allege that they "have strong and sincere religious convictions regarding the education of their children" about gender identity and sexual orientation and that, had they been provided notice of the topics discussed at GSA meetings, "they would have elected to opt their child out based on these deeply held religious beliefs." [*Id.* at ¶¶ 124–26].

Additionally, Mr. and Ms. Lee's son, M.L., was a seven-year-old first grader at RES in May 2021.  [*Id.* at ¶¶ 16, 78].  The Lees learned that the District offers gender support plans[3] that "prohibit harassment based on gender identities or gender expressions" and that "oblige [District] personnel to use the elected pronouns and names identified" in a plan when speaking with or about the child who is the subject of the plan.  [*Id.* at ¶¶ 79, 81].  The Lees completed gender support forms for M.L. on three separate occasions, requesting that District personnel refer to M.L. by his biological sex and birth name.  [*Id.* at ¶¶ 85, 178].  The District "informed the Lees that gender support plans exist only to benefit and protect the gender identities of transgender children, whereas the Lees sought a gender support plan binding the [District] to benefit and protect the gender identity of their son, including his name and masculine pronouns."  [*Id.* at ¶ 86].  Plaintiffs allege that "an Individual Gender Support Form is not available to a biological male student who identifies as male nor a biological female student who identifies as . . . female" due to "the conjunction of the biological sex and gender identity of the student."  [*Id.* at ¶¶ 177, 180].  H.J., C.L., and M.L. no longer attend District schools.  [*Id.* at ¶¶ 15–16, 20].

Plaintiffs initiated this lawsuit on May 3, 2023, asserting two claims against Defendants:  (1) a Fourteenth Amendment substantive due process claim alleging a "[d]enial of [the] right of the Plaintiff Parents to direct the education and upbringing of the Plaintiff Children," asserted by all Plaintiffs against all Defendants ("Count I"), [*id.* at ¶¶ 205–22]; and (2) a Fourteenth Amendment equal protection claim based on the District's denial of a gender support plan for M.L., asserted against both Defendants by

---

[3] Plaintiffs also use the term "Individual Gender Support Forms" interchangeably with "gender support plans."  *See* [Doc. 1 at ¶¶ 167–80].

Mr. Lee, Ms. Lee, and M.L. ("Count II"), [*id.* at ¶¶ 223–31]. They request the following relief: (1) a permanent injunction requiring (a) that the District provide notice and opt-out rights if gender dysphoria, gender transitioning, or related topics are taught in the District, (b) that these topics only be taught by qualified and trained professionals, and (c) that all materials used in any such instruction be given to parents fourteen days in advance of any instruction; (2) compensatory damages, including the costs of private-school tuition, medical expenses, counseling fees, compensation for damage to Plaintiffs' reputation, transportation, and emotional anguish; and (3) punitive damages. [*Id.* at 30–31].

Defendants filed the instant Motion to Dismiss on July 7, 2023. [Doc. 29]. In the Motion, Defendants contend that Plaintiffs' claims should be dismissed in their entirety because (1) Plaintiffs do not have standing to assert their claims, such that the Court lacks jurisdiction over the claims under Rule 12(b)(1), [*id.* at 17–20]; and (2) Plaintiffs fail to state a claim upon which relief can be granted under Rule 12(b)(6), [*id.* at 4–13]. Defendants also contend that Plaintiffs fail to allege facts supporting a theory of municipal liability and assert that their request for punitive damages is non-viable. [*Id.* at 13–17]. And finally, they contend that the Board should be dismissed because Plaintiffs' claims against it are duplicative. [*Id.* at 13–14]. Plaintiffs responded in opposition to the Motion, *see* [Doc. 37], and Defendants have replied, *see* [Doc. 43]. The matter is thus ripe for disposition and the Court considers the Parties' arguments below.

## LEGAL STANDARDS

### I.     Rule 12(b)(1)

Rule 12(b)(1) permits a court to dismiss an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Dismissal under Rule 12(b)(1) is not a judgment

on the merits of the plaintiff's claim.  Instead, it is a determination that the court lacks authority to adjudicate the matter." *Creek Red Nation, LLC v. Jeffco Midget Football Ass'n, Inc.*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016).  "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013) (quotation omitted).  The burden of establishing jurisdiction rests with the party asserting jurisdiction. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017).

"The Supreme Court's standing jurisprudence contains two strands:  Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing[,] which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Wilderness Soc'y v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011) (en banc) (citations, ellipses, and quotations omitted).  Under Article III of the United States Constitution, federal courts only have jurisdiction to hear certain "cases" and "controversies." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014).  Article III standing is a jurisdictional prerequisite to suit and requires "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Id.* at 157–58 (alterations in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. ---, 141 S. Ct. 2190, 2208 (2021).

The elements of standing are not simply pleading requirements, but are instead "an indispensable part" of a plaintiff's case. *Lujan*, 504 U.S. at 561. For this reason, the elements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* Thus, at the pleading stage, factual allegations of injury resulting from the defendant's conduct "may suffice." *Id.*

## II.    Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a Rule 12(b)(6) motion, the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quotation omitted). The plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (explaining that plausibility refers "to the scope of the allegations in a complaint," and that the allegations must be sufficient to nudge a plaintiff's claim(s) "across the line from conceivable to plausible" (quotation omitted)). The ultimate duty of the Court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

Defendants contend that Plaintiffs' claims should be dismissed under Rule 12(b)(1) for lack of standing and under Rule 12(b)(6) for failure to state a claim. *See* [Doc. 29 at 4–13, 17–20]. The Court addresses Defendants' arguments on a claim-by-claim basis, starting with Defendants' standing arguments before turning to the merits of each claim. *See United States v. Springer*, 875 F.3d 968, 973 (10th Cir. 2017) ("Jurisdiction is a threshold question that a federal court must address before reaching the merits." (quotation omitted)).

## I.      Substantive Due Process – Count I

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). One of these protected rights is the right of parents "to make decisions concerning the care, custody, and control of their children." *Id.* at 66. This protection includes a parent's right to direct a child's education. *Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998). However, this due process right is "limited in scope" and does not permit a parent "to control each and every aspect of their children's education and oust the state's authority over that subject." *Id.*

### A.     Standing

Defendants first challenge Plaintiffs' standing to bring their substantive due process claim, which is brought by all Plaintiffs against Defendants.  *See* [Doc. 1 at 27]. Defendants contend that Plaintiffs have failed to allege facts establishing any of the three required standing elements:   injury in fact, causation, and redressability.   [Doc. 29 at 17–20].  The Court addresses each element in turn.

***Injury in Fact.***  "Article III requires more than a desire to vindicate value interests." *Diamond v. Charles*, 476 U.S. 54, 66 (1986).  Article III's standing requirements help distinguish between "a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem."  *Id.* at 66–67 (quoting *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 689 n.14 (1973)).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).  An injury is particularized if it affects the plaintiff "in a personal and individual way," and it is concrete if it is a real, non-abstract injury.  *Id.* at 339–40 (quoting *Lujan*, 504 U.S. at 560 n.1).

Defendants argue that Plaintiffs fail to allege facts showing any concrete harm or direct injury to Plaintiffs.  [Doc. 29 at 17].  According to Defendants, Plaintiffs' allegations are nothing more than conclusory assertions that fail to establish any concrete harm or direct injury to the Lees, the Juriches, or their children.  [*Id.* at 17–18].  Plaintiffs respond that they "allege substantive due process injuries of 'private school tuition, medical expenses, counseling fees, compensation for damages to the Plaintiffs' reputation,

transportation, and emotional anguish' as a result of the violation of their substantive due process rights."  [Doc. 37 at 16 (quoting Doc. 1 at 30)].

