**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 23-cv-01117-NYW-STV

JONATHAN LEE,
ERIN LEE,
C.L., a minor, by and through parents Jonthan and Erin Lee as next friends,
M.L., a minor, by and through parents Jonathan and Erin Lee as next friends,
NICOLAS JURICH,
LINNAEA JURICH, and
H.J., a minor, by and through parents Nicolas and Linnaea Jurich as next friends,

       Plaintiffs,

v.

POUDRE SCHOOL DISTRICT R-1, and
POUDRE SCHOOL DISTRICT R-1 BOARD OF EDUCATION,

       Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

      This matter is before the Court on Plaintiffs' Amended Motion for Leave to Amend Complaint (Oral Argument Requested) (the "Motion to Amend") [Doc. 64, filed January 18, 2024].[1]  The Court has reviewed the Motion, the Parties' briefing [Doc. 67; Doc. 68], and the applicable case law, and concludes that oral argument would not materially assist in the resolution of the Motion.  For the reasons set forth in this Order, the Motion to Amend is respectfully **DENIED**.

---

[1] This Court uses the convention of [Doc.___] and the page number assigned by the Court Management/Electronic Court Files ("CM/ECF") system for this District to refer to materials filed in this action.

## BACKGROUND

The Court has discussed the background of this action previously, *see* [Doc. 58], and will limit its discussion here accordingly.

***Original Complaint.*** On May 3, 2023, Plaintiffs Jonathan Lee ("Mr. Lee"); Erin Lee ("Ms. Lee"); C.L., a minor, by and through parents Jonthan and Erin Lee as next friends; M.L., a minor, by and through parents Jonathan and Erin Lee as next friends; Nicolas Jurich ("Mr. Jurich"); Linnaea Jurich ("Ms. Jurich," and collectively with Mr. Lee, Ms. Lee, and Mr. Jurich, the "Plaintiff Parents"); and H.J., a minor, by and through parents Nicolas and Linnaea Jurich as next friends, initiated this action by filing a Complaint for Damages and Injunctive Relief (the "Original Complaint") against Defendant Poudre School District R-1 (the "District") and the Poudre School District Board of Education (the "Board").   [Doc. 1].   The District is a K-12 public school district in Larimer County, Colorado, and its schools include Rice Elementary School ("RES") and Wellington Middle School ("WMS"), which is now consolidated into Wellington Middle-High School.   [*Id.* at ¶¶ 12, 15–16, 22].

In their Original Complaint, Plaintiffs alleged that the District ran an after-school organization called the Genders and Sexualities Alliance ("GSA") at a number its schools, which was not disclosed as part of the District curriculum.   [*Id.* at ¶¶ 28–30].   Plaintiffs alleged that GSA meetings "regularly address sex, sexualities, mental health, suicide, sexual orientation, gender identities, and other topics in discussions, lectures, and distributed materials."   [*Id.* at ¶ 123].   Plaintiffs alleged that a GSA meeting was held at WMS on May 4, 2021, and following the meeting, C.L., then a twelve-year-old sixth grader at WMS, announced to her mother, Ms. Lee, that "she would be transitioning," although

she had never expressed such sentiments to her parents before. [*Id.* at ¶¶ 66–67]. Plaintiffs alleged that "C.L.'s experience at the GSA club led to a months-long emotional decline of gender and sexuality confusion that required counseling and included suicidal thoughts." [*Id.* at ¶ 75].

Additionally, M.L., the seven-year-old son of Mr. and Ms. Lee (the "Lees"), was a first grader at RES in May 2021. [*Id.* at ¶¶ 16, 78]. The Lees alleged that they learned that the District offers gender support plans that "prohibit harassment based on gender identities or gender expressions" and that "oblige [District] personnel to use the elected pronouns and names identified" in a plan when speaking with or about the child who is the subject of the plan. [*Id.* at ¶¶ 79, 81]. The Lees completed gender support forms for M.L. on three separate occasions, requesting that District personnel refer to M.L. by his biological sex and birth name, but the District denied their request because, they alleged, "gender support plans exist only to benefit and protect the gender identities of transgender children, whereas the Lees sought a gender support plan binding the [District] to benefit and protect the gender identity of their son, including his name and masculine pronouns." [*Id.* at ¶¶ 85, 86, 178].

Plaintiffs further alleged that H.J., then a twelve-year-old sixth grader at WMS, attended GSA meetings on May 11 and May 18, 2021. [*Id.* at ¶¶ 90, 97]. After attending the GSA meetings, H.J. "began to have her first suicidal thoughts." [*Id.* at ¶ 113]. Throughout the summer of 2021, H.J. began leaving notes for her parents, Mr. Jurich and Ms. Jurich (the "Juriches"), about "transgenderism" and being aromantic or asexual. [*Id.* at ¶ 114]. In the fall of 2021, H.J. began to question her gender identity. [*Id.* at ¶ 115]. H.J. then "underwent a significant emotional decline," and in December 2021, requested

to be homeschooled.  [*Id.* at ¶ 117].  Shortly thereafter, H.J. attempted suicide.  [*Id.* at ¶ 118].  H.J., C.L., and M.L. no longer attend District schools.  [*Id.* at ¶¶ 15–16, 20].[2]