The requests listed by Plaintiffs in their prayer for relief are not allegations demonstrating an "invasion of a legally protected interest," *Lujan*, 504 U.S. at 560, but are instead simply the categories of damages sought by Plaintiffs, *see* [Doc. 1 at 30 (Plaintiffs requesting "[c]ompensatory damages . . . including . . . private school tuition, medical expenses, counseling fees, compensation for damage to the Plaintiffs' reputation, transportation, and emotional anguish")].  However, the Court nevertheless finds that the parent Plaintiffs have adequately alleged an injury in fact for purposes of their substantive due process claim.  The Lees and the Juriches allege that they have "strong and sincere religious convictions" about educating their children on the topics of gender identity and sexual orientation.  [Doc. 1 at ¶¶ 124–25].  They allege that Defendants improperly taught "sexually themed matters" to their children without notice or the opportunity to opt out, [*id.* at ¶ 209], and that had they had notice of the topics discussed at GSA meetings, they would have "elected to opt their child out," [*id.* at ¶ 126].  Plaintiffs assert that Defendants' actions interfered with Plaintiffs' "ability to make decisions . . . directly related to their children's care and education," [*id.* at ¶ 219], and violated Plaintiffs' "fundamental right to make decisions regarding the upbringing, education, custody, care, and control of their children," [*id.* at ¶ 209].  The Court concludes that these allegations are sufficient, at the pleading stage, to adequately allege an injury in fact experienced by the Lees and the Juriches.  *See Doe v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 3:22-cv-00337-MJN-PBS, 2023 WL 5018511, at *11 (S.D. Ohio Aug. 7, 2023) (finding similar allegations sufficient to establish parents' standing), *appeal docketed*, No. 23-3740 (6th Cir. Sept. 8, 2023).

However, the Court cannot say the same with respect to H.J., C.L., or M.L. Although this specific argument was not raised by Defendants, *see generally* [Doc. 29], Article III standing is a jurisdictional requirement and the Court must satisfy itself that a case or controversy exists with respect to each claim, even if it requires sua sponte action. *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 942 (10th Cir. 2003).

Count I is a substantive due process claim based solely on an alleged violation of the Fourteenth Amendment *parental* right to direct the education and upbringing of one's children. *See* [Doc. 1 at 27 ("COUNT I – Violation of *Parental* Rights Under the Fourteenth Amendment"; "Denial of [the] right *of the Plaintiff Parents* to direct the education and upbringing of the Plaintiff Children" (emphasis added))]. It is axiomatic that the Fourteenth Amendment right to direct the care, custody, and control of one's children belongs to *parents*, not their children. *See Troxel*, 530 U.S. at 65 ("The liberty interest at issue in this case—*the interest of parents* in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." (emphasis added)); *see also id.* at 66 (explaining that the Supreme Court has "recognized the fundamental right *of parents* to make decisions concerning the care, custody, and control of their children" (emphasis added) (collecting cases)). In Count I, H.J., C.L., and M.L. do not allege that they themselves have minor children and a resulting fundamental Fourteenth Amendment due process right, *see generally* [Doc. 1], nor do they appear to claim a Fourteenth Amendment right to direct their *own* upbringing, *see, e.g.*, [*id.* at ¶ 219 (alleging a violation of "Plaintiffs' fundamental *parental* rights" (emphasis added))]. A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," *Warth v. Seldin*, 422 U.S. 490, 499

(1975), and the Court has located no authority that would permit a minor child to claim a parental due process right under the Fourteenth Amendment.

If there is no identified constitutional right, there can be no violation of that right or standing to assert a claim alleging a violation of that right. *See, e.g.*, *Black Lives Matter-Stockton Chapter v. San Joaquin Cnty. Sheriff's Off.*, 398 F. Supp. 3d 660, 674 (E.D. Cal. 2019) (plaintiffs lacked standing to assert a violation of a constitutional right they did not possess); *Batista v. City of Perth Amboy*, No. 2:15-cv-02833-KM-MAH, 2020 WL 1329980, at *9 n.8 (D.N.J. Mar. 23, 2020) (same); *cf. Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, No. 23-cv-00069-SWS, --- F. Supp. 3d. ---, 2023 WL 4297186, at *7 (D. Wyo. June 30, 2023) (finding it "unlikely" that stepparent had standing to assert a Fourteenth Amendment claim based on care, custody, and control of stepchild with whom he had no legal relationship).   Because H.J., C.L., and M.L. do not identify a viable constitutional right that they actually possess with respect to Count I, they cannot allege a personal, particularized "invasion of a legally protected interest" for purposes of establishing an injury in fact.   *Spokeo*, 578 U.S. at 339 (quotation omitted).   Accordingly, the Court concludes that H.J., C.L., and M.L. do not have standing with respect to Count I.  Count I is **DISMISSED without prejudice** to the extent it is asserted by these Plaintiffs. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) (dismissal for lack of standing must be without prejudice).   The Court limits its remaining analysis on Count I to the Lees and the Juriches.

*Causation.*   Next, Defendants contend that any injury suffered by the Lees and the Juriches cannot be traced to the conduct of the Defendants.   "The requisite causal connection between the injury and the conduct complained of requires the injury be 'fairly

traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Willey*, 2023 WL 4297186, at *7 (quoting *Lujan*, 504 U.S. at 560). Defendants argue that causation is lacking because some of the claimed injuries—namely, private school tuition and transportation costs for C.L.—are "self-inflicted due to [the Lees'] decision to disenroll C.L. from WMS and enroll her in a private school." [Doc. 29 at 18]. They also argue that the parent Plaintiffs cannot demonstrate that Defendants' conduct was the impetus for C.L.'s and H.J.'s emotional decline because "the Complaint shows that it was parental non-acceptance and enforcement of their own traditional gender beliefs that caused C.L. and H.J.'s emotional decline." [*Id.* at 19 (footnote omitted)].

Accepting Defendants' arguments would require the Court to construe allegations in Defendants' favor, draw inferences in Defendants' favor, and find facts in Defendants' favor, all of which this Court cannot do. *Casanova*, 595 F.3d at 1124. In any event, as explained above, the injury underlying Count I is the alleged violation of the parent Plaintiffs' Fourteenth Amendment right to direct the care, custody, and control of their children—not the various types of damages claimed in the Complaint. And the parent Plaintiffs have adequately tied their alleged injury to the Defendants' conduct: they allege that Defendants taught "sexually themed matters" to their children in a way that contravenes the parent Plaintiffs' preferences, without notice to the parents and without permitting the parents to opt their children out of these discussions; that these actions interfered with their ability to make decisions related to their children's care and education; and that they would have made different choices had they been given notice and the option to opt-out. [Doc. 1 at ¶¶ 125–26, 191–95, 209, 219]. These allegations are

sufficient at the pleading stage to establish the causation element of standing.  *See Doe*, 2023 WL 5018511, at *11.

**Redressability.**  Finally, Defendants challenge Plaintiffs' standing with respect to their request for injunctive relief, which relates only to Count I.  *See* [Doc. 1 at 30 (Plaintiffs requesting a permanent injunction ordering the District to provide notice and opt-out rights if certain subjects will be taught in school, that these topics only be taught by qualified individuals, and that parents receive materials in advance of instruction)].  Defendants argue that Plaintiffs' request for injunctive relief would not be redressable by a judicial decision because Plaintiffs "do not plausibly allege any injury in fact or any immediate danger of sustaining a direct injury much less any continuing injury to establish any entitlement to injunctive relief as a matter of law."  [Doc. 29 at 20 n.14].[4]  Plaintiffs respond that they "will continue to sustain injuries if they reenroll their students in the Defendants' public schools," adding that their "current educational plans for their children are much less convenient and much more costly" than attending District schools.  [Doc. 37 at 18–19].

The purpose of injunctive relief is to prevent future violations of the law, *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953), and thus, a plaintiff cannot maintain a request for injunctive relief "unless he or she can demonstrate a good chance of being likewise injured in the future," *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991).  In

---

[4] Defendants also argue that Plaintiffs cannot demonstrate redressability because "the [District's] Guidelines follow both state law and District policies, all of which would still be in effect regardless of any court decision pertaining to the GSA meetings or Guidelines." [Doc. 29 at 20].  However, all references to the District's Guidelines in the Complaint are in the context of Count II, not Count I.  *See, e.g.*, [Doc. 1 at ¶¶ 148–56, 170–81, 223–31].  The Court thus addresses this argument in the context of Count II.

requesting equitable relief, the plaintiff must "demonstrate 'an adequate basis for equitable relief'—that is, '[a] likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law.'"  *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (alteration in original) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499, 502 (1974)).  The plaintiff's continued susceptibility to injury "must be reasonably certain," and speculation or conjecture are insufficient.  *Id.*

Plaintiffs allege that H.J., C.L., and M.L. are "former student[s]" of District schools, [Doc. 1 at ¶¶ 15–16, 20], though they only affirmatively allege that C.L. was disenrolled from her former school, [*id.* at ¶ 69].  Importantly, the Complaint contains no allegations that the student Plaintiffs are currently enrolled in District schools, that the parent Plaintiffs intend to or desire to reenroll their children in District schools, or that they have other children attending District schools.  *See generally* [*id.*].  Indeed, the Stipulated Facts in the Scheduling Order omit any assertion that H.J., C.L., or M.L. attend District schools as of the filing of this action.  [Doc. 27 at 4–6].  Although the parent Plaintiffs assert in their Response that they will continue to suffer injuries if they reenroll their children in District schools and suggest that they may benefit economically from doing so, [Doc. 37 at 18–19], it is well-established that a plaintiff cannot amend a pleading by including new facts in a response brief, *see Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F. Supp. 3d 1201, 1206 (D. Colo. 2015).  Further, the parent Plaintiffs identify no present plans—in the Complaint or otherwise—to reenroll their respective children in District schools.