Plaintiffs alleged that the District and the Board engaged in a pattern and practice of keeping the GSA activities secret from District parents in that they failed to disclose GSA activities to parents and encouraged students to not discuss GSA activities with their parents.  [*Id.* at ¶¶ 31–33]; *see also, e.g.*, [*id.* at ¶¶ 58, 104].  Plaintiffs alleged that, in the District, school-sponsored clubs are "considered part of the school program and/or relate[] to a school's curriculum," [*id.* at ¶ 184], and that the District has a policy that requires written notice to parents or guardians of any curriculum that is "part of the District's comprehensive health education program," which includes notice that the parents or guardians may excuse their children from some or all of the comprehensive health education program, [*id.* at ¶ 134].  The Lees and the Juriches contended that they were not given notice of the GSA's activities, agenda, or materials; otherwise, "they would have elected to opt their child out based on [their] deeply held religious beliefs."  [*Id.* at ¶¶ 76, 109, 124–26].

Plaintiffs asserted two claims against Defendants pursuant to 42 U.S.C. § 1983: (1) a Fourteenth Amendment substantive due process claim alleging a "[d]enial of [the] right of the Plaintiff Parents to direct the education and upbringing of the Plaintiff Children," asserted by all Plaintiffs against all Defendants, [*id.* at ¶¶ 205–22]; and (2) a Fourteenth Amendment equal protection claim based on the District's denial of a gender support plan

---

[2] C.L. was not a student at WMS as of May 14, 2021.  [Doc. 64-2 at ¶¶ 94–95].  H.J. was homeschooled in or about December 2021 for the remainder of the 2021–2022 school year, and left permanently "[s]hortly after the start of the 2022-2023 school year."  [*Id.* at ¶¶ 130–132].

for M.L., asserted against both Defendants by Mr. Lee, Ms. Lee, and M.L., [*id.* at ¶¶ 223–31]. They requested the following relief: (1) a permanent injunction requiring (a) that the District provide notice and opt-out rights if gender dysphoria, gender transitioning, or related topics are taught in the District, (b) that these topics only be taught by qualified and trained professionals, and (c) that all materials used in any such instruction be given to parents fourteen days in advance of any instruction; (2) compensatory damages, including the costs of private-school tuition, medical expenses, counseling fees, compensation for damage to Plaintiffs' reputation, transportation, and emotional anguish; and (3) punitive damages. [*Id.* at 30–31].

On July 7, 2023, Defendants moved for dismissal of the Original Complaint. [Doc. 29]. After full briefing on the merits, this Court granted Defendants' Motion to Dismiss. [Doc. 58]. The Court concluded that the minors, H.J., C.L., and M.L., lacked standing to bring a Fourteenth Amendment substantive due process claim rooted in the right of parents to make decisions concerning the care, custody, and control of their children. [*Id.* at 12–13]. The Court further found that the Plaintiff Parents lacked standing to seek any prospective injunctive relief, because none of their children continued to attend District schools. [*Id.* at 17]. Finally, the Court concluded that the Plaintiff Parents had not adequately stated a violation of the Fourteenth Amendment. [*Id.* at 28]. In addition, the Court concluded that M.L., and the Lees as his next friends, had failed to state a claim under the Equal Protection Clause. [*Id.* at 45]. The Court granted Plaintiffs leave to file a motion to amend. [*Id.* at 46].

***Motion to Amend.*** The Plaintiff Parents filed the instant Motion to Amend on January 18, 2024. [Doc. 64]. In the proposed First Amended Complaint, the Plaintiff

Parents assert a sole Fourteenth Amendment substantive due process claim against the District, again invoking § 1983.  [*Id.* at 2; Doc. 64-1; Doc. 64-2].  Although many of the factual allegations remain the same, *see* [Doc. 64-1], the Plaintiff Parents describe "[t]he most important change . . . is [the proposed First Amended Complaint's] focus on the broad policy of the District to unconstitutionally interfere with the parent/child relationship." [Doc. 64 at 2].  The Plaintiff Parents identify this broad policy as "the District Secrecy Policy."[3]  [*Id.*; Doc. 64-2 at ¶ 32].  In addition, the Plaintiff Parents have abandoned their requests for injunctive relief and punitive damages.  [Doc. 64-2 at 39].  Instead, the Plaintiff Parents seek compensatory damages (including private school tuition, medical expenses, counseling fees, compensation for damage to the Plaintiffs' reputation, transportation, and emotional anguish); reasonable attorneys' fees and costs; and "[a]ny and all other relief that the Court deems appropriate."  [*Id.* at 40].