Because the Complaint alleges that H.J., C.L., and M.L. are no longer enrolled in District schools, and because Plaintiffs allege no present plans to reenroll the students in District schools, Plaintiffs' continued susceptibility to injury is not "reasonably certain."

*Jordan*, 654 F.3d at 1024.  The Court thus concludes that Plaintiffs lack standing to seek the prospective injunctive relief requested in the Complaint.  *See Cash v. Lees-McRae Coll., Inc.*, No. 1:18-cv-00052-MR-WCM, 2018 WL 7297876, at *11 (W.D.N.C. Aug. 13, 2018) (finding that injunctive relief would not redress former student's alleged injuries where she had withdrawn from the defendant college and did not allege a present intention to reenroll), *report and recommendation adopted*, 2019 WL 276842 (W.D.N.C. Jan. 22, 2019), *aff'd*, 811 F. App'x 190 (4th Cir. 2020); *Hole v. Tex. A&M Univ.*, No. 1:04-cv-00175, 2009 WL 8173385, at *6 (S.D. Tex. Feb. 10, 2009) ("Plaintiffs' graduation, coupled with the fact that they are not now enrolled, or have even sought to re-enroll at the University indicates no ongoing harm, and thus, prevents the Court from providing any *prospective* remedy as to them." (emphasis in original)), *aff'd*, 360 F. App'x 571 (5th Cir. 2010).  Count I is therefore **DISMISSED without prejudice** to the extent it seeks prospective injunctive relief.  Having decided that the parent Plaintiffs have standing to assert their Fourteenth Amendment claim to the extent they seek monetary damages, the Court turns to the Parties' substantive merits arguments.

## B.     The Sufficiency of Plaintiffs' Allegations

"[T]he touchstone of due process is protection of the individual against arbitrary action of government."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quotation omitted).  In addition to guaranteeing fair procedures, the Due Process Clause of the Fourteenth Amendment "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1181 (10th Cir. 2009) (alteration in original) (quoting *Lewis*, 523 U.S. at 840).  "[T]he Supreme Court recognizes two types

of substantive due process claims:  (1) claims that the government has infringed a 'fundamental' right, . . . and (2) claims that government action deprived a person of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience."  *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (citing *Glucksberg*, 521 U.S. at 721–22, and *Lewis*, 523 U.S. at 846).

In the Tenth Circuit, courts generally "apply the fundamental-rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action." *Halley v. Huckaby*, 902 F.3d 1136, 1153 (10th Cir. 2018) (emphasis omitted).  However, courts will also employ the fundamental-rights approach if "the plaintiff challenges 'the concerted action of several [government] employees, undertaken pursuant to broad government policies,' which is 'akin to a challenge to legislative action.'"  *Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1117 (10th Cir. 2021) (quoting *Abdi v. Wray*, 942 F.3d 1019, 1027 (10th Cir. 2019)).  Here, both Parties appear to use the fundamental-rights test without analyzing whether it is the appropriate test for Plaintiffs' claim.  *See* [Doc. 29 at 4–9; Doc. 37 at 4–10].  Because neither Party argues that the conscience-shocking approach applies here, and because Plaintiffs appear to challenge broadly the conduct of several District employees, allegedly undertaken pursuant to official and unofficial District policies, as opposed to the specific conduct of one government actor, *see ETP Rio Rancho Park, LLC v. Grisham*, 522 F. Supp. 3d 966, 1029 (D.N.M. 2021) ("An 'executive action' in the substantive due process analysis context is typically a 'specific act of a governmental officer.'" (quoting *Lewis*, 523 U.S. at 846)), the Court will consider the Parties' arguments under the fundamental-rights approach, *cf. Hernandez v. Grisham*, 508 F. Supp. 3d 893, 982 (D.N.M. 2020) (applying

the fundamental-rights test to challenge to a school district's official guidance), *aff'd in part, appeal dismissed in part*, No. 20-2176, 2022 WL 16941735 (10th Cir. Nov. 15, 2022).

The Court analyzes a substantive due process claim using three steps. First, the Court determines whether a fundamental right is at stake. *Abdi*, 942 F.3d at 1028. Second, the Court must decide whether the claimed right has been infringed "through either total prohibition or direct and substantial interference." *Id.* (quotation and alteration marks omitted). And third, if the right allegedly violated is fundamental, the Court must determine whether the challenged government action is narrowly tailored to achieve a compelling government purpose—or, if the right at issue is not a fundamental right, whether it is rationally related to a legitimate government end. *Id.*; *see also United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002) (explaining rational basis review). With this framework, this Court now turns to considering whether Plaintiffs have sufficiently alleged a viable cause of action.

Plaintiffs allege a violation of their fundamental right to make decisions about the care, custody, and control of their children. *See, e.g.*, [Doc. 1 at ¶¶ 122, 206, 209, 219]. Defendants argue that Plaintiffs fail to allege a violation of that right because while parents have a right to direct the care, custody, and control of their children, they have no constitutional right to control each and every aspect of their child's education. [Doc. 29 at 4–6]. They contend that the right does not extend to the curriculum or extracurricular activities offered by the school. [*Id.* at 6]. In response, Plaintiffs insist that Defendants' actions have violated their right "to direct the upbringing of their children" by "surreptitiously inserting themselves into the private realm of the family" and "[keeping] parents uninformed about sexually explicit topics taught at school-sponsored clubs and

discourag[ing] children from discussing issues related to gender and sexuality with their parents."  [Doc. 37 at 4–5].

The right of parents to direct the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court, *Troxel*, 530 U.S. at 65, and encompasses the constitutional right to direct their children's education, "up to a point," *Swanson*, 135 F.3d at 699.  This right can be traced back to *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925).  In *Meyer*, the Supreme Court held that a law requiring that school lessons be in English was unconstitutional because it infringed on parents' due process rights to direct the education of their children.  262 U.S. at 399–401.  And in *Pierce*, the Supreme Court held that a law which required public-school attendance for children ages eight to sixteen also "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control."  268 U.S. at 534–35.  *Meyer* and *Pierce* "evince the principle that the state cannot prevent parents from choosing a specific educational program—whether it be religious instruction at a private school or instruction in a foreign language," and cannot otherwise "completely foreclos[e] the opportunity of individuals and groups to choose a different path of education."  *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533 (1st Cir. 1995), *abrogated in part on other grounds by DePoutot v. Raffaelly*, 424 F.3d 112, 118 n.4 (1st Cir. 2005).

But the Supreme Court has stressed the "limited scope" of this authority.  *Norwood v. Harrison*, 413 U.S. 455, 461 (1973); *see also, e.g.*, *Pierce*, 268 U.S. at 534 ("No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children

of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare."); *Meyer*, 262 U.S. at 402 (recognizing the state's right to "compel attendance at some school," "make reasonable regulations for all schools," and "prescribe a curriculum for institutions which it supports").   Indeed, the Tenth Circuit (like other circuits) recognizes that this right only extends so far.  *See, e.g.*, *Swanson*, 135 F.3d at 699 (explaining that the right is "limited in scope" and that "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject"); *see also Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003) ("*Meyer*, *Pierce*, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught."); *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th Cir. 2005) (holding that the parental right to direct the care, custody, and control of children "does not extend beyond the threshold of the school door").   The Sixth Circuit has described the limits of the right as follows:

> While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child.   Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or, as here, a dress code, these issues of public education are generally "committed to the control of state and local authorities."