In the proposed First Amended Complaint, the Plaintiff Parents allege that the District has engaged in a custom and practice of secrecy which manifests itself through verbal statements by the District's agents as well as its written policies.  [*Id.* at ¶¶ 32–33]. They allege that the District engaged in a pattern and practice of keeping GSA activities secret from parents by not disclosing the GSA as part of the District's curriculum and that "agents of the Defendant District who led the GSA meetings actively encouraged the children to treat the discussions as secret."  [*Id.* at ¶¶ 34, 37, 39].  Though the proposed First Amended Complaint is not entirely clear as to the definition of the "District Secrecy Policy," the Plaintiff Parents point to several elements, including:  (1) "Policy IHAM," which

---

[3] Consistent with its obligations at this juncture of the case, this Court construes the proposed First Amended Complaint in the light most favorable to the Plaintiff Parents and uses their terminology without passing on the substantive merits.

they describe as "illusory" because it "deliberately mollifies parental anxiety and caution" by providing that written notice will be provided before the commencement of any unit or lesson that is part of the District's comprehensive health education program at a child's school to allow parents to excuse their student, [*id.* at ¶ 152]; (2) "Policy KD Public Information and Communications" that "obliges [the District] and the schools therein to '[k]eep the public informed about the **policies**, administrative operations, objectives, and **educational programs** of the schools," [*id.* at ¶ 159]; (3) the Guidelines for Supporting Transgender and Non-Binary Students ("Guidelines"), [*id.* at ¶ 162];[4] (4) the Gender Support FAQ,[5] which "announces that school staff will not inform a parent or guardian of conversations that school staff privately have with their child regarding sex, sexual orientation, or gender identity," [*id.* at ¶ 174]; (5) a toolkit for Supporting Transgender and Gender Expansive Nonconforming Students which states that "'[p]rior to notification of any parent/guardian or guardian [sic] regarding the transition process, school staff should work closely with the student to assess the degree, **if any**, the parent/guardian will be involved in the process' of the child's gender transition," [*id.* at ¶ 181]; (6) the gender support forms, which may be completed wholly by a child without parental notice or

---

[4] The Guidelines are attached to Plaintiff Parents' proposed First Amended Complaint. [Doc. 64-2 at 43–56]. The Court previous noted that these Guidelines were dated January 13, 2023. [Doc. 58 at 2 n.1]. But in its Response to the Motion to Amend, the District does not dispute their authenticity, seemingly adopts the Guidelines as in effect in 2021, and argues that the Court may consider them in the context of a motion to dismiss. *See* [Doc. 67 at 5].

[5] The Plaintiff Parents cite to https://www.psdschools.org/programs-services/PSD-Gender-Support-FAQs, accessed on May 2, 2023. [Doc. 64-2 at ¶ 174 & n.2]. This Court accessed the website on May 16, 2024. It is not clear that these FAQs were in place, or what they said, in 2021 when the incidents giving rise to this action occurred.

consent, [*id.* at ¶ 186]; and (7) the District's de facto policies, including WMS's GSA, [*id.* at ¶ 191].

With respect to these de facto policies, the Plaintiff Parents aver that Jenna Riep, a WMS teacher, personally invited C.L. to attend the GSA club meeting, describing it as an after-school club called the "GSA Art Club."  [*Id.* at ¶ 49].  They allege that the principal of WMS, Kelby Benedict ("Mr. Benedict"), confirmed to Mr. Lee that "in order to create a 'safe space,' the GSA clubs created an expectation of confidentiality, and students were strongly encouraged to keep the discussions at GSA meetings private."  [*Id.* at ¶ 96].  Further, the Plaintiff Parents allege that the District[6] never provided the Lees notice of the GSA's activities, agenda, or materials; that an employee of the District would solicit C.L.'s attendance without notice and consent from her parents; and that the District had a policy of keeping these topics secret from parents and encouraging children to do the same. [*Id.* at ¶ 98].

Finally, the Plaintiff Parents allege that District personnel are "regularly encouraged" to attend professional training sessions during which they are trained to "not reveal a student's in-school transgender or gender non-conforming identity to that student's parents."  [*Id.* at ¶ 207].  They also allege that there is a "common practice" amongst District personnel to discuss the best means of circumventing parental notice when students seek to use alternative names and pronouns in school.  [*Id.* at ¶ 210].  To that end, they aver that District officials consistently directed personnel to avoid revealing the divergent name and pronoun use to parents.  [*Id.* at ¶ 214].  The Plaintiff Parents point

---

[6] The Plaintiff Parents use the terminology "No Defendant" to frame this allegation.  [Doc. 64-2 at ¶ 98].  However, as noted above, the District is the only remaining defendant in the proposed First Amended Complaint.  *See* [*id.* at 1].

to examples of unnamed District officials providing guidance to District personnel, including deferring to the student's use of their preferred name and pronouns in school, while using their given name and pronouns in communications with parents.  [*Id.* at ¶ 217].

## LEGAL STANDARDS

### I.    Motion to Amend

Rule 15(a) provides that leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  Because the Plaintiff Parents filed the Motion to Amend before any deadline for amending pleadings, this Court considers only whether they have satisfied the Rule 15(a) standard.  *See Fernandez v. Bridgestone/Firestone, Inc.*, 105 F. Supp. 2d 1194, 1195 (D. Colo. 2000); *cf. Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Assoc.*, 771 F.3d 1230, 1242 (10th Cir. 2014) (adopting two-prong analysis and considering whether both Rule 16(b)(4) and Rule 15(a) are satisfied when a motion to amend is submitted after deadline included in scheduling order).  Refusing leave to amend "is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."  *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir.1993).  A general presumption exists in favor of allowing a party to amend its pleadings, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), and the non-moving party bears the burden of showing that the proposed amendment is sought in bad faith, that it is futile, or that it would cause substantial prejudice, undue delay or injustice, *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Inv. Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999).