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395–96 (6th Cir. 2005) (emphasis in original) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)).  "These decisions make clear

that a parent has the right to control where their child goes to school.  But that is where their control ends."  *Doe*, 2023 WL 5018511, at \*13.

Plaintiffs assert that their Fourteenth Amendment parental rights were violated when District personnel allegedly taught H.J. and C.L. about sexual orientation and/or gender identity without providing the parents with notice or the opportunity to opt their children out of GSA meetings.  [Doc. 1 at ¶ 209].  However, Plaintiffs direct the Court to no authority demonstrating that the Fourteenth Amendment confers a *constitutional right* to receive notice about topics discussed in the District's curriculum, and particularly, at after-school, voluntary extracurricular clubs that they may find objectionable, or the right to excuse their children from those discussions.  *See generally* [Doc. 37].  In fact, the weight of authority demonstrates that the Fourteenth Amendment right does not extend so far.  *See, e.g.*, *Leebaert*, 332 F.3d at 140–42 (parent had no fundamental right to demand that child be excluded from health education classes); *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008) (holding that there is no constitutional right that "permit[s] parents to demand an exemption for their children from exposure to certain books used in public schools"); *Fields*, 427 F.3d at 1206 (parents "have no constitutional right . . . to prevent a public school from providing its students with whatever information it wishes to provide, sexual or otherwise, when and as the school determines that it is appropriate to do so").

Recent district court decisions involving factual allegations similar to those asserted here hold similarly.  For example, in *Doe*, the plaintiff parents alleged that the defendant school district violated their constitutional rights by (1) permitting transgender students to use the bathroom that corresponds with their gender identity and (2) refusing to answer the parents' questions about the district's bathroom policies.  *See* 2023 WL

5018511, at *6.   The court concluded that the parents failed to allege a plausible Fourteenth Amendment violation on either basis.  *Id.* at *13–14.  Noting the limited nature of the parents' Fourteenth Amendment right, the court determined that implementing new bathroom policies was "for the school to decide" and did not "in any way" implicate the rights recognized in earlier Supreme Court cases—e.g., the right to send students to a particular private school, the right to instruct children in certain subjects or to homeschool them, or parents' right to decide where their children receive an education.  *Id.* at *13 (citing *Meyer*, 262 U.S. at 401–03; *Runyon v. McCrary*, 427 U.S. 160, 177 (1976); and *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972)).   Furthermore, even more relevant here, the Court found that the parents' objections to the district's alleged refusal to answer their questions about the bathroom policies "[did] not implicate a parent's fundamental right to control their children's upbringing," reasoning that "the Fourteenth Amendment does not confer parents with an unfettered right to access information about what their children are learning," to "interject in how a State school teaches children," or to receive an "answer [to] every demand made of them from frustrated parents (no matter how reasonable that frustration may be)."  *Id.* at *13–14.

In addition, this Court finds a recent Recommendation issued by a Magistrate Judge in this District persuasive and relevant to the analysis in this case.  *See Jones v. Boulder Valley Sch. Dist. RE-2*, No. 20-cv-03399-RM-NRN, 2021 WL 5264188 (D. Colo. Oct. 4, 2021).[5]   In that case, the parent plaintiffs alleged, inter alia, that their due process

---

[5] In *Jones*, the Honorable N. Reid Neureiter issued a Recommendation that the defendant school district's motion to dismiss be granted and the parent plaintiffs' motion to amend the complaint be denied.  *See* 2021 WL 5264188, at *22.  Before the *Jones* parties filed any objections to Judge Neureiter's Recommendation, and before the Honorable Raymond P. Moore could rule on the Recommendation, the *Jones* parties settled the

rights were violated when the school district planned a performance by a transgender choir with accompanying videos and classroom discussion on transgender issues. *Jones*, 2021 WL 5264188, at *2.  While parents were given the option to opt their children out of the musical performance, they were not given this option for the videos or classroom lessons. *Id.* at *4.  The plaintiff parents kept their children home from school on the day of the performance and discussion and subsequently requested that if any similar topics arose in the future in the classroom, that their children "immediately be removed from the classroom (even before a teacher responds to a child's question), sent to the office, and [that the parents be] notified immediately"; the school district declined to opt-out the students from certain topics prospectively.  *Id.* at *5.  The court concluded that the plaintiffs had failed to allege a plausible violation of their Fourteenth Amendment due process rights, stating:

> The Parents' primary complaint is that the School, without notice, is attempting to "indoctrinate" their children about LGBTQ-affirming and transgender-affirming principles, in conflict with the Family's religious beliefs.  Despite the use of the loaded term "indoctrinate," reading the Amended Complaint liberally, it is the mere exposure to ideas or principles that allegedly conflict with their beliefs to which they are objecting. *And the Parents cite no federal case under the Due Process Clause which has permitted public school parents to demand an exemption for their children from mere exposure to certain concepts or ideas.*

*Id.* at *15 (emphasis added).  The court found that "[d]ecisions as to what curriculum a public school decides to offer or require are uniquely committed to the discretion of local school authorities," *id.* at *16, relying on, inter alia, *Fields*, which similarly held that a parent has no constitutional right to "prevent a public school from providing its students

_____

case.  *See Jones v. Boulder Valley Sch. Dist. RE-2*, No. 20-cv-03399-RM-NRN, ECF No. 79 (D. Colo. Nov. 15, 2021).

with whatever information it wishes to provide, . . . when and as the school determines that it is appropriate to do so," *Fields*, 427 F.3d at 1206.

Plaintiffs do not discuss any of this case law and do not identify any authority demonstrating that parents' fundamental Fourteenth Amendment rights are violated if they are deprived of the opportunity to direct what their children learn in schools, receive notice of what students are learning in schools, or exempt their children from certain lessons or topics.  *See* [Doc. 37 at 4–10].  Instead, they direct the Court to the Supreme Court's decision in *Troxel*, as well as two recent district-court decisions from other courts in the Tenth Circuit:  *Ricard v. USD 475 Geary County, Kansas School Board*, No. 5:22-cv-04015-HLT-GEB, 2022 WL 1471372 (D. Kan. May 9, 2022), and *Willey*.  *See* [Doc. 37 at 5–7].

Plaintiffs first contend that "[w]hen examined through the lens of *Troxel* the unlawful nature of Defendants' policy is clear."  [*Id.* at 5].  Plaintiffs seem to read *Troxel* to hold that school districts must always defer to parents' preferences about what their children can and cannot be taught in schools, so long as there has been no determination that the parents are "unfit."  *See* [*id.* at 5–6 ("[T]here has been no suggestion that any Lee or Jurich parent [is] unfit.  Accordingly, the Defendants were compelled to presume that the Lees and Juriches possess the maturity and experience their children lack and that their natural bonds of affection will lead the parents to act in the best interests of their children." (quotation and alteration marks omitted))].  But *Troxel* does not stand for this broad proposition.  *Troxel* concerned parental visitation rights; it did not discuss a right of parents to direct the policies of or lessons taught in public schools or a right to receive notice about topics planned for discussion.  *See Troxel*, 530 U.S. at 67–73; *see also*

*Parents for Priv. v. Barr*, 949 F.3d 1210, 1230 (9th Cir. 2020) (discussing the nature and scope of the *Troxel* opinion).  "[T]here is *nothing* in Troxel that would lead [a court] to conclude . . . that parents have a *fundamental* right to the upbringing and education of the child that includes the right to tell public schools what to teach or what not to teach him or her."  *Leebaert*, 332 F.3d at 142 (first emphasis added).  In contrast, numerous circuit courts have held, even post-*Troxel*, that parents have no fundamental constitutional right to exercise such control over a school's curriculum or extracurricular activities.  *See id.*; *Parker*, 514 F.3d at 102; *Fields*, 427 F.3d at 1206.