## II.    Substantive Due Process

***Fourteenth Amendment***.   The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."   U.S. Const. amend. XIV, § 1.   The Due Process Clause "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'"   *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).   "[T]he Supreme Court recognizes two types of substantive due process claims:   (1) claims that the government has infringed a 'fundamental' right, . . . and (2) claims that government action deprived a person of life, liberty, or property in a manner so arbitrary it shocks the judicial conscience."   *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (citing *Glucksberg*, 521 U.S. at 721–22, and *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Different standards apply to the respective approaches.   Under the fundamental rights approach, the Fourteenth Amendment Due Process Clause "forbids the government to infringe fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).   If the plaintiff fails to establish that the challenged action implicates a "fundamental right," then there only a "reasonable relation to a legitimate state interest" is required for constitutional purposes.   *Id.* at 722.   The standard is higher for the shocks-the-conscience approach. *See e.g.*, *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1278 (D. Wyo. 2023).   In determining whether a plaintiff has asserted a violation of substantive due process under the shocks-the-conscience approach is "whether the

challenged government action shocks the conscience of federal judges." *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006) (citing *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002)).

**Monell Liability.** Under the law of the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit"), liability for constitutional violations pursuant to § 1983 may exist against governmental entities, like school districts, without liability against a particular individual. *See Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023). But liability against the District cannot be based on a respondeat superior theory, i.e., solely because the governmental entity employs a person or people who violated a plaintiff's constitutional rights. *See Dorsey v. Pueblo Sch. Dist. 60*, 140 F. Supp. 3d 1102, 1119 (D. Colo. 2015) (citing *Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 794 (10th Cir. 2014)); *see also Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000) (applying *Monell* to school district). Instead, a school district may only be held liable if the constitutional violation arises from an official policy or custom or was carried out by an official with final policy making authority with respect to the challenged action. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978). An official policy or custom under *Monell* may take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (cleaned up).

It is also not enough for a plaintiff to simply identify a policy or custom—the plaintiff must also "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). The challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right—often described as "the moving force." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).

Finally, the plaintiff must demonstrate that the challenged policy was enacted with deliberate indifference. A plaintiff may show deliberate indifference by alleging that the municipality had actual or constructive notice that its action (or its failure to act) was substantially certain to result in a constitutional violation and that the municipality consciously and deliberately chose to disregard that risk. *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022). A municipality may be on notice through a pattern of tortious conduct or "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Id.* (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998)).

**ANALYSIS**

The sole claim in the proposed First Amended Complaint is a substantive due process claim that alleges a violation of the fundamental right of parents to direct the education and upbringing of their children based on the "District Secrecy Policy." *See generally* [Doc. 64; Doc. 64-2]. The District opposes Plaintiffs' request to amend on futility grounds. *See* [Doc. 67]. It argues that the proposed First Amended Complaint still fails to plead a Fourteenth Amendment violation because it "is still based on a narrow right to control [the Plaintiff Parents'] children's education," [*id.* at 2–11], and alternatively

contends that Plaintiffs fail to meet the pleading requirements for municipal liability under *Monell*, [Doc. 67 at 13–15].

A proposed amendment is futile if the complaint, as amended, would be subject to dismissal. *Moody's Inv. Servs.*, 175 F.3d at 859. "If a party opposes a motion to amend or to supplement on the grounds of futility, the court applies the same standard to its determination of the motion that governs a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Conkleton v. Zavaras*, No. 08-cv-02612-WYD-MEH, 2010 WL 6089079, at *3 (D. Colo. Oct. 6, 2010). Therefore, the Court must determine if the proposed pleading contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff may not rely on conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Whether to allow amendment or to dismiss pursuant to a futility analysis is within the trial court's discretion. *Burks v. Okla. Publ'g Co.*, 81 F.3d 975, 978–79 (10th Cir. 1996); *see also Frank*, 3 F.3d at 1365. Thus, the Court, taking all factual averments as true and drawing them in favor of the Plaintiff Parents, now turns to considering whether amendment is futile.

## I.     The Plaintiff Parents' Arguments

As previously acknowledged, the right of parents "to make decisions concerning the care, custody, and control of their children" has been recognized as a fundamental right. *Troxel*, 530 U.S. at 66. This protection includes a parent's right to direct a child's education. *Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998). This right can be traced back to *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). In *Meyer*, the Supreme

Court held that a law requiring that school lessons be in English was unconstitutional because it infringed on parents' due process rights to direct the education of their children. 262 U.S. at 399–401.  And in *Pierce*, the Supreme Court held that a law which required public-school attendance for children ages eight to sixteen also "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control."  268 U.S. at 534–35.  *Meyer* and *Pierce* "evince the principle that the state cannot prevent parents from choosing a specific educational program—whether it be religious instruction at a private school or instruction in a foreign language," and cannot otherwise "completely foreclos[e] the opportunity of individuals and groups to choose a different path of education."  *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 533 (1st Cir. 1995), *abrogated in part on other grounds by DePoutot v. Raffaelly*, 424 F.3d 112, 118 n.4 (1st Cir. 2005).