The district court cases cited by Plaintiffs are similarly unhelpful.  *Ricard* involved a teacher's challenge to school district policies that required her to refer to students using their preferred first name and pronouns.  *See* 2022 WL 1471372, at *1.  *Ricard* is a First Amendment free exercise case, not a Fourteenth Amendment parental rights case, *see id.* at *4, and despite its brief discussion of parental constitutional rights, *see id.* at *8, it is not analogous to this case.  Meanwhile, *Willey* involved a challenge to a school district policy that prohibited, or could be read to prohibit, school district personnel from answering parents' questions about their children's use of pronouns at school.  *See* 2023 WL 4297186, at *3, *15.  In ruling that the parent plaintiffs had established a likelihood of success on the merits for purposes of obtaining preliminary injunctive relief, the *Willey* court concluded that the policy might burden a parent's right to direct the upbringing of their child "if a parent was misinformed or the District or a teacher refused to respond to a parent's inquiry regarding their minor child's request to be called by a different name, absent a showing of some danger to the health or wellbeing of the student."  *Id.* at *13–14.  In so doing, it specifically highlighted the denial of information *after parental inquiry*:

> To the extent the Student Privacy Policy prohibits a teacher or school employee, *upon inquiry* by a parent or legal guardian, from responding or providing accurate and complete information concerning their minor child (and absent a threat to the wellbeing of the student), it burdens a parent's fundament right to make decisions concerning the care, custody and education of their child.

*Id.* at *14 (emphasis in original).  The *Willey* court reasoned that parents could not make an informed decision as to how to exercise their parental rights to choose the site of their child's education—private school, public school, or home schooling—if "they [we]re unaware of circumstances that have a significant bearing on that decision because of the school's withholding of information or active deception, despite their inquiry."  *Id.*

Willey is factually distinguishable from this case.  Although the Complaint contains allegations concerning a District policy governing the disclosure of students' transgender status or pronouns used at school to parents, *see* [Doc. 1 at ¶¶ 148–65], Count I is not based on this policy, *see* [*id.* at ¶¶ 205–22].  Indeed, the Complaint contains no allegations that the Lees or the Juriches asked District personnel for information concerning their children's transgender status or use of pronouns at school and were denied information. *See generally* [*id.*].  Nor does the Complaint raise any claim based on this policy, *see* [*id.* at ¶¶ 205–31], assert any injury based on this policy, or seek any relief with respect to this policy, *see* [*id.* at 30–31].  The Court remains persuaded by the case law discussed above holding that parents have no constitutional right to exercise control over a school's curriculum or extracurricular activities or to demand information about the same.

Finally, Plaintiffs assert that "Defendants' concealment efforts also run afoul of Colorado law" because "Colorado parents have statutory rights to be notified of educational materials that contemplate sexually explicit content and require parents to be afforded a meaningful opt-out provision."  [Doc. 37 at 8 (citing Colo. Rev. Stat. §§ 22-1-

128(3)(b), 22-25-110(4)(a))].   But a state-law requirement that school districts provide certain information to parents does not create a *constitutional* right to receive that information.  *See Parents for Priv.*, 949 F.3d at 1232 ("Although state and federal statutes may expand upon constitutional protections by creating new statutory rights, statutes do not alter the protections afforded by the Constitution itself."); *Jones*, 2021 WL 5264188, at *11 ("A failure by the District or the School's principal to strictly adhere to a Colorado's notice and opt out requirements does not necessarily a federal constitutional claim make.").   The Complaint, which asserts only federal claims, contains no allegations that Defendants' conduct violates state law, *see generally* [Doc. 1], nor do Plaintiffs assert that Defendants have deprived them of a protected property interest conferred by statute, *see generally* [*id.* at ¶¶ 205–22]; *see also Carnes v. Parker*, 922 F.2d 1506, 1509 (10th Cir. 1991) (explaining that property rights protected by the Due Process Clause are "created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract").

In sum, while the parent Plaintiffs generally have a Fourteenth Amendment fundamental right to direct the upbringing of their children, they have not adequately alleged a violation of that fundamental right.  As a result, the Court need not, and does not, analyze whether Defendants' conduct passes any particular level of scrutiny.  *See Abdi*, 942 F.3d at 1028.[6]   The Motion to Dismiss is respectfully **GRANTED** with respect

---

[6] It is not entirely clear to the Court whether it must conduct a rational basis review even though it has concluded that the parent Plaintiffs have not alleged a violation of their fundamental right to direct the upbringing of their children.  *Compare Abdi*, 942 F.3d at 1028, *with Dias*, 567 F.3d at 1182 ("Even if the Ordinance does not implicate a fundamental right, it must nonetheless bear a rational relationship to a legitimate government interest.").  Even if the Court did proceed to a rational basis review, the end result would not change.  Government action satisfies the rational basis standard if "if

to Count I.  Count I is **DISMISSED without prejudice** for failure to state a claim under

Rule 12(b)(6).[7]

## II.      Equal Protection – Count II

As a preliminary matter, the Court pauses to ascertain the nature of Count II.

Count II is titled "COUNT II – Violation of Parental Rights Under the Fourteenth

Amendment."  [Doc. 1 at 29].  Its subheading asserts a "[d]enial of equal protection under

---

there is any reasonably conceivable state of facts that could provide a rational basis for the [infringement]."  *Maehr*, 5 F.4th at 1122 (alteration in original) (quoting *F.C.C. v. Beach Comm'cns, Inc.*, 508 U.S. 307, 313 (1993)).  "This requires 'no more than a 'reasonable fit' between governmental purpose . . . and the means chosen to advance that purpose.'" *Id.* (alteration in original) (quoting *Reno v. Flores*, 507 U.S. 292, 305 (1993)).  In their Motion, Defendants argue that the District "has a legitimate interest in providing a safe and supportive environment for all its students, including those who are transgender or gender nonconforming."  [Doc. 29 at 7].  They contend that their policies further that interest by "seek[ing] to reduce the stigmatization of, and improv[ing] the educational experiences and outcomes of, transgender and non-binary students while maintaining the privacy of all students and fostering cultural competence and professional development for school staff."  [*Id.* at 8].  The Court agrees with Defendants that they have identified a legitimate government purpose that is furthered by rational means.  *See Vesely v. Ill. Sch. Dist. 45*, No. 1:22-cv-02035, 2023 WL 2988833, at *5 (N.D. Ill. Apr. 18, 2023) (recognizing a legitimate government interest in "maintaining a non-discriminatory environment for students and protecting students' privacy, mental well-being, and physical safety"), *appeal dismissed*, No. 23-2190 (7th Cir. July 14, 2023).

[7] Defendants request that Count I be dismissed with prejudice.  [Doc. 29 at 9].  "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile."  *Brereton*, 434 F.3d at 1219.  While Defendants cite to the *Jones* recommendation in support of their request, they make no substantive futility argument.  *See* [Doc. 29 at 9].  The Court declines to undertake a futility analysis sua sponte and instead will dismiss Count I without prejudice.  *But see Jones*, 2021 WL 5264188, at *21 (concluding that amendment of claim would be futile because "there is no federal constitutional right for public school parents or families to get advance notice of and the right to opt-out of religiously offensive material"); *Parents for Priv.*, 949 F.3d at 1233 (affirming dismissal of Fourteenth Amendment claim with prejudice because "Supreme Court and Ninth Circuit case law . . . ha[d] not recognized the specific rights asserted by Plaintiffs" and "further foreclose[d] recognizing such rights as being encompassed by the fundamental parental rights protected by the Fourteenth Amendment's Due Process Clause").

the law by denial of a gender support plan to Plaintiff ML where other similarly situated students are granted gender support plans."  [*Id.*].  The Complaint alleges that M.L. was "denied . . . the protection of the laws offered to other similarly situated children within the district and [was denied] his right to equal protection of the laws," [*id.* at ¶ 230], but also cursorily states that "[t]he Fourteenth Amendment to the United States Constitution provides that the right to direct and control the upbringing of children is the province of fit parents and that this right is fundamental," [*id.* at ¶ 231].  Count II does not plainly allege the violation of the Lees' parental rights under the Fourteenth Amendment.  *Compare* [*id.* at ¶¶ 224–31], *with* [*id.* at ¶ 209 (explicitly alleging that Defendants violated the parent Plaintiffs' Fourteenth Amendment rights in the context of Count I)].  Defendants too construed Count II as asserting only an equal protection claim, *see* [Doc. 29 at 9–13], and Plaintiffs did not take issue with this interpretation or try to correct it in their Response, *see* [Doc. 37].  Instead, in their Response, Plaintiffs direct their Fourteenth Amendment due process arguments strictly to Count I, *see* [Doc. 37 at 4–10], and with respect to Count II, they raise arguments only under the Equal Protection Clause, *see* [*id.* at 10–13].[8]

---

[8] Plaintiffs do briefly reference gender support plans in the context of arguing that "Defendants' efforts at concealment were a feature, not a bug, of the Defendants' policies and practices," stating:  "[r]egarding the [gender support plans,] Defendants are again perfectly willing to exclude parents from the decision process and keep them ignorant of student decisions."  [Doc. 37 at 6–7 (citing Doc. 1 at ¶¶ 169–70)].  The cited paragraphs in the Complaint allege that gender support forms may be completed without parental consent and that District personnel are not obligated to inform parents if their child completes a gender support form.  [Doc. 1 at ¶¶ 169–70].  Notably, however, the Complaint does not allege that M.L. filled out a gender support form himself or that the District failed to notify the Lees of such; rather, the Complaint expressly alleges that it was the Lees who filled out a gender support form for M.L.  *See* [*id.* at ¶ 85].  The Court thus does not construe Plaintiffs' due process argument in the Response to be directed to Count II.