But the Supreme Court has stressed the "limited scope" of this authority.  *Norwood v. Harrison*, 413 U.S. 455, 461 (1973); *see also, e.g.*, *Pierce*, 268 U.S. at 534 ("No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare."); *Meyer*, 262 U.S. at 402 (recognizing the state's right to "compel attendance at some school," "make reasonable regulations for all schools," and "prescribe a curriculum for institutions which it supports").  Indeed, the Tenth Circuit (like other circuits) recognizes that this right only extends so far.  *See, e.g.*, *Swanson*, 135 F.3d at 699 (explaining that

the right is "limited in scope" and that "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject"); *see also Leebaert v. Harrington*, 332 F.3d 134, 141 (2d Cir. 2003) ("*Meyer*, *Pierce*, and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught."); *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th Cir. 2005) (holding that the parental right to direct the care, custody, and control of children "does not extend beyond the threshold of the school door").  The Sixth Circuit has described the limits of the right as follows:

> While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child.  Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or . . . a dress code, these issues of public education are generally "committed to the control of state and local authorities."

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395–96 (6th Cir. 2005) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)).  "These decisions make clear that a parent has the right to control where their child goes to school.  But that is where their control ends."  *Doe v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 3:22-cv-00337-MJN-PBS, 2023 WL 5018511, at *13 (S.D. Ohio Aug. 7, 2023), *appeal docketed*, No. 23-3740 (6th Cir. Sept. 8, 2023).

In their proposed First Amended Complaint, the Plaintiff Parents assert that their Fourteenth Amendment parental rights were violated by a "District Secrecy Policy," under which District personnel fail to provide parents full and correct information regarding curriculum and actions taken by District personnel involving gender identification issues. *See generally* [Doc. 64-2].  The Plaintiff Parents insist that they are not challenging the

District's substantive curriculum or policies regarding transgender and gender identification issues, but argue that the District Secrecy Policy violated their fundamental right to choose *whether* to maintain their children's enrollment in District schools. [Doc. 68 at 3]. Specifically, the Lees and the Juriches argue that Ms. Riep's and Mr. Benedict's conduct under the District Secrecy Policy interfered with their fundamental right to decide *whether* to send their kids to WMS. [Doc. 64 at 11]. The Plaintiff Parents allege that had they been provided notice of the topics planned for discussion at the GSA meetings, they would have elected to opt their children out of District schools and sought alternative education based on their deeply held religious beliefs. [Doc. 64-2 at ¶ 143]. They further aver that the District "knew or should have known that the failure to provide notice, coupled with affirmative steps to discuss the topics secretly, would necessarily undermine parental authority and informed parental decision-making on whether to seek alternative education for their children." [*Id.* at ¶ 147]. In other words, the Plaintiff Parents attempt to re-frame their alleged constitutional injury as a violation of their fundamental right to choose whether their child attends District schools, *see* [Doc. 64 at 3], which is consistent with how the district court framed the Fourteenth Amendment issue in *Willey v. Sweetwater County School District No. 1 Board of Trustees*, 680 F. Supp. 3d 1250 (D. Wyo. 2023), though that case is not cited in any of the Plaintiff Parents' briefing.

While the Court is not bound to the framework of the Plaintiff Parents' or another district court's constitutional analysis, *see United States v. Rhodes*, 834 F. App'x 457, 462 (10th Cir. 2020) ("[D]istrict courts in this circuit are bound by [Tenth Circuit] decisions and those of the United States Supreme Court—they are not bound by decisions of other

district courts"), it need not decide that issue.[7]  Because this Court finds that the Plaintiff

Parents have inadequately alleged *Monell* liability, it focuses its analysis accordingly.

## II.   *Monell* Liability

---

[7] The Court notes that, despite the Plaintiff Parents' attempt to re-frame their claim, the core of their claim remains the assumption that they have a right to receive notice and information about topics discussed within an after-school, voluntary extracurricular club and the manner in which school employees address students.  *See, e.g.*, *generally* [Doc. 64-2 at ¶¶ 142–43, 146–48].  Significantly, the Plaintiff Parents direct the Court to no Supreme Court or Tenth Circuit authority demonstrating that the Fourteenth Amendment confers a constitutional right to receive "full and correct information" about topics discussed in the District's curriculum, and particularly, at after-school, voluntary extracurricular clubs that they may find objectionable, so that they may exercise their right to withdraw their children from the District.  *See generally* [Doc. 64].