The Court is neither obligated nor permitted to construct legal theories on behalf of parties that they do not advance themselves.  *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that the court has no obligation to make arguments or perform research on behalf of litigants); *Carrillo v. New Mexico ex rel. Child., Youth & Fams. Dep't*, 405 F. Supp. 3d 1048, 1055 (D.N.M. 2019).  For the several reasons above, the Court assumes that the heading of Count II is a typographical error and that Count II does not assert a Fourteenth Amendment substantive due process claim.  The Court thus limits its analysis on Count II to the Equal Protection Clause.

### A.     Standing

With respect to Count II, Defendants contend that Plaintiffs fail to allege facts establishing Article III standing on the part of the Lees or M.L.   [Doc. 29 at 17–18]. Defendants' arguments related to Count II address only the first and third standing requirements—injury and redressability—and the Court's analysis is similarly limited.

***Injury in Fact.***  Defendants assert that the Lees and M.L. fail to identify an injury in fact supporting Count II because "the Complaint is devoid of any alleged harm arising from [the Lees'] request for a gender support plan reiterating [M.L.'s] biological gender and pronouns—i.e., his status quo remained the same and there is no other alleged injury to M.L. evident in the Complaint."  [*Id.* (emphasis omitted)].

For equal protection claims, the injury "is the denial of equal treatment resulting from the imposition of [a] barrier," *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993), i.e., the injury is the imposition of the

barrier *itself*, *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 493 (10th Cir. 1998). Here, Plaintiffs allege that the Lees requested a gender support plan for M.L., but their request was denied based on "the conjunction of [M.L.'s] biological sex and gender identity."  [Doc. 1 at ¶¶ 83–88, 180].  While not robust, these allegations are sufficient to plausibly allege an injury in fact at the pleading stage.

*Redressability.*  Next, Defendants argue that Plaintiffs fail to demonstrate that any injury suffered as a result of Defendants' actions would be redressed by a favorable judicial decision.  They contend that the District's guidelines governing the provision of gender support plans "follow both state law and District policies, all of which would still be in effect regardless of any court decision pertaining to the GSA meetings or Guidelines." [Doc. 29 at 20].  Plaintiffs respond that a "favorable decision would provide monetary damages fully redressing Plaintiffs' injuries," but do not directly address Defendants' argument.  *See* [Doc. 37 at 18–19].

The Court is respectfully unpersuaded by Defendants' argument, which lacks meaningful development.  First, the Court notes that Plaintiffs only requested injunctive relief with respect to Count I, *see* [Doc. 1 at 30], and that request has been dismissed, limiting the relief sought to monetary damages.  Furthermore, if the Lees and M.L. are correct on their legal theory that the District's policies and conduct violated M.L.'s Fourteenth Amendment rights, their injury will be redressable by money damages regardless of any state law or District guidelines.  *Cf. Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 2:23-cv-01595-ALM-KAJ, 2023 WL 4848509, at *8 (S.D. Ohio July 28, 2023) ("Federal statutes must give way to the federal Constitution; an unconstitutional action cannot stand simply because it is authorized by a

federal law.  Thus, if the Policies violate the First or Fourteenth Amendments, then they must be enjoined even if the School District is compelled by Title IX to combat harassment on the basis of gender identity." (citation omitted)), *appeal docketed*, No. 23-3630 (6th Cir. July 31, 2023).  The Court is respectfully unpersuaded by Defendants' argument and finds that the Lees' and M.L.'s alleged injuries could be redressed by a favorable court decision.

### B.    The Sufficiency of Plaintiffs' Allegations

The Fourteenth Amendment states that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  It does not create substantive rights, but instead "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly."  *Vacco v. Quill*, 521 U.S. 793, 799 (1997).

"Different types of equal protection claims call for different forms of review.  A claim that a state actor discriminated on the basis of a suspect (e.g., race), quasi-suspect (e.g., gender), or a non-suspect classification calls for strict, intermediate, or rational basis scrutiny, respectively."  *Brown v. Montoya*, 662 F.3d 1152, 1172 (10th Cir. 2011).  In each instance, the plaintiff must make "a threshold showing that they were treated differently from others who were similarly situated to them."  *Id.* at 1173 (quotation omitted). Individuals are "similarly situated" only if they are alike "in all relevant respects."  *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (quotation omitted).  "[A]lthough this is not a precise formula, it is nonetheless clear that similarly situated individuals must be

very similar indeed." *Ebonie S. ex rel. Mary S. v. Pueblo Sch. Dist. 60*, 819 F. Supp. 2d 1179, 1189 (D. Colo. 2011) (quoting *United States v. Moore*, 543 F.3d 891, 896–97 (7th Cir. 2008)).

Defendants argue first that M.L.'s equal protection claim must be dismissed because Plaintiffs fail to allege that he was similarly situated to any students who allegedly received more favorable treatment. [Doc. 29 at 11]. In the alternative, they contend that rational basis review applies here and Defendants' conduct satisfies this standard. [*Id.* at 11–13].

### 1.    Similarly Situated

Defendants contend that M.L., whose parents sought a gender support plan to ensure the use of his birth name and male pronouns, is not identical in all relevant respects to District students who requested and received gender support plans, as those students are presumably transgender or gender non-confirming; instead, according to Defendants, M.L. is "identical in all relevant respects to other cisgender students who may request and would be denied gender support plans." [*Id.* at 11]. Plaintiffs respond that "[c]ontrary to the Defendants' suggestion, the similarly situated pertinent groups are not 'transgender' and 'cisgendered' [sic] but rather any child that experiences gender who seeks 'access to a school environment that is affirming and is free from discrimination and harassment on the basis of gender identity and gender expression.'" [Doc. 37 at 11]. But then, Plaintiffs immediately go on to assert that the denial of a gender support plan was "based on [M.L.'s] sex," that "the Guidelines, on their face, deny gender support plans to cisgender children while granting them to transgender children," and that the denial of

a gender support plan to M.L. "was based on the fact that M.L.'s sex aligned with his preferred pronouns." [*Id.* at 11–12 (emphasis omitted)].

To the extent Plaintiffs suggest that M.L.'s and any unidentified comparator students' cisgender or transgender status is not relevant to the Court's analysis or to M.L.'s claim, this assertion is contradicted by Plaintiffs' own allegations in their Complaint. The Complaint does not clearly define the group of students to whom Plaintiffs believe M.L. is similarly situated; instead, Plaintiffs cursorily assert that M.L. was denied protections "that are available to other, similarly situated children." [Doc. 1 at ¶ 89]; *see also* [*id.* at ¶ 230]. The Complaint alleges that M.L. was denied a gender support plan, but that gender support plans are generally available to transgender students. [*Id.* at ¶¶ 86, 229]. And Plaintiffs consistently allege that the reason for the denial of a gender support plan for M.L. was the "conjunction of the biological sex and gender identity of the student," [*id.* at ¶¶ 180, 182], and suggest that transgender status is a relevant consideration in the grant or denial of a gender support plan, *see* [*id.* at ¶ 229 ("Children who are considered transgender and who desire a gender support plan may have one. Children who are not considered transgender but who nevertheless desire a gender support plan may not have one.")]; *see also* [Doc. 37 at 11–12]. Indeed, Plaintiffs allege that the District denied the Lees' request "on the basis that the parents could not use a plan to re-affirm M.L.'s given name and biological gender," as District policy provides that the District "cannot accommodate parent requests that the school staff use pronouns that align with a student's biology." [Doc. 1 at ¶¶ 227–28]. Thus, notwithstanding Plaintiffs' suggestion in their Response that the relevant question is whether M.L. was similarly situated to "any child that experiences gender" who seeks a safe and affirming

educational environment, the Court agrees with *both* sides that the relevant question in this case is whether M.L., a cisgender child who requested and was denied a gender support plan, is similarly situated to the students for whom a gender support plan is allegedly available, i.e., transgender or non-binary students.