There is also no clear weight of authority from district courts to suggest the Fourteenth Amendment confers a substantive due process right to receive information.  *See Bethel Loc. Sch. Dist. Bd. of Educ.*, 2023 WL 5018511, at *13–14 (holding that the district's alleged refusal to answer parents' questions about bathroom policies "[did] not implicate a parent's fundamental right to control their children's upbringing," reasoning that "the Fourteenth Amendment does not confer parents with an unfettered right to access information about what their children are learning," to "interject in how a State school teaches children," or to receive an "answer [to] every demand made of them from frustrated parents (no matter how reasonable that frustration may be)."); *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 136 (D. Md. 2022) (concluding that parents did not have a fundamental right to be promptly informed of their child's gender identity when it differs from the identity of the child at birth, regardless of the child's wishes or any concerns regarding the potential detrimental impact upon the child), *vacated and remanded on other grounds*, 78 F.4th 622 (4th Cir. 2023).  Even the *Willey* court did not find one.  *See Willey*, 680 F. Supp. 3d at 1280 (in the context of a preliminary injunction, declining to find an affirmative obligation on the District under the Constitution to actively disclose information regarding a student in the absence of a parent's inquiry or request).

The Supreme Court has long warned that, "[a]s a general matter, [it] has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended."  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).  To that end, "[courts] must . . . exercise the utmost care whenever [they] are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [courts]."  *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022) (quoting *Glucksberg*, 521 U.S. at 720).

The Tenth Circuit has directed lower courts to apply requirements of *Monell* rigorously to avoid collapsing municipal liability into respondeat superior liability. *Schneider*, 717 F.3d at 772. The District may only be held liable for the constitutional violations of its employees if they were taken pursuant to a District policy or custom; thus, the Court turns to whether the Plaintiff Parents have adequately alleged facts to allow a factfinder to conclude that such a policy or custom existed. The Plaintiff Parents allege that the District Secrecy Policy "prevents parents from being informed about unilateral decisions the District takes regarding the best interests of their children, and prevents parents from being fully informed about the nature of the District's curriculum." [Doc. 64-2 at ¶ 32]. They argue that the District Secrecy Policy is comprised of both the Guidelines and informal customs resulting in a widespread practice of preventing them from receiving "[f]ull and correct information" regarding their children. [Doc. 64 at 7–9, 11]. The District argues in response that Plaintiffs fail to allege the existence of a widespread practice or custom, as required for *Monell* liability, because their allegations "relate to a sole District employee (Ms. Riep) in relation to one GSA club at a single District school over a narrow span of time." [Doc. 67 at 14]. Plaintiffs respond that their Motion to Amend "articulate[s] numerous instances in which C.L. and H.J. were impressed upon to distrust their parents," and that they "clearly articulated numerous instances in which District employees complied with or sought to comply with the District's Secrecy Policy." [Doc. 68 at 9].

### A.    The Guidelines

The Plaintiff Parents have attached the Guidelines to their proposed First Amended Complaint, [Doc. 64-2 at 43–56], and neither side disputes the Court's ability to consider them. To the extent that there is a conflict between the allegations by the

Plaintiff Parents about the Guidelines or any other source documentation, to the extent that the written document has been provided, it controls. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017). The Guidelines do not prohibit disclosure to parents or guardians of information regarding a student's gender status or any curriculum regarding gender identity and gender expression issues, including but not limited to extracurricular GSA meetings. The Guidelines provide that "[s]tudents have a general right to keep their transgender or non-binary status private from other students, parents, or third parties." [Doc. 64-2 at 45]. They further state:

> When contacting or communicating with a parent/guardian of a transgender or non-binary student, school staff should use the name and pronouns that the student's parent/guardian use, unless the student requests otherwise. If a parent/guardian asks a staff member about whether their student uses another name/pronoun at school or has other gender-related questions, the staff member should refer them to the school counselor, who can address questions and concerns that the parent/guardian may have. If a school counselor receives questions from a parent/guardian, they should use their professional judgment to determine how best to follow up with the student and then the parent/guardian.

[*Id.*]. The Guidelines provide that parents and guardians have the right under the federal Family Educational Rights and Privacy Act ("FERPA") to view all of their student's educational records, including a student's gender support form. [*Id.*]. And parent or guardian signatures are specifically required for transgender and non-binary students to request their name and/or gender be updated in Synergy, the District's internal record-keeping system, or if such signature is not available, District staff will notify the parents/guardians prior to making an update to Synergy. [*Id.* at 46]. There is no direction in the Guidelines that requires or even suggests that instructors of gender-inclusive clubs should encourage students who are attending to confide in teachers rather than their

parents, or to hide their attendance or the topics of discussion from their parents.  [*Id.* at 52].

As for Plaintiffs' allegation that the Guidelines "evidence a broader custom and unwritten policy at [the District] to exclude parents from making well-informed decisions regarding the education of their children as it pertains to transgenderism, sexual orientation, and diverging gender identity," [Doc. 64-2 at ¶ 149], the plain language of the Guidelines renders this allegation implausible.  *Brokers' Choice of Am.*, 861 F.3d at 1105; *Iqbal*, 556 U.S. at 678.  Thus, this Court finds that the Guidelines alone are inadequate to satisfy the Plaintiff Parents' obligation to plead sufficient facts of the existence of a District Secrecy Policy that precludes parents from accessing full and accurate information "regarding the best interests of their children, and . . . the nature of the District's curriculum."  *Cf. John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 136 (D. Md. 2022).