Notably, Plaintiffs cite no legal authority demonstrating, and raise no argument asserting, that M.L. is similar in *all relevant* respects to those students for whom a gender support plan is available.  *See* [Doc. 37 at 10–11].  Nor does the Complaint specifically identify the students to whom M.L. is similarly situated.  *See generally* [Doc. 1].  "The absence of firm comparators renders Plaintiff[s'] claim nebulous at best," and ambiguous allegations are insufficient to support a plausible claim.  *Oliver v. Va. Bd. of Bar Examiners*, 312 F. Supp. 3d 515, 534 (E.D. Va. 2018).  "An equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff."  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986)).  While the Complaint loosely compares M.L. to a student who could receive a gender support plan, *see, e.g.*, [Doc. 1 at ¶¶ 86, 229], the allegations are unclear as to whether M.L. is alike in *all* relevant respects to those students.  As alleged in the Complaint, the Lees requested a gender support plan for M.L. so District personnel would "refer to M.L. by his biological gender and birth name," and the District rejected the request on the basis that gender support plans are only available for transgender students.  [*Id.* at ¶¶ 85–86]; *see also* [*id.* at ¶ 176 (alleging that a gender support plan is "intended to support a transgender or non-binary student in gaining access to a school environment that is affirming and is free from discrimination and harassment" (emphasis omitted))].  But the Court finds it highly

relevant that the alleged purpose behind the Lees' request for a gender support plan for M.L.—to "affirm M.L.'s given name and biological gender," *see* [*id.* at ¶ 227]—is likely different from the reason a transgender or non-binary student would request a gender support plan. *Cf. Thompson v. Lengerich*, No. 22-1128, 2023 WL 2028961, at *2 (10th Cir. Feb. 16, 2023) (where plaintiff asserted an equal protection claim based on the denial of access to a private shower, while transgender inmates received access to a private shower, concluding that inmate was not similar to transgender inmates in all *relevant* respects because "[w]hether an inmate is transgender . . . is relevant to the inmate's need for a private shower because transgender . . . inmates may face an additional risk of assault"). However, the Court is mindful that, in other contexts, the Tenth Circuit has cautioned that whether individuals are similarly situated is typically a fact question reserved for the jury. *See, e.g.*, *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007). Accordingly, the Court will assume, without deciding, that Plaintiffs have adequately alleged that M.L. was similarly situated to other students who could receive a gender support plan and will turn to whether Plaintiffs' allegations plausibly allege a denial of equal protection.

### 2. Rational Basis Scrutiny is Appropriate

Before deciding whether Defendants' alleged policy passes constitutional scrutiny, the Court must determine what level of scrutiny applies. "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying strict scrutiny." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008). If the government action classifies individuals based on a "quasi-suspect

characteristic," such as gender, courts apply intermediate scrutiny. *Id.* Government conduct satisfies intermediate scrutiny if it serves "'important governmental objectives' and is 'substantially related to achievement of those objectives.'" *Id.* at 1110 (quoting *Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 959 (10th Cir. 2003)). And finally, if the government action does not implicate a fundamental right, a suspect class, or a quasi-suspect class, rational basis scrutiny applies. *Id.* In this circumstance, the government classification requires only "a rational relation to some legitimate end." *Id.* (quotation omitted).

The Parties disagree about what level of scrutiny applies here. Plaintiffs contend that intermediate scrutiny applies because "Defendants' denial of M.L.'s [gender support plan] was based on his sex." [Doc. 37 at 11]. Defendants disagree, arguing that intermediate scrutiny does not apply because the provision of gender support plans does not create a gender classification between male and female students, but instead creates a classification between transgender or gender-non-confirming students and cisgender students. [Doc. 29 at 10–11]. Thus, Defendants contend, Defendants' policy should be reviewed for a rational basis. [*Id.* at 11–13].

The Court respectfully agrees with Defendants and disagrees with Plaintiffs. Plaintiffs attempt to frame this case as challenging a straightforward sex-based classification, asserting that the denial of the gender support plan "was based on sex discrimination." [Doc. 1 at ¶ 226]. However, this conclusory assertion is not plausible because it fails to account for the numerous allegations in the Complaint alleging that M.L. was denied a gender support plan due to the "conjunction of [M.L.'s] biological sex and gender identity" (i.e., M.L.'s cisgender status). *See, e.g.*, [*id.* at ¶¶ 86, 180–82,

227–29]; *see also* [*id.* at ¶ 226 ("[H]ad M.L. been a biological female, . . . [the District] would have granted M.L.'s gender support plan *for the use of male gender pronouns*." (emphasis added))].   The Complaint contains *no* allegations that a similarly situated female student who, *like M.L.*, requested a gender support plan to ensure the use of *female* pronouns was, or would have been, granted a gender support plan under the District's policies.   *See generally* [*id.*].   Indeed, Plaintiffs expressly allege that a gender support plan is "not available to a biological male student who identifies as male nor a biological female student who identifies as . . . female," [*id.* at ¶ 177 (emphasis added)], i.e., that a gender support plan is *equally* unavailable to both male and female students who seek to "affirm" their biological sex.   In other words, the Complaint plausibly alleges that M.L. was denied a gender support plan due to his cisgender or non-transgender status, but does not plausibly allege that he was denied a gender support plan solely due to his sex.   Plaintiffs' cursory legal conclusion that the denial of a gender support plan to M.L. "was based on sex discrimination" is thus not a well-pleaded factual allegation that the Court must take as true.   *See Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1303 (10th Cir. 2021) ("Courts do not assume as true allegations that are legal conclusions, formulaic recitations of elements, or naked assertions devoid of further factual enhancement."); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (explaining that well-pled allegations are those that are "plausible, non-conclusory, and non-speculative").

The Supreme Court has only identified two classifications subject to intermediate scrutiny:  "sex and illegitimacy."  *Fowler v. Stitt*, No. 4:22-cv-00115-JWB-SH, --- F. Supp. 3d. ---, 2023 WL 4010694, at *19 (N.D. Okla. June 8, 2023) (citing *Reed v. Reed*, 404

U.S. 71 (1971), and *Trimble v. Gordon*, 430 U.S. 762, 767 (1977)), *appeal docketed*, No. 23-5080 (10th Cir. July 7, 2023).  "[T]he Supreme Court has been reluctant to expand the scope of quasi-suspect classifications.  In fact, since adding illegitimacy in 1977, the Supreme Court has declined every opportunity to recognize a new quasi-suspect class." *Id.* at *20 (collecting cases).  There is "little guidance for determining whether intermediate scrutiny should apply to classifications based on characteristics beyond sex or illegitimacy." *Id.* at *19.

This Court could locate no case in which a cisgender plaintiff alleged that their equal protection rights were violated because they were treated less favorably than a transgender or non-binary individual.  A number of courts have decided cases involving the reverse, i.e., a transgender plaintiff alleging they were treated less favorably than similarly situated cisgender individuals.  Many of these courts "have analyzed the relevant factors for determining suspect class status and held that transgender people are at least a quasi-suspect class." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610 (4th Cir. 2020) (collecting cases); *see also id.* at 611 (extrapolating from Supreme Court precedent four factors to consider when recognizing a new quasi-suspect class:  whether the class has historically been subject to discrimination; whether the class has a defining characteristic that bears a relation to its ability to perform or contribute to society; whether the class may be defined as a discrete group by an "obvious, immutable, or distinguishing characteristic[]"; and whether the class is a minority class lacking political power).