### B.  Widespread Practice

Next, the Court considers the Plaintiff Parents' allegations that the District maintains "de facto" policies that "evidence a custom and unwritten policy of secrecy towards parents on matters regarding transgenderism, sexual orientation, and gender identity."  *See, e.g.*, [Doc. 64-2 at ¶ 223].  In order to adequately plead a cognizable custom or practice, the Plaintiff Parents must plead facts that demonstrate that the District employed a policy that was "so permanent and well settled as to constitute a custom or usage with the force of law."  *Bryson*, 627 F.3d at 788.  Even taking the factual allegations as true and drawing all inferences in favor of the Plaintiff Parents, this Court concludes that the allegations are insufficient to meet that threshold.

The Plaintiff Parents' allegations generally contemplate a broad, generalized informal policy "of concealing information relating to transgenderism from parents." *See, e.g.*, [Doc. 64-2 at ¶ 148]. However, "at the pleading stage, the existence of a *Monell* policy is a 'conclusion' to be built up to, rather than a 'fact' to be baldly asserted." *Sanchez v. City of Littleton*, 491 F. Supp. 3d 904, 923 (D. Colo. 2020) (quotation omitted). "In attempting to prove the existence of such a 'continuing, persistent and widespread custom,' plaintiffs most commonly offer [allegations] suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008); *Duran v. Colbert*, No. 2:16-cv-805 CW, 2023 WL 2742738, at *5 (D. Utah Mar. 31, 2023). While the Plaintiff Parents generally allege that "the Defendant engaged in a pattern and practice of keeping the GSA activities secret from parents," [Doc. 64-2 at ¶ 38], or "actively encouraged [students] to treat the [GSA] discussions as secret," [*id.* at ¶ 39], they identify actions with respect to the GSA at WMS only during a limited timeframe, and they do not have any factual allegations about similar conduct outside of WMS or outside of that timeframe.[8]  *See, e.g.*, [*id.* at ¶¶ 61, 108]. There are also no allegations of the implementation of GSA clubs at the other nine schools in the District, *see* [*id.* at ¶ 36 ("[The District] runs ten GSA clubs at its schools.")], or examples from other schools where information about "transgenderism" was hidden from parents, *see generally* [*id.*].   Nor are there any allegations of similar conduct directed to other specific WMS students or parents; instead, the proposed First

---

[8] The Plaintiff Parents allege that in 2022, Mr. Benedict provided false information to the Lees by characterizing the relationship between C.L. and Ms. Riep as "not inappropriate." [Doc. 64-2 at ¶ 220].  To the extent that the Lees allege that this violated their constitutional rights, this Court notes that by 2022, C.L. was no longer a District student. [*Id.* at ¶ 90].

Amended Complaint contains only allegations of specific instances of WMS personnel allegedly enforcing the District Secrecy Policy with the Plaintiff Parents. *See generally* [*id.* at ¶¶ 98, 122, 219]. The Juriches' allegations regarding H.J.'s experiences during the 2022–2023 school year at WMS do not pertain to any withholding of information through the GSA, Ms. Riep, or Mr. Benedict; the Plaintiff Parents simply allege that H.J. "expressed to her parents that she did not feel safe in a building with Jenna Riep, at which point Nick and Linnaea Jurich enrolled H.J. in a non-PSD charter school." [*Id.* at ¶ 136]. In other words, the Plaintiff Parents' allegations of an informal custom of secrecy are extrapolated from their *own* experiences with WMS staff. *See Dechant v. Grayson*, No. 2:20-cv-02183-HLT, 2021 WL 63280, at *2 (D. Kan. Jan. 7, 2021) (concluding that the plaintiff failed to plausibly allege an informal custom where his "broad allegations . . . stem[med] solely from [his] own encounter" with municipality employees); *see also Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, No. 2:23-cv-00158-JDL, 2024 WL 1975596, at *7 (D. Me. May 3, 2024) (the plaintiff failed to allege a widespread policy "of withholding and concealing information respecting 'gender-affirming' treatment of minor children from their parents" where the plaintiff alleged only "one occasion" that a school employee withheld information from a parent).

Insofar as the Plaintiff Parents contend that the District Secrecy Policy extends to gender support plans, *see* [Doc. 64-2 at ¶¶ 184–190], there are no factual allegations to support the conclusion that information regarding the forms are kept secret from parents. The section of the Guidelines to which the Plaintiff Parents refer, *see* [*id.* at ¶ 189], cannot be fairly read to "contemplate the exclusion of parents in the submission of an Individual Gender Support Form," as the language expressly encourages the participation of

parents and guardians, [*id.* at 52 ("There is no one best way to manage communication with classmates, parents/guardians, and staff.   Therefore, it is helpful as the school counselor meets with the student and parents/guardians, if involved, to discuss if others are aware of the student's gender identity, if they plan to share this information, and whether they require communication or confidentiality from the involved staff member(s).")].   The Guidelines go on to explain:

> If a student initiates a conversation about needing support at school related to the student's gender identity or gender expression, the school counselor will encourage and discuss with the student how to inform and/or include the parent(s)/guardian(s) in this process.   While it is not unusual for a student's identity to be first communicated at school, [the District] recognizes the importance of involving the student's parent(s)/guardian(s) to promote congruent and affirming environments through the student's daily experiences.   If a student requests not to inform or include their parent(s)/guardian(s) at the time of creating or reviewing an Individual Gender Support Form, staff will work with the student to support them in their coming out process, and there are exceptions for student safety.