Nearly two decades ago, the Tenth Circuit decided *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995).  In *Brown*, a transgender inmate alleged that her equal protection rights were violated when prison officials denied her access to estrogen treatment.  63 F.3d at

969.  The Tenth Circuit declined to hold that the plaintiff was a member of a quasi-suspect class, relying on the now-overruled Ninth Circuit decision in *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659 (9th Cir. 1977), *overruling recognized in Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000)).   *See Brown*, 63 F.3d at 971 (stating that "[r]ecent research . . . suggests reevaluating *Holloway*" but "declin[ing] to make such an evaluation in this case" and instead following *Holloway*).  To date, the Tenth Circuit has not decided whether transgender individuals are members of a quasi-suspect class.  *See Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015).  District courts within the Tenth Circuit remain obligated to follow *Brown* and apply rational basis scrutiny when a transgender person brings an equal protection claim alleging discrimination based on their transgender status.  *See, e.g.*, *Griffith v. El Paso Cnty.*, No. 21-cv-00387-CMA-NRN, 2023 WL 2242503, at *10 (D. Colo. Feb. 27, 2023), *report and recommendation adopted*, 2023 WL 3099625 (D. Colo. Mar. 27, 2023), *appeal docketed*, No. 23-1135 (10th Cir. Apr. 26, 2023); *Poe v. Drummond*, No. 4:23-cv-00177-JFH-SH, 2023 WL 6516449, at *7 (N.D. Okla. Oct. 5, 2023), *appeal docketed*, No. 23-5110 (10th Cir. Oct. 10, 2023); *Fowler*, 2023 WL 4010694, at *21.

While *Brown* and its progeny are not directly on point because M.L. does not claim discrimination based on transgender status, but *cis*gender status, the Court finds that these cases lend support to the conclusion that rational basis scrutiny is appropriate here. If the Court is bound by *Brown*'s holding that transgender individuals are not members of a quasi-suspect class, the Court simply cannot conclude that cisgender individuals are members of a quasi-suspect class by virtue of their cisgender status, particularly where "the Supreme Court has been reluctant to expand the scope of quasi-suspect

classifications." *Fowler*, 2023 WL 4010694, at *20; *see also Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018) ("[O]ther than certain races, one would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people."). And Plaintiffs make no argument explaining why the Court should recognize a new quasi-suspect class. *See* [Doc. 37]. For these reasons, the Court agrees with Defendants that rational basis scrutiny applies here.

### 3.      Defendants' Alleged Policy Passes Constitutional Scrutiny

Finally, the Court must determine whether Defendants' alleged policy of providing gender support plans only to transgender or non-binary students is rationally related to a legitimate government interest. Courts "accord a strong presumption of validity to [government actions] that neither involve fundamental rights nor proceed along suspect lines." *City of Herriman v. Bell*, 590 F.3d 1176, 1194 (10th Cir. 2010). A court will strike down the government's action only "if the state's classification 'rests on grounds *wholly irrelevant* to the achievement of the State's objective.'" *Id.* (emphasis in original) (quoting *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 71 (1978))). "Because a classification subject to rational basis review 'is presumed constitutional, the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Petrella v. Brownback*, 787 F.3d 1242, 1266 (10th Cir. 2015) (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012)).

"In the context of a motion to dismiss under 12(b)(6), this court accepts all of the allegations in the complaint as true and then considers these 'facts' according to the

deferential rational basis standard." *Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007). "To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Id.* (quotation omitted). The determination whether there is a conceivable basis for the government's classification "is a legal question which need not be based on any evidence or empirical data." *Id.* at 1084. But the Court is not limited to the Parties' arguments in determining what government interests the classification seeks to further. *Id.* "In fact, this Court is *obligated* to seek out other conceivable reasons for validating a state policy." *Id.* (quotation and alteration marks omitted) (emphasis in original).

Defendants contend that the District has a legitimate interest in "providing a safe and supportive environment for all its students, including those who are transgender or gender nonconforming." [Doc. 29 at 7]. They also contend that the District has an interest in "adhering to prohibitions against discrimination for sexual orientation, gender expression, or gender identity in state law and District policy while providing educational services to students." [*Id.* at 12]. The Court agrees that these are legitimate government interests. *See Vesely v. Ill. Sch. Dist. 45*, No. 1:22-cv-02035, 2023 WL 2988833, at *5 (N.D. Ill. Apr. 18, 2023); *see also Prince v. Massachusetts*, 321 U.S. 158, 168 (1944) ("A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens.").

The Court also finds that the District's policy of providing gender support plans to transgender or gender non-conforming students is rationally related to this objective. Here, the stated reason for the District's classification appears on the face of the Complaint. Plaintiffs allege that a gender support plan

is intended to support a transgender or non-binary student in gaining access to a school environment that is affirming and is free from discrimination and harassment on the basis of gender identity and gender expression. Cisgender and gender normative students inherently have access to a gender-affirming school environment based on this held identity, and an Individual Gender Support Form's purpose is to work to ensure this access for students who have historically faced discrimination and harassment on the basis of gender identity and gender expression.

[Doc. 1 at ¶ 176 (emphasis omitted)].  In other words, the District's reason for providing gender support plans to transgender students is to provide those students access to a supportive environment to which the District says that cisgender students already "inherently" have access.  And if the District believes that cisgender students already have access to a gender-affirming environment, such that there is no need to provide gender support plans to these students, the District's classification is rationally related to that legitimate interest.  *See City of Herriman*, 590 F.3d at 1194 (explaining that government conduct will be deemed unconstitutional only where it rests on grounds "wholly irrelevant" to the achievement of the state's objective).  To the extent Plaintiffs could argue that gender-normative students do not have access to an affirming or supportive environment at District schools because, as Plaintiffs allege, these students experience gender-based pressure from District personnel, *see, e.g.*, [Doc. 1 at ¶¶ 54, 102], "[t]he fact that a [policy] is imperfect does not make it irrational," *Fowler*, 2023 WL 4010694, at *23, and the government "must be allowed leeway to approach a perceived problem incrementally," *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 316 (1993).

Plaintiffs have not alleged any facts to overcome the presumption of rationality applied to the District's classifications.  *See generally* [Doc. 1 at ¶¶ 78–89, 166–82, 223–31].  In their Response, they contend that Defendants' alleged actions fail to pass rational basis review because Defendants withheld a benefit from M.L. "because of his

'sexual orientation, gender identity, [or] gender expression'" and because "[i]t is impossible for there to be a reasonable fit between an interest of 'adhering to prohibitions against discrimination' and a policy that is itself discriminatory." [Doc. 37 at 12 (first alteration in original) (citing Colo. Rev. Stat. § 24-34-601(2)(a)]. Plaintiffs' argument ignores the fact that the Equal Protection Clause "does not forbid classifications" outright, *Nordlinger*, 505 U.S. at 10, and permits the government to "treat unlike cases accordingly," *Vacco*, 521 U.S. at 799. And again, Plaintiffs have not asserted a state-law discrimination claim, and they have cited no case law demonstrating that the Court could or should analyze the propriety of Defendants' conduct under Colorado state law to determine whether it passes constitutional scrutiny. *See* [Doc. 37 at 12]; *see also Beach Commc'ns*, 508 U.S. at 313 ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."). Plaintiffs fail to address Defendants' legitimate interest in providing a means to ensure that gender non-conforming students experience a non-discriminatory and gender-affirming environment, and thus, they fail to "negative every conceivable basis which might support" the government's actions. *Petrella*, 787 F.3d at 1266.

Because Defendants' classifications are rationally related to a legitimate state interest, the Court concludes that M.L. and the Lees as M.L.'s next friends have failed to state a claim under the Equal Protection Clause. The Motion to Dismiss is thus **GRANTED** with respect to Count II, and Count II is **DISMISSED without prejudice** under Rule 12(b)(6). The Court does not reach Defendants' remaining arguments.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendants' Motion to Dismiss Plaintiffs' Complaint [Doc. 29] is **GRANTED**;

(2)    Count I is **DISMISSED without prejudice** for lack of subject matter jurisdiction under Rule 12(b)(1) to the extent it is asserted by H.J., C.L., or M.L.;

(3)    Count I is **DISMISSED without prejudice** for failure to state a claim under Rule 12(b)(6) to the extent it is asserted by Jonathan Lee, Erin Lee, Nicolas Jurich, and Linnaea Jurich;

(4)    Count II is **DISMISSED without prejudice** for failure to state a claim under Rule 12(b)(6);

(5)    On or before **January 9, 2024**, Plaintiffs may file a motion to amend that complies with the Local Rules and the Federal Rules of Civil Procedure; and

(6)    If no such motion to amend is filed by the Court's deadline, the Court will direct the Clerk of Court to close this case.

DATED:  December 19, 2023                   BY THE COURT:

Nina Y. Wang
United States District Judge