[*Id.* at 53 (emphasis added)].   Thus, read in context, the expectation is parent disclosure, with an exception for student safety.   Indeed, there are no allegations contained in the proposed First Amended Complaint that would allow a factfinder to conclude that these Plaintiff Parents, or any other District parents, were provided incomplete or incorrect information regarding their child's gender support form.

Finally, as for the Plaintiff Parents' factual allegations regarding District employees trying to prevent disclosure of the District students' in-school pronoun usage to parents, *see, e.g.*, [*id.* at ¶¶ 210–15], these allegations do not plausibly establish the existence of a widespread, informal "secrecy" policy.   Plaintiffs' allegations lack factual details about who these employees were, which District schools these employees worked at, when these employees took the alleged actions, or how often this alleged conduct occurred.

*Cf. Hernandez v. City & Cnty. of Denver*, No. 21-cv-01538-PAB-MEH, 2022 WL 3597452, at *5–6 (D. Colo. Aug. 23, 2022) (explaining that both the nature of the alleged similar incidents and the time frame in which those incidents occurred are relevant to the determination of whether the plaintiff's allegations are sufficient to allege a widespread practice) (collecting cases). Conclusory allegations that unnamed District employees tried to circumvent the Synergy system "[o]n numerous occasions" or that one unnamed "medical staff" employee tried to circumvent FERPA requirements do not suffice to establish a widespread, informal custom that is "so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson*, 627 F.3d at 788; *cf Murphy v. City of Tulsa*, 950 F.3d 641, 649 (10th Cir. 2019) ("A single unconstitutional incident is ordinarily insufficient for municipal liability" unless that incident is "caused by an existing policy that can be attributed to a municipal policymaker." (cleaned up)); *Sodaro v. City & Cnty. of Denver*, 629 F. Supp. 3d 1064, 1082 (D. Colo. 2022) ("[T]wo incidents [of similar conduct] are insufficient to plausibly allege a widespread practice of constitutional violations similar to that alleged in the case, much less a practice so permanent and well settled as to constitute a custom or usage with the force of law." (quotation omitted)). Furthermore, the allegations, as pleaded—particularly in the context of the Guidelines, discussed above—are distinguishable from the alleged constitutional violation in this case so as to not permit a plausible inference of a widespread informal practice "of concealing information relating to transgenderism from parents." *See Hernandez*, 2022 WL 3597452, at *5 (factually dissimilar allegations do not lend plausible support to informal custom theory).

Thus, this Court concludes that the Plaintiff Parents have failed to allege sufficient facts—as opposed to conclusory allegations—to establish that the Guidelines, along with other informal actions, amount to "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."[9]  *Bryson*, 627 F.3d at 788.[10]  For this reason, the Court concludes that amendment would be futile.  *Moody's Inv. Servs.*, 175 F.3d at 859.  Accordingly, the Motion to Amend is respectfully **DENIED**.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Plaintiffs' Amended Motion for Leave to Amend Complaint (Oral Argument Requested) [Doc. 64] is **DENIED**;

---

[9] There are no allegations that Ms. Riep or Mr. Benedict are final policymakers, or that the District ratified their actions, *see generally* [Doc. 64-2], nor do the Plaintiff Parents attempt to proceed on these theories, *see* [Doc. 64; Doc. 68].

[10] Having found that the Plaintiff Parents fail to allege sufficient facts to state a cognizable custom or policy to support Monell liability against the District, this Court need not decide whether they have alleged sufficient facts to plausibly allege that the District was deliberately indifferent to constitutional violations that were "the obvious consequence of its policy."  *See Finch*, 38 F.4th at 1244; *see also Crowson v. Washington Cnty.*, 983 F.3d 1166, 1188 (10th Cir. 2020) (collecting cases)).  Indeed, this element was not raised by the District in opposition to the Motion to Amend.  However, the Court simply notes that the Plaintiff Parents only cursorily allege that the District "knew or should have known that the failure to provide notice, coupled with affirmative steps to discuss the topics secretly, would necessarily undermine parental authority and informed parental decision-making on whether to seek alternative education for their children."  [Doc. 64-2 at ¶ 147].  Without more specific factual details regarding what the District knew when it implemented the Guidelines that were effective as of May 2021, or what the District knew about employees' conduct vis-à-vis parents surrounding transgender or gender identification issues prior to May 2021, the Plaintiff Parents' allegations appear insufficient to satisfy the third element of a *Monell* claim.  *See Iqbal*, 556 U.S. at 678 (in the context of a motion to dismiss, holding that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

(2)    Defendants are entitled to their costs pursuant to Federal Rule of Civil Procedure 54(d) and Local Rule 54.1; and

(3)    The Clerk of Court is **DIRECTED to CLOSE** this case.

DATED:  May 16, 2024                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge